UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

FREDY RENAN NAJERA MONTOYA,

Defendant.

S1 15 Cr. 378 (PGG)

**THE GOVERNMENT'S OPPOSITION TO
THE DEFENDANT'S PRETRIAL MOTIONS**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Emil J. Bove III
Matthew J. Laroche
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................. 1

DISCUSSION ................................................................................................................... 6

  I. The Defendant Is Not Entitled to Early Witness Disclosures ................................. 6

    A. The Defendant Is Not Entitled to Premature Disclosures Related to
    Confidential Sources, Cooperating Witnesses, or a Witness List .......................... 6

      1. Applicable Law ................................................................................................. 7

        a. The Informant's Privilege and Early Identification of Witnesses ............... 7

        b. Timing of *Giglio* Disclosures ..................................................................... 8

      2. Discussion ......................................................................................................... 8

    B. The Government Is in Compliance with Its *Brady* Obligations ....................... 11

  II. The Defendant's Motion to Compel the Disclosure of Particulars Relating to
  Recordings and Other Evidence Should Be Denied ................................................. 12

    A. Applicable Law ................................................................................................ 12

    B. Discussion ........................................................................................................ 13

  III. Early Expert Disclosures and Rule 404(b) Notice Are Unwarranted .................. 18

  IV. The Defendant's Requested Rule 15 Depositions Are Not in the Interests of Justice ....... 20

    A. Relevant Facts ................................................................................................. 21

    B. Discussion ........................................................................................................ 24

CONCLUSION ............................................................................................................... 26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

FREDY RENAN NAJERA MONTOYA,

                    Defendant.

S1 15 Cr. 378 (PGG)

The Government respectfully submits this memorandum of law in opposition to the defendant's pretrial motions (i) for early access to extensive witness-related information, including a witness list and disclosures pursuant to *Brady*, *Giglio*, and the Jencks Act (Dkt. No. 27); (ii) to compel the disclosure of particulars relating to previously produced discovery, such as recordings, electronic communications, and drug ledgers (Dkt. No. 29); and (iii) to compel early expert disclosures and notice pursuant to Rule 404(b) of the Federal Rules of Evidence (Dkt. No. 28).[1] For the reasons set forth below, the defendant's pretrial motions are either meritless, moot, or both. In addition, as explained in Part IV of the Discussion section, court documents recently obtained from Honduras further underscore that the defendant has not demonstrated that the Rule 15 depositions he sought in a prior motion are in the interests of justice. (*See* Dkt. No. 20)

## BACKGROUND

The Government will establish at trial that the defendant engaged in drug-trafficking activities and related weapons offenses with a variety of significant traffickers in Honduras,

---

[1] Although current defense counsel filed a motion to withdraw from the case on the night of September 18, 2018, the Government respectfully submits this opposition to the pretrial motions that counsel filed prior to seeking to withdraw and that remain pending with the Court.

Guatemala, and Mexico over a long period, including while he acted as a Honduran congressman representing the Olancho Department.

Beginning in at least approximately 2008, the defendant worked with a now-convicted Honduran national named Sergio Neftali Mejia-Duarte to coordinate the receipt of cocaine-laden aircraft at clandestine airstrips that the defendant constructed and controlled near San Esteban, Olancho.[2] The defendant's airstrips were protected by heavily armed security teams. He also worked with similarly armed personnel, and others, to coordinate the transportation of the cocaine west to Guatemala and then to Mexico so that it could be imported into the United States. Many of these shipments were partially owned by members of the Sinaloa Cartel, and the Government will prove that the defendant was told directly that at least one of the cocaine loads personally belonged to Sinaloa Cartel leader Joaquin Archivaldo Guzman Loera, a/k/a "El Chapo" ("Chapo").[3] Testimony from cooperating witnesses regarding these activities will be corroborated by documentary evidence, such as a drug ledger maintained by a Sinaloa Cartel member that described drug flights received by the defendant and a relative referred to as "Cooper."

---

[2] In January 2018, Mejia-Duarte was convicted at trial in the Southern District of Florida of participating in a cocaine-importation conspiracy. *See United States v. Mejia-Duarte*, No. 15 Cr. 20540 (S.D. Fla.). In May 2018, Mejia-Duarte was sentenced to a term of life imprisonment. *See* DOJ, *Honduran Drug Kingpin Sentenced to Life in Prison* (May 21, 2018), https://www.justice.gov/opa/pr/honduran-drug-kingpin-sentenced-life-prison (describing trial evidence demonstrating that "Mejia-Duarte is responsible for trafficking at least an estimated 20,000 kilograms of cocaine" and "much of the cocaine was supplied to the Sinaloa Cartel led by Joaquin Guzman Loera, also known as 'Chapo,' and Ismael Zambada, also known as 'Mayo'").

[3] (*See* Mem. of Law in Support of Pretrial Detention at 2, *United States v. Guzman Loera*, No. 09 Cr. 466 (E.D.N.Y. Jan. 20, 2017) (Dkt. No. 17) (characterizing Chapo as "the principal leader of the Mexico-based international drug trafficking organization known as the Sinaloa Cartel, which is the world's largest and most prolific drug trafficking organization")).

In addition to the defendant's use of clandestine airstrips in Olancho, the defendant assisted drug traffickers with logistical aspects of transporting cocaine within Honduras. The Government will establish, for example, that the defendant advised certain traffickers to modify large cattle trailers by adding a hidden compartment to store cocaine, and introduced a member of the conspiracy to an associate who provided cattle to be transported in the trailers that were carrying the drugs. In April 2014, law enforcement seized approximately 743 kilograms of cocaine from such a trailer in Honduras:






Also in approximately 2014, the defendant worked with Sinaloa Cartel leadership to bribe Fabio Porfirio Lobo—who is the son of a former President of Honduras—and another Honduran official who was preparing to run for president at the time ("Official-1") to help receive drug shipments at a major commercial shipping hub in Puerto Cortés, Honduras.[4] In this regard, the Government will establish at trial that the Sinaloa Cartel paid the defendant, Lobo, and Official-1 an aggregate amount in excess of $1 million in order to facilitate the receipt of drug shipments on commercial shipping vessels sent to Puerto Cortés.

