UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>FREDY RENAN NÁJERA MONTOYA,<br><br>                          Defendant. | S1 15 Cr. 378 (PGG) |

**THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTIONS *IN LIMINE***

                                            GEOFFREY S. BERMAN
                                            United States Attorney for the
                                            Southern District of New York
                                            One Saint Andrew's Plaza
                                            New York, New York 10007

Emil J. Bove III
Matthew J. Laroche
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1
ARGUMENT ....................................................................................................................... 3
   I. The Expert Testimony of Professor Navia and FEO Kingery Should Be Admitted ............... 3
      A. Applicable Law .................................................................................................... 3
      B. Discussion ........................................................................................................... 5
         1. Professor Navia's Anticipated Testimony Would Assist the Jury in Understanding How and Why the Defendant Used His Position as a Honduran Congressman to Further His Drug-Trafficking Activities ................................................................................ 6
         2. FEO Kingery's Anticipated Testimony Would Assist the Jury in Assessing the Capabilities and Functions of Firearms Possessed By the Defendant and His Co-Conspirators ........................................................................................................ 10
CONCLUSION ................................................................................................................... 14

**PRELIMINARY STATEMENT**

The Government respectfully submits this opposition to defendant Fredy Renan Nájera Montoya's motions to exclude the anticipated expert testimony of Professor Patricio Navia regarding the Honduran political system, and Firearms Enforcement Officer ("FEO") Max M. Kingery of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") regarding the functions and capabilities of certain machineguns and destructive devices that were used by the defendant and his co-conspirators in connection with the drug-trafficking crime charged in Count One of the Indictment. (Dkt. Nos. 57 and 58). In his motions, the defendant does not challenge the experts' qualifications or their specialized knowledge, and he does not suggest that the topics of the expert testimony are within the common knowledge of an ordinary juror. Instead, he claims that (i) Professor Navia's anticipated testimony is irrelevant and unduly prejudicial because it is designed "to convict the defendant as a result of his position within the Honduran government," and (ii) FEO Kingery's anticipated testimony is irrelevant and would not assist the jury because no firearms were seized during the course of the investigation. These arguments are without merit.

The Government will establish at trial that the defendant abused the political power that he obtained by virtue of his status as a Honduran congressman to distribute enormous amounts of cocaine that was imported into the United States between approximately 2008 and 2015. The Government will also establish that the defendant possessed, and caused large security teams involved in his drug-trafficking activities to possess, numerous weapons including machineguns and destructive devices. These weapons were used to provide security for the defendant's large-scale drug trafficking—protection against law enforcement authorities and rivals alike.

Professor Navia is expected to offer limited testimony regarding the basic structure of the

Honduran Congress, the party affiliations and positions held by the defendant and some of his co-conspirators, the 2009 presidential coup in Honduras and subsequent national elections, and the development of Honduran laws governing the extradition of Honduran nationals to the United States.  FEO Kingery is expected to testify concerning the functionality and capabilities of certain machineguns and destructive devices, as manufactured, including AK-47s and RPG-7s.  In this regard, cooperating witnesses will testify that these weapons were possessed by the defendant and his co-conspirators, and cooperating witness Devis Leonel Rivera Maradiaga will testify concerning the use of similar weapons by the *Cachiros*.

In light of the defendant's conduct, which is detailed in the Government's motions *in limine*, dated November 16, 2018 (Dkt. No. 61), this proposed expert testimony is plainly relevant, highly probative, and not unduly prejudicial.  Professor Navia's testimony will provide important context regarding the defendant's political position in Honduras, the public officials with whom he conspired, and events in Honduran politics that influenced his drug-trafficking activities and demonstrate his knowledge that the drugs he conspired to distribute were destined for the United States.  Similarly, FEO Kingery's testimony will assist the jury in assessing whether the weapons possessed by the defendant and his co-conspirators qualify as machineguns and destructive devices under their respective definitions as cross-referenced in 18 U.S.C. § 921.  Professor Navia's and FEO Kingery's testimony also will be extremely limited, lasting for approximately one hour each on direct examination.  For these reasons and those described in additional detail below, the defendant's motions should be denied.