The Government will also offer evidence related to the defendant's support of the *Cachiros* drug-trafficking organization, which was a prolific and violent criminal syndicate operating in Honduras between approximately 2004 and 2013, including testimony from one of the leaders of the *Cachiros*, Devis Leonel Rivera Maradiaga. In widely publicized actions during 2013, the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"), designated the *Cachiros* pursuant to the Foreign Narcotics Kingpin Act (the "Kingpin Act") and imposed financial sanctions on Rivera Maradiaga and others. Nevertheless, in early 2014, the defendant met in Honduras with, among others, Rivera Maradiaga, Honduran congressman Midence Oquelí Martínez Turcios, and Juan Ramon Matta-Waldurraga.[5] During the meeting, parts of which Rivera

---

[4] In May 2016, Lobo pleaded guilty to participating in a cocaine-importation conspiracy. *See United States v. Lobo*, No. 15 Cr. 174 (LGS). In September 2017, Judge Schofield sentenced Lobo principally to 288 months' imprisonment, a $50,000 fine, and $266,667 in forfeiture.

[5] Martínez Turcios is charged with drug-trafficking and weapons offenses similar to those included in the Indictment in this case, and is believed to be in Honduras. *See United States v. Martínez Turcios*, No. 18 Cr. 499 (LAK). In January 2018, Matta-Waldurraga pleaded guilty to participating in a cocaine-importation conspiracy. *See United States v. Matta-Waldurraga*, No. 14 Cr. 442 (E.D.N.Y.).

Maradiaga captured on video, the defendant and others spoke at length about strategies for pursuing favorable treatment for drug traffickers by the Honduran government. Part of the strategy discussed by the group was to use their associates—including former Honduran congressman and unsuccessful presidential candidate Yani Benjamin Rosenthal Hidalgo[6]—to access a recently elected Honduran official ("Official-2") in an effort to persuade Official-2 to appoint a Honduran congressman from the Colón Department ("Official-3") to a position of authority so that Official-3 could support pro-trafficker policies. In addition to the recorded meeting involving the defendant, the Government expects to offer other recorded meetings related to the efforts by significant drug traffickers to co-opt the Honduran government,[7] which were consensually recorded by Rivera Maradiaga and involved, among others, Official-3, Yankel Rosenthal Coello (Rosenthal Hidalgo's cousin),[8] Hector Emilio Fernandez Rosa,[9] and Carlos Arnoldo Lobo.[10]

---

[6] In July 2017, Rosenthal Hidalgo pleaded guilty to a money laundering offense, in violation of Title 18, United States Code, Section 1957. *See United States v. Rosenthal, et al.*, No. 13 Cr. 413 (JGK). In December 2017, Judge Koeltl sentenced Rosenthal Hidalgo principally to 36 months' imprisonment, a $2.5 million fine, and $500,000 in forfeiture.

[7] The Government intends to file a motion *in limine* prior to trial regarding the admissibility of recorded statements by individuals other than the defendant pursuant to, *inter alia*, Rules 801(d)(2)(E) and 804(b)(3).

[8] In August 2017, Rosenthal Coello pleaded guilty to a money laundering offense, in violation of Title 18, United States Code, Section 1957. *See United States v. Rosenthal, et al.*, No. 13 Cr. 413 (JGK). In January 2018, Judge Koeltl sentenced Rosenthal Coello principally to 29 months' imprisonment and a $50,000 fine.

[9] In February 2015, Fernandez Rosa was extradited to this District based on a drug-trafficking charge. *See United States v. Fernandez Rosa*, No. 12 Cr. 894 (RJS).

[10] In April 2014, Carlos Arnoldo Lobo was designated pursuant to the Kingpin Act based on his "significant role in international narcotics trafficking,Acc" including drug trafficking that involved Chapo. *See* OFAC, Treasury Targets Honduran Maritime Drug Trafficker Carlos Arnoldo Lobo (Apr. 9, 2014), https://www.treasury.gov/press-center/press-releases/Pages/jl2350.aspx. Lobo

# DISCUSSION

## I. The Defendant Is Not Entitled to Early Witness Disclosures

The defendant has not provided a sufficient explanation to warrant the early witness-related disclosures he seeks, and his motion should therefore be denied.

### A. The Defendant Is Not Entitled to Premature Disclosures Related to Confidential Sources, Cooperating Witnesses, or a Witness List

Offering little more than the assertion that cooperating witnesses in this case "will have the bulk of their criminal activities occurring outside the United States," the defendant seeks the Government's witness list and a laundry list of additional information relating to not only the Government's anticipated witnesses but also other potential witnesses whom the Government does not intend to call. (Dkt. No. 27 at 2). The defendant's requests include information that may in the future be subject to the Government's obligations under the Jencks Act and *Giglio* (*e.g.*, *id.* at 4 (seeking disclosures regarding "promises of immunity, leniency, preferential treatment or other inducements made to the cooperating witness or any family member")), as well as information that exceeds the scope of those obligations (*e.g.*, *id.* at 5 (seeking the "name and current whereabouts of any witness to the underlying events of this case whom the government does not anticipate calling as a witness at trial and a copy of any statement made by or summary of an interview with such a witness")), and a demand for exculpatory information. The defendant's request for *Brady*

---

was subsequently extradited to the United States based on a drug-trafficking charge. *See International Narcotics Trafficker Extradited from Honduras to United States Sentenced* (Dec. 9, 2014) (U.S. Attorney characterizing Carlos Lobo as "one of the most significant drug traffickers in Central America"), https://www.justice.gov/usao-sdfl/pr/international-narcotics-trafficker-extradited-honduras-united-states-sentenced. He pleaded guilty in the Southern District of Florida and was sentenced to a 240-month term of imprisonment. *See United States v. Lobo*, No. 11 Cr. 20358 (S.D. Fla.).

material is moot, and the Government will complete the disclosure of substantially all of the Jencks Act and *Giglio* material in its possession more than one week prior to trial. The defendant has not demonstrated why earlier disclosures are required.