# ARGUMENT

## I. The Expert Testimony of Professor Navia and FEO Kingery Should Be Admitted

### A. Applicable Law

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under this standard, expert testimony is generally admissible if it will assist the trier of fact to understand the evidence or to determine a fact in issue. *See Daubert* v. *Merrell Dow*, 509 U.S. 579, 597 (1993); *United States* v. *Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). In order to provide such assistance, an expert's proposed testimony must therefore "shed light on activities not within the common knowledge of the average juror." *United States* v. *Wexler*, 522 F.3d 194, 204 (2d Cir. 2008) (citations omitted); *Duncan*, 42 F.3d at 101 (holding that expert testimony that helps to explain "a complicated morass of obscure terms and concepts" is proper); *United States* v. *Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("[I]n complex cases . . . expert testimony may help a jury understand unfamiliar terms and concepts."); *United States* v. *Carson*, 702 F.2d 351, 369 (2d Cir. 1983) (testifying police officers had "specialized knowledge, not possessed by the jury" which was helpful in understanding narcotics trafficking).

Experts also may opine on factual conclusions, even when they embrace an ultimate issue to be decided by the jury. *Bilzerian*, 926 F.2d at 1294-95; *see also* Fed. R. Evid. 704(a)

("[T]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."). However, "the use of expert testimony is not permitted if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Duncan*, 42 F.3d at 101. As a result, an expert may "opine on an issue of fact within the jury's province," so long as the expert does not state "ultimate legal conclusions based on those facts." *Bilzerian*, 926 F.2d at 1294; *see also United States* v. *Scop*, 846 F.2d 135, 140 (2d Cir. 1988).

Like all evidence, expert testimony also must be relevant and not unfairly prejudicial under Federal Rules of Evidence 401 and 403. Rule 401 defines "relevant evidence" as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. As the Second Circuit has emphasized, "[a]ll relevant evidence is admissible unless excluded by the constitution, a statute, or a rule." *United States* v. *Onumonu*, 967 F.2d 782, 786 (2d Cir. 1992). Indeed, Rule 403, which squarely addresses the exclusion of relevant evidence, instructs that, to justify suppression, it is not sufficient that an item's probative value be somewhat less than its pernicious potential; rather, relevant evidence may not be excluded unless its "probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added). All evidence of guilt is, of course, prejudicial, in the sense of disadvantaging the defense, but that is not the same as being "unfairly" prejudicial. *Costantino* v. *Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair.").

The decision to admit expert testimony rests soundly with the discretion of the trial court and shall be sustained unless "manifestly erroneous." *See United States* v. *Schwartz*, 924 F.2d 410, 425 (2d Cir. 1991); *Boucher* v. *U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("[I]t is well-established that the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence." (internal quotation marks omitted)). "Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' . . . other contentions that the assumptions are unfounded 'go to the weight, not the admissibility, of the testimony.'" *Boucher*, 73 F.3d at 21 (citations omitted). In fact, the Supreme Court has stated that the appropriate means of attacking admissible expert testimony is through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

**B. Discussion**

The defendant does not challenge the expert qualifications of Professor Navia or FEO Kingery. Nor could he; they are both eminently qualified in their respective fields.[1] The defendant

---

[1] To summarize their qualifications, Professor Navia holds positions as a professor at New York University in the Center for Latin American and Caribbean Studies, and as a professor in political science at Universidad Diego Portales in Chile. Professor Navia also has been a visiting professor at Princeton University, New School University, Universidad de Salamanca, Universidad de Chile and NYU Buenos Aires, and a visiting fellow at the University of Miami. He has published scholarly articles and book chapters on democratization, electoral rules, and democratic institutions in Latin America. Through his education and experience, Professor Navia has become familiar with political systems in, among other places, Honduras.