## 1. Applicable Law

### a. The Informant's Privilege and Early Identification of Witnesses

The "general and well-established rule is that the Government enjoys a 'privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law.'" *United States v. Shamsideen*, No. 03 Cr. 1313 (SCR), 2004 WL 1179305, at *11 (S.D.N.Y. Mar. 31, 2004) (quoting *Roviaro v. United States*, 353 U.S. 53, 59 (1957), and *United States v. Jackson*, 345 F.3d 59, 69 (2d Cir. 2003)). To overcome this qualified privilege against disclosure—often referred to as the informant's privilege—"[t]he defendant bears the burden of showing the need for a disclosure of an informant's identity, and to do so must establish that, absent such disclosure, he will be deprived of his right to a fair trial." *United States v. Fields*, 113 F.3d 313, 324 (2d Cir. 1997) (internal citation omitted). Thus, overcoming the informant's privilege requires the defendant to do more than simply show that the informant was a witness to the crime charged. *See United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988) (citing *United States v. Jimenez*, 789 F.2d 167, 170 (2d Cir. 1986)); *United States v. Castro*, No. 94 Cr. 809 (JFK), 1995 WL 6235, *2 (S.D.N.Y. Jan. 6, 1995).

"Speculation that disclosure of the informant's identity will be of assistance is not sufficient to meet the defendant's burden . . . ." *Fields*, 113 F.3d at 324. Instead, the defendant must make a specific showing that "the disclosure of an informant's identity . . . is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause." *Saa*, 859 F.2d at 1073.

Since *Saa*, the Second Circuit has found disclosure at trial of the identity of informants, or the Government's production at trial of the informants for testimony, sufficient to permit a defendant to conduct a meaningful defense. *See DiBlasio v. Keane*, 932 F.2d 1038, 1043 (2d Cir. 1991) (permitting Government to physically produce informant for testimony to address defendant's need to obtain informant's identity in presentation of entrapment defense).

### b. Timing of *Giglio* Disclosures

"Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." *United States v. Nixon*, 418 U.S. 683, 701 (1974); *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001). Thus, "[t]he Government is under no obligation at the present time to disclose *Giglio* material, as the Government's obligation to do so arises only with the pendency of trial and knowledge of the specific testifying witnesses." *United States v. Dames*, 380 F. Supp. 2d 270, 272 (S.D.N.Y. 2005). There are sound reasons for this rule. For one, impeachment material "does not ordinarily require any independent investigation in order to use it effectively at trial." *United States v. Jacques Dessange, Inc.*, No. 99 Cr. 1182 (DLC), 2000 WL 280050, at *9 (S.D.N.Y. Mar. 14, 2000). Also, requiring early disclosure of *Giglio* material would effectively require the Government to produce a witness list well in advance of trial. *See id.*

### 2. Discussion

The defendant claims that he has not received "a single cooperation-type agreement" during discovery. (Dkt. No. 27 at 2.) But he cites no authority for his argument that he is currently entitled to such disclosures. *See, e.g.*, *United States v. Giffen*, 379 F. Supp. 2d 337, 345 (S.D.N.Y. 2004) ("A defendant is not entitled to the Government's witness list prior to trial."); *see also United*

*States v. Rivera*, No. 16 Cr. 175 (LGS), 2017 WL 1843302, at *2 (S.D.N.Y. May 8, 2017) ("Courts in the Second Circuit typically deny motions for the early disclosure of witness lists where, as here, Defendants have not made a specific showing of need."). In any event, the defendant is also factually incorrect. The Government confirmed in writing on August 27, 2018 that it expects Rivera Maradiaga to testify at trial as a cooperating witness, and his cooperation agreement is available on the public docket sheet in this case. (*See* Dkt. Nos. 23, 23-1). The Government also informed the defense that Rivera Maradiaga had testified at a sentencing hearing in *United States v. Lobo*, No. 15 Cr. 174 (S.D.N.Y.), and transcripts of his testimony in that matter are available on the Internet. (*See* Dkt. No. 23 at 5 n.5).

In addition to Rivera Maradiaga, the Government intends to call several additional cooperating witnesses during its case-in-chief. The Government plans to complete its disclosures of Jencks Act and *Giglio* material in the possession of the prosecution team by November 30, 2018, more than a week prior to trial. The defendant has "failed to show" that this schedule "would not be 'in time for its effective use' at trial." *Dames*, 380 F. Supp. 2d at 273 (quoting *Coppa*, 267 F.3d at 139); *accord United States v. McDow*, 206 F. Supp. 3d 829, 858 (S.D.N.Y. 2016) (Gardephe, *J.*) ("As for impeachment material, the Second Circuit has stated that the Government is only required to produce such material in time for its effective use at trial." (internal quotation marks omitted)); *United States v. Gomez*, 199 F. Supp. 3d 728, 751-52 (S.D.N.Y. 2016) (Gardephe, *J.*) (denying motion for early disclosure of *Giglio* material where Government "represented that it will provide material under *Giglio* . . . , and its progeny, in a timely manner" (internal quotation

marks omitted)).[11]  Even if the defendant had made the required showing, "[i]n narcotics cases"—particularly where, as here, the case involves related firearms charges—"early disclosure of informants' true names with other identifying information can have repercussions that can prevent a fair trial." *United States v. Manley*, 781 F. Supp. 296, 298 (S.D.N.Y. 1992).  Thus, there are also significant safety concerns justifying the Government's proposed disclosure schedule.