FEO Kingery has been employed by the ATF since 2005 and is currently the Branch Chief of the Firearms Technology Criminal Branch, which is directly responsible for the classification of firearms. During the course of his career at the ATF, FEO Kingery has been responsible for, among other things, (i) providing technical information regarding ammunition and firearm identification, operation, and design for the purpose of assisting the ATF, as well as the law

also does not challenge that their testimony will be based on their specialized knowledge and is beyond the common knowledge of the ordinary juror. Rather, the defendant argues that Professor Navia's and FEO Kingery's testimony should be excluded as unfairly prejudicial and/or irrelevant. These arguments are without merit.

### 1. Professor Navia's Anticipated Testimony Would Assist the Jury in Understanding How and Why the Defendant Used His Position as a Honduran Congressman to Further His Drug-Trafficking Activities

The topics to be addressed by Professor Navia are highly probative and relevant to the conduct at issue in this case. As noted above, Professor Navia will testify concerning (i) the basic structure of the Honduran Congress; (ii) the party affiliations and positions held by the defendant and some of his co-conspirators, such as Oscar Nájera, Midence Oquelí Martínez Turcios, Yankel Rosenthal Coello, Yani Benjamin Rosenthal Hidalgo, Porfirio Lobo Sosa, and Miguel Rodrigo Pastor Mejía; (iii) the 2009 presidential coup in Honduras and the national elections in 2009 and 2013; and (iv) 2012 Honduran legislation and provisions of the Honduran constitution relating to the extradition of Honduran nationals to the United States. This testimony will provide important context to the defendant's crimes, which is otherwise outside the common knowledge of jurors serving in this District and is probative of the defendant's intentions and motivations.

With respect to the 2009 coup, Professor Navia is expected to testify in a minimal fashion that Honduran President Manuel Zelaya vacated the office and was temporarily replaced by Honduran congressman Roberto Micheletti. The power vacuum resulting from that situation

---

enforcement community in general, in the implementation of the Gun Control Act of 1968 and the National Firearms Act, and (ii) assisting in maintaining the ATF's firearms reference collection of approximately 12,000 firearms and extensive reference library of books, catalogs, and official documents relating to the firearms field.

allowed drug traffickers to infiltrate several aspects of the reformed Government. As indicated in the Government's motions *in limine*, Rivera Maradiaga will explain that around the time of the coup, the *Cachiros* became concerned about increasing law enforcement scrutiny and, among other things, started to bribe Porfirio Lobo Sosa as he prepared to campaign for the Honduran presidency. Other cooperating witness will explain that the defendant helped broker bribes paid to Fabio Lobo, the son of then-President Lobo Sosa, and Miguel Rodrigo Pastor Mejía, a former Honduran official who was appointed to public office by Lobo Sosa, in connection with the drug trafficking that occurred at a major commercial shipping hub in Puerto Cortés. (Dkt. No. 61 at 5-6, 8). The purpose of these payments is clear in light of the context provided by Professor Navia: to facilitate access to Puerto Cortés through Fabio Lobo and Pastor, individuals with the political connections and power to engage in drug trafficking in Honduras with virtual impunity.

Similarly, Professor Navia's testimony concerning the extradition of Honduran nationals to the United States is highly probative and relevant. In this regard, Professor Navia will testify that in January 2012, Honduras amended its constitution to authorize the Honduran government to start extraditing Honduran citizens in cases involving "crimes of trafficking of narcotics in any of their forms, terrorism and any other illegal act of organized crime and when there exists a Treaty or Convention of extradition with the requesting country." As a result, for the first time, the defendant and his co-conspirators faced the possibility of prosecution in the United States for their illegal drug-trafficking conduct.