The fact that the conduct at issue occurred outside the United States is not, as the defendant suggests, sufficient to overcome the informant's privilege or warrant earlier access to Jencks Act and *Giglio* information.  For example, in *United States v. Akasha Abdalla*, No. 14 Cr. 716, Judge Marrero recently found that "the Government is meeting its . . . *Giglio* obligations" based on the undertaking to provide Jencks Act and *Giglio* material one week prior to jury selection, in a trial expected to involve three confidential sources, at least one cooperating witness, and drug-trafficking and weapons charges related to criminal conduct that occurred in Kenya, South Africa, Afghanistan, and Pakistan.  (*See* Decision And Order, No. 14 Cr. 716 (S.D.N.Y. Sept. 12, 2018) (Dkt. No. 83 at 15)).  Similarly, in *United States v. Georgescu*, No. 14 Cr. 799 (RA) (S.D.N.Y. 2016), the Government provided *Giglio* and Jencks Act material on the Tuesday before jury selection, in a trial involving two cooperating witnesses, a confidential source, and charges of

---

[11] *See also, e.g.*, *United States v. Viera*, No. 14 Cr. 83 (ER), 2015 WL 171848, at *6 (S.D.N.Y. Jan. 14, 2015) (holding that production of *Giglio* material one week before trial and Jencks Act material for all witnesses on the Friday before trial "comports with the defendants' due process rights" (collecting cases)); *United States v. Davis*, 57 F. Supp. 3d 363, 369 (S.D.N.Y. 2014) (approving production of *Giglio* material, including with respect to a confidential informant and cooperating witness by "reveal[ing] their identities," one week before trial); *United States v. Davis*, No. 06 Cr. 911 (LBS), 2009 WL 637164, at *14 (S.D.N.Y. Mar. 11, 2009); *United States v. Bosch*, 385 F. Supp. 2d 387, 391 (S.D.N.Y. 2005).

conspiracy to murder Americans and provide material support to the FARC, with evidence relating to conduct in Romania, Montenegro, Italy, Germany, Albania, Poland, and Bulgaria.[12]

In light of the foregoing, the production timeframe proposed by the Government will give the defendant a reasonable and sufficient opportunity to prepare for trial. Accordingly, the defendant's motion to compel early disclosure of information relating to cooperating witnesses, confidential sources, and other potential trial witnesses should be denied.

### B. The Government Is in Compliance with Its *Brady* Obligations

The defendant's motions for disclosure of *Brady* material are moot. (*See* Dkt. No. 27 at 1; Dkt. No. 28 at 2). The Government is aware of its discovery obligations, including its *Brady* obligations, has complied with those obligations, and will continue to do so in the future. Courts, including this one, have routinely denied defense requests for specific *Brady* material as moot where the Government has made good-faith representations that it understands its discovery obligations and will continue to comply with these obligations. *E.g.*, *McDow*, 206 F. Supp. 3d at 858; *Gomez*, 199 F. Supp. 3d at 751; *United States v. Lobo*, No. 15 Cr. 174 (LGS), 2017 WL 1102660, at *4 (S.D.N.Y. Mar. 22, 2017); *United States v. Campo Flores*, No. 15 Cr. 765 (PAC),

---

[12] *See also, e.g.*, *United States v. Muntslag*, No. 13 Cr. 635 (AJN) (S.D.N.Y. 2016) (*Giglio* and 3500 material produced the week before drug-trafficking trial with conduct in Suriname, Trinidad, and Panama between approximately December 2011 and August 2013); *United States v. Garavito*, No. 12 Cr. 839 (JSR) (S.D.N.Y. 2015) (*Giglio* and 3500 material produced four days before narcoterrorism and drug-trafficking trial with conduct in Guinea Bissau, Colombia, and Holland between approximately May 2012 and January 2013); *United States v. Epskamp*, No. 12 Cr. 120 (RJS) (S.D.N.Y. 2015) (*Giglio* and 3500 material produced 10 days before drug-trafficking trial with conduct in the Dominican Republic, Colombia, Belgium, and the Middle East between approximately January 2009 and December 2011—where one cooperating witness testified at trial via videoconference while incarcerated in Colombia).

2016 WL 5946472, at *11-12 (S.D.N.Y. Oct. 12, 2016). Therefore, the defendant's motion for disclosure of *Brady* material should be denied as moot.

## II. The Defendant's Motion to Compel the Disclosure of Particulars Relating to Recordings and Other Evidence Should Be Denied

The defendant's motion to "compel disclosures" (Dkt. No. 29) is, in essence, a motion for a bill of particulars relating to consensually obtained audio and video recordings, text messages, other documents produced during discovery, and translations of Spanish-language evidence. The discovery produced by the Government to date exceeds the scope of Federal Rule of Criminal Procedure 16, and provides the defendant with sufficient information to prepare for trial.

### A. Applicable Law

"Rule 7(f) of the Federal Rules of Criminal Procedure provides that a court may direct the Government to file a bill of particulars." *United States v. Wedd*, No. 15 Cr. 616 (KBG), 2016 WL 1055737, at *3 (S.D.N.Y. Mar. 10, 2016) (citing Fed. R. Crim. P. 7(f)). A bill of particulars is "required 'only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" *Id.* (quoting *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999)). This is so because "[t]he purpose of the bill of particulars is to avoid prejudicial surprise at trial and give [a] defendant sufficient information to meet the charges against him." *Id.* Thus, "a 'bill of particulars is not a discovery device and should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense.'" *United States v. Yun Lee*, No. 13 Cr. 290 (PAC), 2013 WL 4889178, at *1 (S.D.N.Y. Sept. 9, 2013) (quoting *United States v. Miller*, No. 12 Cr. 368 (PAC), 2012 WL 4791992, at *4 (S.D.N.Y. Oct. 9, 2012)). "Nor is the proper scope and function of a bill

of particulars to obtain disclosure of evidence or witnesses to be offered by the government at trial." *Dames*, 380 F. Supp. 2d at 274.