In response, the defendant and his co-conspirators took steps to avoid being targeted by law enforcement and extradited to the United States. For example, a cooperating witness will testify that the defendant obtained and provided him with a confidential list of individuals

7

purportedly identified by the Honduran government as being subject to extradition, which included the name of cooperating witness Rivera Maradiaga.  Moreover, the defendant and his co-conspirators, some of whom were or became public officials in Honduras, participated in meetings in 2013 and 2014 to corruptly obtain political support and protection in Honduras so that they could avoid arrest and extradition to the United States.

The Government will offer recordings of two such meetings at trial, and each contains several references to politicians, political parties, and elections and other political procedures.[2] For example, the November 2013 recording contains a reference to former President Micheletti, and "internal elections" in Honduras that are similar to national primaries conducted in the United States. (Dkt. No. 61-1 at 11:9, 16:14).  During the January 2014 recording, the defendant refers to, *inter alia*, the "National Party," the "Liberales" Party, and the "PAC" Party. (Dkt. No. 61-2 at 18:8, 36:10).  Professor Navia's testimony will help the jurors to understand the recordings, including the level of multi-partisan support for drug trafficking pursued by the defendant and others, and therefore provides important context for this conduct that is probative of the defendant's participation in the drug-trafficking conspiracy, as well as his knowledge that the drugs he conspired to distribute were destined for the United States.

In similar circumstances, courts regularly admit expert testimony to assist the jury in understanding the context of the defendant's crimes. *See, e.g.*, *United States* v. *Kantengwa*, 781

---

[2] As detailed in the Government's motions *in limine*, these meetings have overlapping participants that include individuals with whom the defendant engaged in drug trafficking.  These meetings also shared a common objective in that the defendant and his co-conspirators coordinated to obtain political support from key figures in Honduras's two major political parties to prevent the arrest and extradition of drug traffickers to the United States.

F.3d 545, 560 (1st Cir. 2015) (admitting expert testimony of political scientist to explain the defendant and his family's role in the Rwandan genocide, which provided important context to the false statements made by the defendant on his asylum application); *United States* v. *Knox*, 540 F.3d 708, 720-21 (7th Cir. 2008) (admitting expert testimony concerning political group to which the defendant belonged to provide context to false statements charge); *United States* v. *Aref*, No. 04 Cr. 402 (TJM), 2007 WL 603508, at *16 (N.D.N.Y. Feb. 22, 2007) (admitting expert testimony concerning political groups in Bangladesh in case where the defendant was charged with providing material support to a terrorist organization). Similarly, courts in this Circuit have repeatedly admitted expert testimony to explain the structure and positions held within organizations relevant to the charges at issue in the case. *See e.g.*, *United States* v. *Kadir*, 718 F.3d 115, 121-22 (2d Cir. 2013) (expert testimony concerning the structure, membership, and activities of a terrorist organization); *United States* v. *El Gammal*, No. 15 Cr. 588 (ER) (S.D.N.Y. 2017); *United States* v. *Abu-Jihaad*, 553 F. Supp. 2d 121, 123-24 (D. Conn. 2008) (same); *United States* v. *Locascio*, 6 F.3d 924, 936 (2d Cir. 1993) (expert testimony concerning the structure, membership, and activities of organized crime group).

The defendant nevertheless contends that Professor Navia's testimony would be unfairly prejudicial because it is designed to convict the defendant based on his position within the Honduran government. (Dkt. No. 57 at 5). This is incorrect. There is nothing unfairly prejudicial about identifying the defendant's political position in Honduras given the numerous ways in which he used that position to further his drug-trafficking activities. For example, the defendant bribed law enforcement officials within the department of Olancho, which he represented; solicited bribes from drug traffickers on behalf of other public officials to seek protection from arrest and

9

extradition; and introduced drug traffickers to other public officials to facilitate additional drug-trafficking activities. To be clear, the Government does not intend to elicit testimony concerning any legislation that the defendant promoted; nor does it intend to discuss the defendant's political views. Rather, as outlined above, Professor Navia's testimony is focused on helping the jury to understand the context of the defendant's crime and the relevance of his position as a congressman within Honduras, which he used to further the drug-trafficking conspiracy, as well as important events in Honduran politics that help to explain actions by the defendant and his co-conspirators during the course of that conspiracy.