Although ordering bills of particulars only insofar as necessary to facilitate *reasonable* defense preparation and to avoid *unfair* surprise at trial makes sense, the Government has a legitimate and weighty interest in avoiding the types of safety risks that can arise from making disclosures beyond those required by Rule 16, *Giglio*, and *Brady*. *See United States v. Gotti*, No. 02 Cr. 743 (RCC), 2004 WL 32858, at *9 (S.D.N.Y. Jan. 6, 2004) (denying disclosure of the identities of co-conspirators, witnesses and victims because the "Government has a legitimate concern about the safety of those individuals it intends to call at trial"). In addition, detailed inquiries into the Government's evidence pursuant to Rule 7(f)—long in advance of trial—unduly restrict the Government in presenting additional proof and argument to the jury based on resources devoted to trial preparation and the ongoing investigation in the time before the trial. *See, e.g.*, *United States v. Jimenez*, 824 F. Supp. 351, 363 (S.D.N.Y. 1993). Finally, "[t]he danger of defendants tailoring their testimony to explain away the Government's case, which has been disclosed in advance, is not unreal." *United States v. Cimino*, 31 F.R.D. 277, 279 (S.D.N.Y. 1962).

**B. Discussion**

The Government's disclosures to date are more than sufficient to provide the defendant with a reasonable opportunity to prepare for trial. The operative Indictment contains a four-paragraph description of the Government's theory of the case. The Government's public filings, including this one, set forth additional details regarding the evidence to be offered against the defendant. As noted above, the Government publicly disclosed additional evidence relating to the defendant in connection with sentencing proceedings related to Fabio Porfirio Lobo. (*See, e.g.*,

*United States v. Lobo*, No. 15 Cr. 174 (LGS) (Dkt. No. 146 at 11 ¶¶ 36, 49-51)).  Finally, on September 18, 2018, as a courtesy, the Government identified the audio and video recordings it currently intends to offer in its case-in-chief and the principal participants in those recordings, and provided draft summary translations of those recordings and the majority of the larger set of audio and video recordings that it has produced during discovery.

Contrary to the defendant's assertions, "[t]he prosecution need not particularize all of its evidence." *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988).  "Nor will a defendant be permitted to use a request for a bill of particulars to compel the government to disclose the manner in which it will prove the charges or preview the government's evidence or legal theory." *United States v. Guerrero*, 669 F. Supp. 2d 417, 426 (S.D.N.Y. 2009).  Thus, "[i]n the context of prosecutions of narcotics conspiracies, courts have consistently refused to grant a bill of particulars requesting the following kinds of information: (1) when the conspiracy was formed; (2) when the defendant joined the conspiracy; and (3) how the Government alleges the defendant performed acts in furtherance of the conspiracy." *United States v. Santiago*, 174 F. Supp. 2d 16, 35 (S.D.N.Y. 2001).[13]  "Simply put, a defendant may not employ a bill of particulars as a general investigative tool." *Guerrero*, 669 F. Supp. 2d at 426.  Because that is precisely what the defendant is seeking

---

[13] *See also, e.g., United States v. Carroll*, 510 F.2d 507, 509 (2d Cir. 1975) ("There is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge."); *Guerrero*, 669 F. Supp. 2d at 426 ("'[D]emands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied.'" (quoting *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001))).

to do, and he already has sufficient information relating to the nature of the charges against him, his motion should be denied.[14]

To the extent the defendant relies on Rule 16 in support of his motion, he presupposes that the Rule requires the Government to disclose facts that will be adduced at trial through the testimony of witnesses, such as the identities of certain participants in communications, the accuracy of dates and times reflected in timestamps on the recordings, or "the purpose of payments" in drug ledgers produced in discovery. (Dkt. No. 29 at 2). He is wrong. *See* Fed. R. Crim. P. 16(a)(2) ("Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500."); *see also United States v. Vondette*, 248 F. Supp. 2d 149, 154 (E.D.N.Y. 2001) ("[I]t does not appear that the Government has discovery obligations with regard to the exact quantity of narcotics allegedly involved in this conspiracy before the trial begins."). The defendant has also ignored the Government's disclosures related to the drug ledgers. The August 13, 2018 cover letter accompanying copies of the ledgers that refer to some of the defendant's drug-trafficking activities identified the individual who maintained the ledgers by name and the alias that he used in Honduras when interacting with the defendant.

Finally, the Government has exceeded the scope of its discovery obligations by producing draft summary translations to the defendant almost three months prior to the start of jury selection.

---

[14] The defendant's effort to gain particulars regarding the Government's evidence is also procedurally defective because he did not file an affidavit as required by Local Rule 16.1. *See United States v. Ojeikere*, 299 F. Supp. 2d 254, 260 (S.D.N.Y. 2004) ("[T]he defendant's failure to file an affidavit as required by Local Criminal Rule 16.1 is a sufficient basis on which to deny his motion for a bill of particulars").

The defendant cannot reasonably claim to be prejudiced by the timing of these disclosures: He speaks Spanish and has been represented by a retained attorney who indicated to the Florida bar that he speaks Spanish as well.[15] In *United States v. Campo Flores*, Judge Crotty denied a defense motion to compel production of translated materials 90 days prior to trial where the Government "represented it would provide Defendants with draft translations that it considers potentially relevant as they are completed." No. 15 Cr. 765 (PAC), 2016 WL 5946472, at *12 (S.D.N.Y. Oct. 12, 2016) (internal quotation marks omitted). Judge Crotty reasoned that (i) "[t]here is no reason to require more here, and Defendants cite no case holding otherwise," (ii) "[d]efendants do not suggest that they have not been in possession of any relevant Spanish-language [recorded] material for too little time or that they have been unable to adequately review the material," and (iii) there is no reason to conclude that Defendants have not been able to prepare to meet any translations put forward by the Government." *Id.* This case is no different than *Campo Flores*, and the defendant's motion to compel early production of translations should be denied.