### 2. FEO Kingery's Anticipated Testimony Would Assist the Jury in Assessing the Capabilities and Functions of Firearms Possessed By the Defendant and His Co-Conspirators

As noted above, several cooperating witnesses are expected to testify that the defendant and his co-conspirators used firearms, including machineguns and destructive devices, during the drug-trafficking conspiracy in this case. In particular, the cooperating witnesses will testify that: (i) the defendant possessed an AK-47 and other firearms, purchased rocket-propelled grenade launchers in 2012 through a cooperating witness, and provided AK-47s to other drug traffickers; (ii) the defendant used security teams armed with heavy weaponry, including AK-47s, AR-15s, and RPG-7s, to receive and transport drugs; and (ii) other members of the *Cachiros* used similar weapons during the course of the conspiracy. Cooperating witnesses also will identify photographs of some of these weapons, which were provided to the Government by FEO Kingery, and explain how and why firearms were possessed and used during the course of the conspiracy.

FEO Kingery's testimony describing the functionality and capabilities of these weapons, as manufactured, is highly relevant and probative in this case. Whether the defendant and his co-

conspirators possessed or conspired to possess machineguns and destructive devices is an element of the crimes charged in Counts Two and Three of the Indictment. *United States* v. *O'Brien*, 560 U.S. 218, 235 (2010) ("The machinegun provision in § 924(c)(1)(B)(ii) is an element of an offense."). As a result, FEO Kingery's testimony will assist the jury in determining whether the firearms identified or used by the defendant, and his co-conspirators (including some of the cooperating witnesses) qualify as such. This includes, for example, explaining whether or not the firearms identified by the cooperating witnesses meet the definition of a machinegun such that it "shoots, is designed to shoot, or can be readily restored to shoot" automatically by a single pull of the trigger. *See infra* Note 2.

In similar circumstances, courts have admitted expert testimony concerning the functionality of firearms. *See, e.g.*, *United States* v. *Tribunella*, 749 F.2d 104, 108 (2d Cir. 1984) (noting that at trial the district court admitted expert testimony regarding capabilities of shotgun for purposes of determining whether it qualified as a "firearm" under 26 U.S.C. § 5864); *United States* v. *Metcalf*, 221 F.3d 1336, 2000 WL 924171, at *2 (6th Cir. 2000) ("Expert testimony at trial established the nature of these firearms and devices as *inter alia* silencers, destructive devices, machineguns and materials readily assembled as hand grenades or bomb."). In fact, FEO Kingery has been qualified as an expert on approximately fifteen occasions, including in cases in which he has testified as to whether a firearm qualified as a machinegun. *See United States* v. *Dunn*, 06 Cr. 19 (TJC) (M.D. Tenn. 2008).

The defendant nevertheless contends that FEO Kingery's testimony is irrelevant for two reasons. First, the defendant contends that because no firearms were seized in this case, FEO Kingery's anticipated testimony is irrelevant in assessing whether the firearms identified by the