At trial, as is customary in cases involving foreign-language evidence, the Government will offer transcripts that contain transcriptions of Spanish conversations and translations of the Spanish statements into English. *E.g.*, *United States v. Chalarca*, 95 F.3d 239, 246 (2d Cir. 1996). The defendant asserts that he "clearly has a right to challenge the[se] transcripts and translations on numerous grounds . . ." (Dkt. No. 29 at 4). He is correct. But "when litigants disagree as to the precise words on a tape, or as to the accuracy of transcripts, the district court may permit each party to submit an alternative transcript to the jury." *Chalarca*, 95 F.3d. at 246; *see also United*

---

[15] *See* https://www.floridabar.org/directories/find-mbr/profile/?num=366382 (last accessed September 18, 2018).

*States v. Gee*, 695 F.2d 1165, 1167 (9th Cir. 1983) (reasoning that defendant "does not allege and we find no reason to assume that [he] was prevented or disabled from producing a transcript for his own use in the same manner in which the Government was able to produce its own").  In the absence of a stipulation, the Government will authenticate its transcripts—including the transcriptions, the translations, and the attributions of statements to particular speakers—through the testimony of a language expert and other witnesses.  The mechanisms to resolve any dispute regarding these Government exhibits are cross-examination and preparation of separate transcripts by the defense—not, as the defendant suggests, suppression of recording evidence or electronic communications.

Although the defendant also refers to the possibility of a motion challenging the audibility of the recordings, "[t]he Second Circuit favors admission of recordings even if they contain some inaudible portions."  *United States v. Daughtry*, No. 09 Cr. 1132 (DAB), 2011 WL 724668, at *2 (S.D.N.Y. Feb. 25, 2011) (citing *United States v. Arango-Correa*, 851 F.2d 54, 58 (2d Cir. 1988) ("Our decisions in this area reveal a clear preference for the admission of recordings notwithstanding some ambiguity or inaudibility, as long as the recordings are probative.")); *see also United States v. Siddiqi*, No. 06 Cr. 377 (SWK), 2007 WL 3125313, at *1 (S.D.N.Y. Oct. 23, 2007) ("[A] tape recording is generally admissible '[u]nless the unintelligible portions [of the recording] are so substantial as to render the recording as a whole untrustworthy . . . .'" (quoting *United States v. Bryant*, 480 F.2d 785, 790 (2d Cir. 1973))).  The draft summary translations produced to the defendant make clear that the probative value of the recordings is substantial despite any arguably unintelligible discussion.  The defendant has not filed an audibility challenge to any recording evidence thus far, and any such challenge would be meritless.

## III. Early Expert Disclosures and Rule 404(b) Notice Are Unwarranted

In response to the defendant's motion seeking expert disclosures, the Government informed the defendant on September 18, 2018 that it currently intends to offer the following categories of expert testimony at trial:

- Drug-trafficking patterns. The Government intends to offer expert testimony relating to (i) drug-trafficking routes used to transport cocaine from South and Latin America into the United States and Canada; (ii) various ways, means, and methods of drug trafficking along these routes, including cocaine production, the development of air and maritime routes to smuggle drugs into the United States, and the use of Central American transshipment points such as Honduras along these routes; and (iii) the prices of cocaine in South America, Central America, Mexico, and the United States.[16]

- Honduran political system. The Government intends to offer expert testimony relating to the Honduran political system, Honduran elections in which the defendant participated as a candidate as well as presidential elections in approximately 2009-2010 and 2013-2014, the extradition treaty between the United States and Honduras and related Honduran legislation (as described in the Government's August 27, 2018 opposition to the defendant's motion for Rule 15 depositions (Dkt. No. 23 at 12-13)), and the history of extraditions by Honduras of Honduran nationals to face drug-trafficking charges in the United States.

- Weapons. The Government intends to offer testimony relating to features and functions of weapons about which other witnesses are expected to testify, including AR-15 rifles, AK-47 and related Kalashnikov rifles, M-16 rifles, M60 machineguns, and rocket-propelled grenade launchers.

- Spanish Translations. The Government intends to offer testimony relating to transcriptions of Spanish-language statements made in previously produced recordings and communications, and translations of those statements into English.

---

[16] In connection with the September 18 disclosures, the Government provided two transcripts reflecting the types of information about which it expects the drug-trafficking expert to testify. *See United States v. Campo Flores*, No. 15 Cr. 765 (PAC), 2017 WL 1133430, at *2 (S.D.N.Y. Mar. 24, 2017) (describing expert trial testimony that "approximately 80 percent of the cocaine sent from Venezuela along the Central American corridor . . . is destined for the United States").

The Government is in the process of identifying its expert witnesses and will supplement its disclosures to comply with Rule 16(a)(1)(G) approximately three weeks prior to the start of jury selection. Completing expert notice by that deadline will afford the defendant *more than* "two weeks to tailor his strategy to the chosen expert[s], an amount of time that is not uncommon in this District or unreasonable in the context of this case and the anticipated testimony." *United States v. Banki*, No. 10 Cr. 08 (JFK), 2010 WL 11606485, at *3 (S.D.N.Y. Mar. 18, 2010) (citing *United States v. Russo*, 483 F. Supp. 2d 301, 310 (S.D.N.Y. 2007) and *United States v. Ma*, No. 03 Cr. 734 (DAB), 2006 WL 708559, at *18 (S.D.N.Y. Mar. 21, 2006)). Therefore, the defendant's motion for early expert disclosures should be denied.