cooperating witnesses qualify as machineguns or destructive devices. This argument is unpersuasive. As an initial matter, the defendant is charged in Count Three with *conspiring* to possess machineguns and destructive devices. Thus, FEO Kingery's testimony is plainly relevant to assessing whether the firearms the cooperating witnesses conspired to possess with the defendant, including for example the rocket-grenade launchers the defendant purchased through a cooperating witness, qualify as machineguns and destructive devices. Regardless, there is substantial evidence that machineguns and destructive devices were actually possessed by the defendant and his co-conspirators, and courts regularly permit experts to opine on the type and/or functionality of firearms without examining the actual weapon. *See United States* v. *Martinez-Armestica*, 846 F.3d 436, 441 (1st Cir.), *cert. denied*, 138 S. Ct. 64 (2017) (district court did not err in admitting testimony of firearms expert who opined on whether photographs of guns found on the defendant's phone were real firearms); *United States* v. *Payne-Owens*, 845 F.3d 868, 875 (8th Cir. 2017) (expert permitted to testify that gun depicted in photograph of the defendant was real); *United States* v. *Brink*, 39 F.3d 419, 421 (3rd Cir. 1994) (allowing a firearms expert to testify that the gun in surveillance photographs was a revolver); *see also Hayes* v. *Lee*, No. 10 Civ. 5134 (PGG), 2013 WL 4008638, at *7 (S.D.N.Y. July 30, 2013) (finding that the state court did not err in admitting photograph of firearm found in defendant's room where firearms expert testified as to whether the gun in the photograph was real); *United States* v. *Joseph*, No. 99 Cr. 238, 2001 WL 562988, at *1 (E.D. La. May 23, 2001). The fact that FEO Kingery did not examine a specific firearm goes to the weight of his testimony, not its admissibility. *Boucher*, 73 F.3d at 21; *see also Daubert*, 509 U.S. at 596.

Second, the defendant contends that FEO Kingery's testimony will invade the province of

the jury because the Court will instruct the jury as to what qualifies as a machinegun or destructive device. This argument also is unpersuasive. As an initial matter, the functionality of a machinegun and destructive device is clearly beyond the ken of the ordinary juror and, thus, FEO Kingery's testimony would assist the jury in determining whether the firearms identified or used by the cooperating witnesses qualified as such. *See e.g.*, *United States v. Pinet-Fuentes*, 888 F.3d 557, 559 (1st Cir. 2018) ("'Machinegun,' defined through cross-references, is not limited to the popular conception portrayed in movies, but effectively includes any weapon, including a Glock, capable of fully automatic fire.").[3] Regardless, experts may opine on factual conclusions, even when they embrace an ultimate issue to be decided by the jury. *Bilzerian*, 926 F.2d at 1294-95. FEO Kingery will not, however, state an "ultimate legal conclusion[] based on those facts." *Id.* Thus, his anticipated testimony is entirely permissible under the relevant case law and Rules of Evidence. *Id.*; *see also* Fed. R. Evid. 704(a); *United States* v. *Grady*, 645 F. App'x 1, 4 (2d Cir. 2016) ("Rule 704(b) does not prohibit all expert testimony that gives rise to an inference concerning a defendant's mental state. The . . . rule . . . means that the expert cannot expressly 'state the inference,' but must leave the inference, however obvious, for the jury to draw." (quoting *United States* v. *DiDomenico*, 985 F.2d 1159, 1165 (2d Cir. 1993))).

---

[3] A machinegun is defined to include, among other things, "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." *See* 18 U.S.C. § 921(a)(23); 26 U.S.C. § 5845(b). The term destructive device includes any explosive bomb or grenade, and any type of weapon other than a shotgun or a shotgun shell that will expel a projectile by the action of an explosive or other propellant and that has any barrel with a bore of more than one-half inch in diameter. 18 U.S.C. § 921(a)(4).

Finally, although the defendant does not make this argument, FEO Kingery's testimony is admissible under Rule 403. FEO Kingery's testimony is not unduly prejudicial because it addresses the functionality of firearms that multiple cooperating witnesses will testify were central to the operations of the drug-trafficking conspiracy in this case. Accordingly, FEO Kingery's testimony should be admitted at trial.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should deny the defendant's motions *in limine*.

Dated: New York, New York
November 26, 2018

>                                     Respectfully Submitted,
>
>                                     GEOFFREY S. BERMAN
>                                     United States Attorney for the
>                                     Southern District of New York
>
> By:      /s/
>                                     Emil J. Bove III
>                                     Matthew J. Laroche
>                                     Assistant United States Attorneys
>                                     212-637-2420

Cc:   Defense Counsel
      (Via ECF)