The defendant also seeks, with little explanation, notice pursuant to Rule 404(b) of the Federal Rules of Evidence almost three months prior to the scheduled start of jury selection. (Dkt. No. 28 at 1). Rule 404(b) requires "reasonable notice," "before trial," of the "general nature" of evidence to be offered. Fed. R. Evid. 404(b)(2). "There is no set timetable for Rule 404(b) notice because[] the evidence the Government may seek to offer at trial often changes as the proof crystallizes." *United States v. Martoma*, No. 12 Cr. 973, 2014 WL 31213, at *2 (S.D.NY. Jan. 6, 2014) (Gardephe, *J.*) (internal quotation marks and ellipsis omitted); *United States v. Al-Marri*, 230 F. 535, 542 (S.D.N.Y. 2002) (adopting 404(b) notice deadline two weeks prior to trial where defendant "has not provided sufficient grounds to justify why an earlier production date is necessary"). "As a general matter, [c]ourts in this Circuit have routinely found that at least ten business days provides reasonable notice to a defendant under Rule 404(b)." *Martoma*, 2014 WL 31213, at *2 (internal quotations marks omitted); *Gomez*, 199 F. Supp. 3d at 751 (denying motion to compel Rule 404(b) notice where "the Government has represented that it will provide

appropriate Rule 404(b) notice in a timely fashion in order to permit the defendant an opportunity to challenge admission of such evidence and to permit the Court to make an appropriate finding"). Therefore, because the Government plans to provide Rule 404(b) notice sufficiently in advance of trial and the defendant has not explained why earlier disclosures are necessary, his motion should be denied.

## IV. The Defendant's Requested Rule 15 Depositions Are Not in the Interests of Justice

As explained in the Government's August 27, 2018 opposition to the defendant's motion for Rule 15 depositions, the defendant has not met his burden on critical elements of the application. He has not established that the proffered witnesses are unavailable,[17] or that the proffered testimony is material to the pending charges in the United States, and countervailing considerations further support denial of the motion. (Dkt. No. 23 at 1-2). The Government recently obtained written judicial opinions relating to the charges under Honduran law that are pending against the defendant relating to the murder of Claudio Rigoberto Méndez Acosta. (*See* Ex. A (trial court majority opinion and translation); Ex. B (trial court dissenting opinion and translation); Ex. C (Honduran Supreme Court opinion and translation)). These opinions further

---

[17] As of the date of this filing, the defense still has not provided the Government with dates of birth or any Honduran passport numbers related to the four witnesses at issue so that the Government can undertake efforts to make the witnesses available at trial. (Dkt. No. 23 at 9-10). Defense counsel suggested in his reply submission that such disclosures would be appropriate only as a *quid pro quo* for similar disclosures relating to cooperating witnesses. (*See* Dkt. No. 25 at 2). The argument overlooks the point that, while the Government is under no obligation to disclose that information at this time, the defendant bears the burden under Rule 15 to establish that the witnesses are unavailable. He cannot meet that burden by thwarting reasonable efforts by the Government to bring purported defense witnesses to this District for the trial so that the jury can properly evaluate their testimony.

establish that the defendant cannot show that the Rule 15 depositions he seeks are in the interests of justice.

## A. Relevant Facts

The defendant was charged in Honduras with participating in the murder of Méndez Acosta and the attempted murder of an individual referred to in the decisions as Protected Witness TP-10. (Ex. A at 55). A three-judge panel conducted a trial in Honduras relating to the charges between August 12 and 15, 2013. (*Id.*). The evidence established that on the evening of October 11, 2012, Méndez Acosta and his son, Rigoberto Rafael Méndez Paz, were sitting outside a liquor store named "HBO" in San Esteban, Olancho, with two other men. (*Id.* at 63). Protected Witness TP-10 and Natividad de Jesús Rubí Matute were inside HBO. (*Id.*). At approximately 7:00 p.m., as Méndez Paz was walking away from HBO, a pickup truck with four people in the cab and several men in the bed, armed with rifles, approach HBO and opened fire. (*Id.*). Méndez Acosta was killed, and Protected Witness TP-10 was wounded. (*Id.*).

At trial, the prosecution offered prior statements from Protected Witness TP-10 and another individual, referred to as Protected Witness TP-20, indicating that the defendant and Rosendo de Jesús Najera Martínez were inside the cab of the truck along with assassins in the back who were wielding AK-47 and M-16 rifles. (*Id.* at 76).[18] Protected Witness TP-10 indicated that the

---

[18] The majority opinion of the trial court indicates that Protected Witnesses TP-10 and TP-20 "could not be located" and that, as a result, the prosecution offered prior statements by these witnesses. (Ex. A at 76). It appears that the pre-trial statements were elicited in front of a Honduran judge, and that representatives of the Honduran government and the defense were permitted to question the witnesses. (*See* Ex. B at 65-66). The unavailability of these witnesses at trial is consistent with information from Rivera Maradiaga, as described in the Government's opposition to the motion for Rule 15 depositions, that following the murder of Méndez Acosta a

defendant and Najera Martínez were both holding a "cutoff AK47 rifle with a double magazine." (Ex. B at 65). The prosecution also offered records indicating that a pickup truck similar to the vehicle described by Protected Witnesses TP-10 and TP-20 was registered in the name of the defendant in 2006. (Ex. A at 90).

The defense offered prior statements from Méndez Paz and Rubí Matute indicating that they were at the scene of the shooting and that the defendant and Najera Martínez were not in the truck. (*Id.* at 79).[19] Ángel Daneri Cardona Castro testified at the trial that he was at HBO that evening and witnessed the murder, but that the defendant and Najera Martínez were not in the truck. (*Id.* at 80). Ángel Alberto Martínez testified that he was at the defendant's house with the defendant at the time of the murder, and the defense offered a similar statement by Olman Alduvin Parrales. (*Id.* at 90-91). The defense also offered evidence from a series of witnesses in an effort to establish that the defendant had been wounded in a shooting on October 6, 2012, and was physically incapable of riding in a pickup truck on October 11. (*E.g.*, *id.* at 68-75). Finally, in response to the evidence that the pickup truck used in the shooting was registered in the name of the defendant, Simeón Abigail Molina Galeas—the Mayor of San Esteban at the time—testified that the defendant bought the truck for him and that the truck was at his house on the evening of October 11, 2012. (*Id.* at 93).

---

truce with the defendant was established and Rivera Maradiaga persuaded a relative (referred to as "Relative-1") not to testify against the defendant. (Dkt. No. 23 at 5).

[19] Rubí Matute "had left Honduras" by the time of the trial. (*Id.* at 81).

On August 26, 2013, two of the trial judges issued an opinion finding that the Honduran prosecution had failed to establish the defendant's guilt beyond a reasonable doubt. (*Id.* at 99-100). The majority credited the pretrial statements of Méndez Paz and Rubí Matute over the statements from Protected Witnesses TP-10 and TP-20. (*Id.* at 79-80, 82). The majority concluded, however, that Cardona Castro and Mayor Molina Galeas were "not credible." (*Id.* at 81, 94). The majority also rejected the defendant's alibi defense, and concluded that Cardona Castro and Alduvin Parrales had "sought to favor the position of the defense" and were "not useful for the majority of the Court." (*Id.* at 92).

One judge on the trial panel dissented and concluded that "the facts for which the defendant . . . has been brought to trial have been proven." (Ex. B at 101). The dissenting judge found Protected Witnesses TP-10 and TP-20 to be credible and corroborated by other evidence at trial, and questioned the reliability of the statement from Méndez Paz because he had indicated that he had received threats related to the case. (*Id.* at 67-68, 98). The dissenting judge also concluded that it would have been "impossible" for Rubí Matute to have observed the occupants of the truck. (*Id.* at 84).

On March 31, 2016, the Honduran Supreme Court reversed the acquittal of the trial court, and ordered a new trial conducted by different judges. (Ex. C at 24). The Supreme Court "fully agree[d] with what is recorded in the entire dissenting vote," and held that the evidence "unquestionably attest[s] beyond all reasonable doubt that [the defendant] participated willfully, along with other persons, in the events" of October 11, 2012 that resulted in the murder of Méndez Acosta. (*Id.* at 22, 24).

## B. Discussion

To reiterate, the Government does not intend to offer evidence in its case-in-chief related to the October 2012 murder of Claudio Rigoberto Méndez Acosta in Honduras unless the defendant opens the door to such evidence. (Dkt. No. 23 at 15). As a result, Rule 15 depositions related to the murder of Méndez Acosta and related acts of violence by Rivera Maradiaga—about which Rivera Maradiaga may be cross-examined but extrinsic proof is inadmissible—are not material to the drug-trafficking and weapons charges against the defendant in the United States. The written opinions by Honduran trial judges and the Honduran Supreme Court also call into question the purported unavailability and reliability of two witnesses the defendant seeks to depose: Rigoberto Rafael Méndez Paz and Ángel Daneri Cardona Castro.

The defendant seeks to offer deposition testimony from Méndez Paz, the son of the murder victim, "that the defendant was not in the area and therefore cannot be responsible for the death of his father." (Dkt. No. 27 at 2). Although defense counsel claims to have had "numerous conversations" with each of the witnesses he hopes to depose (Dkt. No. 20 at 3), Méndez Paz did not even testify at the defendant's trial in Honduras. (*See* Ex. A (explaining that a pretrial statement by Méndez Paz was "reproduced via reading" at the trial)). In a pretrial statement on June 24, 2013, Méndez Paz indicated that "he was being threatened and planned to leave the country." (Ex. B at 96, 98). After the trial, the dissenting judge found that the information provided by Méndez Paz was "flawed," "untruthful," and "unreliable" because of the "fear that he experience[d]" based on "threats from people whose identities were only known to him, since they have not been mentioned to the Court." (Ex. A at 98). Defense counsel has still not confirmed that he has spoken to Méndez Paz, or any of the other three proposed Rule 15 witnesses. (*See* Dkt.

No. 25 at 2).  The trial proceedings in Honduras suggest that Méndez Paz may have fled years ago.

Thus, absent—at minimum—firm representations by a member of the defense team with firsthand

knowledge that Méndez Paz is available for a deposition but unwilling to testify in the United

States, and specific representations regarding the details of the testimony that Méndez Paz would

offer, it is not in the interest of justice to grant the defendant's Rule 15 motion as to this witness.

The defendant also seeks to offer deposition testimony from Cardona Castro because,

according to counsel, Cardona Castro "was in the immediate area where the murder was

committed" and "he saw the shooter and it was someone other than the defendant."  (Dkt. No. at

20 at 2).  The Honduran prosecutors did not proceed on the theory that the defendant was "the

shooter" in the murder, and there was no dispute at the trial that multiple shooters arrived in the

bed of the pickup truck and participated in the crimes.  (*Id.*).  Moreover, Cardona Castro did not

testify at the Honduran trial, as the defendant now suggests, that he "saw the shooter."  (*Id.*).  To

the contrary, he testified that he "did not look at the features of the persons on the truck bed," who

"began to fire" their guns in the direction of HBO.  (Ex. A at 80).  With respect to the defendant,

Cardona Castro testified that "[n]one of the persons riding in the cab" of the pickup truck was the

defendant or Rosendo de Jesús Najera Martínez.  (*Id.*).  Each of the three judges who presided over

Najera's trial concluded that Cardona Castro was not credible.  (*Id.*. at 81 (majority reasoning that

Cardona Castro was "not credible" because he offered testimony "at the expense of what he could

have effectively observed [on] the day of the events"); *see also* Ex. B at 91 (dissent finding

Cardona Castro's testimony "not logical" and concluding that the testimony "does not deserve

credibility")).  Thus, granting a Rule 15 deposition of such a witness, in light of all of the other

deficiencies in the defendant's motion, is not in the interest of justice.

## <u>CONCLUSION</u>

For the foregoing reasons, the defendant's pretrial motions should be denied.

Dated: New York, New York
September 19, 2018

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

By:     /s/
Emil J. Bove III
Matthew J. Laroche
Assistant United States Attorneys

Cc:    Defense Counsel
(Via ECF)