

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

December 8, 2018

Via ECF
The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
New York, New York 10007

    Re: **United States v. Fredy Renan Najera Montoya**,
       S1 15 Cr. 378 (PGG)

Dear Judge Gardephe:

   The Government respectfully submits this letter pursuant to the Court's instructions at the final pretrial conference on December 7, 2018. In particular, the Court requested additional information about the Government's anticipated evidence regarding: (i) the defendant's role and participation in the murder of General Julian Arístides González; and (ii) the defendant's and Rosendo Najera's statements regarding the conspiracy to kill Individual-1. For the reasons set forth below, the Government respectfully submits that the Court should admit testimony concerning the murder of General Arístides González. Moreover, in light of the guidance provided by the Court at the conference on December 7, the Government will not elicit testimony from CW-1 concerning conversations with Rosendo Najera or the defendant about Individual-1.

## The Arístides Murder

   During the conference on December 7, the Court asked for additional detail concerning the anticipated testimony of Devis Leonel Rivera Maradiaga about the defendant's role in the murder of General Arístides González. The substance of Rivera Maradiaga's anticipated testimony is detailed below in section B. To fully understand the context of Rivera Maradiaga's testimony, a description of some of the anticipated testimony of two other cooperating witnesses is set forth below in sections A and C. Section A describes anticipated testimony regarding some of the defendant's drug-trafficking activities that led to an investigation by General Arístides González. Section C describes anticipated testimony regarding, among other things, statements made by the defendant to a cooperating witness after the murder.

Together, the Government expects the evidence to establish that (i) General Arístides González began investigating the defendant and other drug traffickers in Honduras in 2009 following a cocaine shipment to Olancho that drew law enforcement attention; (ii) in retaliation, Sergio Neftali Mejia Duarte, on behalf of the defendant, contacted other drug traffickers, including Rivera Maradiaga, and requested that they assist in killing General Arístides González in order to stop the investigation and other similar investigations; (iii) Rivera Maradiaga, in turn, recruited members of the Honduran National Police to carry out the murder; (iv) following the murder, the defendant and Mejia Duarte provided Rivera Maradiaga with between approximately $250,000 and $300,000 in cash to pay the assassins who carried out the murder and during a meeting where that money was present, the defendant congratulated Rivera Maradiaga for successfully coordinating General Arístides González's murder; and (v) the defendant acknowledged to another cooperating witness that the murder cost hundreds of thousands of dollars.

      A.      **Relevant Facts**

           1.      **General Arístides González Began Investigating the Defendant and Some of His Co-Conspirators**

By way of background, multiple witnesses will testify that the defendant worked with a variety of drug traffickers in Honduras, including members of the Sinaloa Cartel, a violent and powerful drug-trafficking organization based in Mexico. In particular, the defendant worked directly with a high-ranking member of the Cartel named Cesar Gastelum Serrano—who reported to the Cartel's leader Joaquín Archivaldo Guzmán Loera, a/k/a "El Chapo"—and several of Serrano's top lieutenants, including two cooperating witnesses who will testify at trial ("CW-2" and "CW-3").[1] The defendant also worked with Rivera Maradiaga on several cocaine shipments that were received at the defendant's airstrips, transported to Rivera Maradiaga's workers, brought to Mejia Duarte, and then turned over to Sinaloa Cartel workers employed by Cesar Gastelum Serrano. As explained below, in approximately 2012, the defendant cut Mejia Duarte out of the relationship and began to deliver cocaine shipments that he received in Olancho directly to members and associates of the Sinaloa Cartel in San Pedro Sula and, at times, in Copan near the Guatemala-Honduras border.

As relevant to the murder of General Arístides, CW-2 will testify that in about 2008, CW-2, Jaime Gastelum Serrano, a/k/a "Kio" (Cesar Gastelum Serrano's brother), and a Colombian drug trafficker traveled to Olancho, Honduras to visit one of the defendant's airstrips. When the men arrived in Olancho, they met the defendant and Mejia Duarte at a ranch. The defendant then drove some members of the group to a nearby airstrip that the defendant said belonged to him (the

---

[1] [redacted]

"Catacamas Airstrip").  After inspecting the airstrip, CW-2 communicated to Cesar Gastelum Serrano that the defendant was ready to receive cocaine at the Catacamas Airstrip.

Following this trip, in about 2009, CW-2 learned that Cesar Gastelum Serrano had participated in a shipment of approximately 1,000 kilograms of cocaine that was sent by aircraft to the defendant at the Catacamas Airstrip (the "Cachete Shipment").  Cesar Gastelum Serrano told CW-2 that a Colombian cocaine supplier named Cachete had sent the cocaine to the Catacamas Airstrip on a Gulfstream aircraft.  CW-2 also learned from Serrano that when the plane was near the airstrip, it had trouble landing, which drew law enforcement attention to the plane and the defendant's Catacamas Airstrip.

CW-3 will also testify about negotiations CW-3 had with Cachete concerning the Cachete Shipment, as well as the problems with the flight before it landed at the Catacamas Airstrip.  CW-3 learned from Mejia Duarte and, later, the defendant that because the plane was off its flight path, the plane almost killed the defendant and Mejia Duarte who were both on the airstrip the day the plane landed.

CW-2 and CW-3 will also testify that following the Cachete Shipment, General Arístides González commenced an overt investigation of drug trafficking in Olancho.

2.   The *Cachiros* Hired Assassins to Kill General Arístides González at the Direction of Mejia Duarte and the Defendant

Rivera Maradiaga will testify that in 2009, he had a meeting with Mejia Duarte in Colon, Honduras.  During that meeting, Mejia Duarte stated, in substance and in part, that General Arístides González was seizing airstrips on the defendant's properties and that General Arístides González had even landed a helicopter on one of the defendant's ranches during the investigation.

Mejia Duarte also recounted to Rivera Maradiaga the defendant's statements concerning General Arístides González.  Rivera Maradiaga is expected to testify that, according to Mejia Duarte, the defendant told Mejia Duarte that (i) General Arístides González was a threat to all drug traffickers given that he was willing to target the defendant; (ii) Mejia Duarte needed to talk with their co-conspirators about what to do with General Arístides González because Arístides planned to target other parts of Honduras after Olancho; and (iii) drug traffickers needed to "silence" General Arístides González by killing him.  Rivera Maradiaga is expected to testify that Mejia Duarte also told Rivera Maradiaga that he and the defendant wanted to use the *Cachiros* to carry out the murder because the Cachiros had better access to assassins who were members of the Honduran National Police.  Mejia Duarte also told Rivera Maradiaga that the defendant had access to information about General Arístides González by virtue of his position in the Honduran National Congress.

During the meeting and after Rivera Maradiaga agreed to help in the assassination, Mejia Duarte told Rivera Maradiaga that he was going to call the defendant, and then Mejia Duarte did so in Rivera Maradiaga's presence.  Although Rivera Maradiaga could not hear what the

defendant said on the call, when the call was over, Mejia Duarte said that the defendant was happy that the *Cachiros* were going to assist in the assassination.

Rivera Maradiaga will explain that, following the meeting with Mejia Duarte, Rivera Maradiaga began meeting with other drug traffickers to seek their financial support for the assassination. Among those Rivera Maradiaga met with was Juan Ramon Matta Waldurraga.[2] Around the time Rivera Maradiaga was meeting with these drug traffickers, Mejia Duarte called Rivera Maradiaga about General Arístides González. During that call, Mejia Duarte stated that the defendant wanted the assassination to happen soon because the defendant had received information that General Arístides González would soon be seizing more of the defendant's properties.

Rivera Maradiaga will also explain that he and his brother approached three members of the Honduran National Police to coordinate the assassination. The police officers agreed to arrange for the murder of General Arístides González for $300,000. Rivera Maradiaga told Mejia Duarte the cost of the murder, and Mejia Duarte responded by saying, in substance, that he was happy because he thought it would cost more money. Days later, General Arístides González was murdered in Tegucigalpa.

Shortly after the murder, one of the assassins contacted Rivera Maradiaga to tell him that General Arístides González was dead and to request payment for the murder. Rivera Maradiaga then contacted Mejia Duarte to confirm General Arístides González was dead and to obtain the payment for the assassins. Mejia Duarte directed Rivera Maradiaga to travel to a specific location in Tegucigalpa to pick up the money (the "Pickup Location").

When Rivera Maradiaga arrived to the Pickup Location, the defendant, Mejia Duarte, and one of Mejia Duarte's relatives were present. Upon Rivera Maradiaga's arrival, the defendant approached Rivera Maradiaga and said, in substance, that Rivera Maradiaga had done a good job killing General Arístides González. Mejia Duarte also congratulated Rivera Maradiaga for arranging the murder. The defendant and Mejia Duarte then presented Rivera Maradiaga with the money to pay the assassins, approximately $300,000 in cash that they had laid out on a table nearby. The money was in twenty dollar denominations and tightly wrapped.

Rivera Maradiaga did not take the money with him because he did not want to be responsible for transporting it. Instead he told the defendant and Mejia Duarte to have the cash delivered to him at another location. Before Rivera Maradiaga left, he heard the defendant take a phone call, after which the defendant said he needed to go to work in the capital. Rivera Maradiaga understood this to mean that the defendant had to leave to work as a congressman. The same relative of Mejia Duarte who was present at the Pickup Location with the defendant later delivered the money to Rivera Maradiaga at another location, and Rivera Maradiaga provided it to the assassins. One of the assassins advised Rivera Maradiaga that the defendant, Rivera Maradiaga,

---

[2] Matta Waldurraga is one of the individuals who was present for the recorded meetings in November 2013 and January 2014 that are the subject of the Government's motions *in limine*.

and Mejia Duarte should leave Tegucigalpa in order to avoid the anticipated investigation of the murder. Rivera Maradiaga passed that instruction to Mejia Duarte, and Mejia Duarte instructed him not to discuss the murder further with other drug traffickers because he expected that a Mexican—*i.e.*, Cesar Gastelum Serrano—would reimburse them.

### 3. The Defendant Discussed the Murder of General Arístides González With Another Cooperating Witness

The Government expects that Rivera Maradiaga's testimony will be corroborated by CW-3. CW-3 is expected to testify that after the Cachete Shipment but before the murder of General Arístides González, Mejia Duarte, Cesar Gastelum Serrano, Jaime Gastelum Serrano, and CW-3 had a meeting about General Arístides González. During the meeting, Mejia Duarte asked Cesar Gastelum Serrano to contribute money to pay for the murder because of the threat General Arístides González posed to traffickers in Honduras (and therefore the pipeline of cocaine that the Sinaloa Cartel was sending through Honduras on its way to the United States). Cesar Gastelum Serrano agreed to support the murder. The Government also expects CW-3 to testify that, after the murder, CW-3 received a call from Mejia Duarte confirming that General Arístides González had been killed, and Serrano later contributed several hundred thousand dollars for the killing.

Later, CW-3 had a meeting with the defendant during which the murder was discussed. At the time of this meeting, the defendant had stopped working with Mejia Duarte because the defendant was upset with his share of the profits. As a result, the defendant cut Mejia Duarte out of his trafficking activities and began working directly with the Cartel.

During the meeting with CW-3, the defendant discussed his frustration with Mejia Duarte to which CW-3 responded, in substance, at least Mejia Duarte had killed General Arístides González. The defendant responded by acknowledging that the murder was paid for with several hundred thousand dollars.

### B. Discussion

The Government respectfully submits that the foregoing testimony from Rivera Maradiaga, CW-2, and CW-3 should be admitted at trial.

*First*, as a threshold matter, the foregoing testimony is admissible under the hearsay rules. Testimony by Rivera Maradiaga and CW-3 concerning statements of the defendant about murder are admissible as statements by a party opponent. Fed. R. Evid. 801(d)(2)(A). These statements include (i) the defendant acknowledging his role in the Cachete Shipment to CW-3; (ii) the defendant congratulating Rivera Maradiaga for killing General Arístides González and providing Rivera Maradiaga with payment for the murder; and (iii) the defendant acknowledging to CW-3 that the assassins were paid hundreds of thousands of dollars for the murder. Similarly, testimony by the cooperating witnesses about meetings with Mejia Duarte and Cesar Gastelum Serrano are also admissible as co-conspirator statements and statements against interest pursuant to Federal Rules of Evidence 801(d)(2) and 804(b)(3). These statements include, among others,

(i) Mejia Duarte telling Rivera Maradiaga that the defendant wanted to kill General Arístides González; (ii) Mejia Duarte telling CW-3 about his role in the Cachete Shipment; and (iii) Cesar Gastelum Serrano telling CW-2 about the Cachete Shipment.³

*Second*, testimony concerning the murder is also admissible as direct proof of the defendant's involvement in the charged crimes, as Rule 404(b) evidence, and under Rule 403. As described in the Government's motions *in limine*, the defendant's coordination of this brazen act of violence with Mejia Duarte, the *Cachiros*, and members of the Sinaloa Cartel is highly probative as to each of the charges in the Indictment. Indeed, as to Count One, the testimony is highly relevant to show the ways in which the defendant would retaliate against anyone for interfering with his drug-trafficking activities. The murder was clearly an act in furtherance of the drug-trafficking conspiracy in that it allowed the defendant to continue operating in Olancho with impunity and sent a message to law enforcement that investigating the defendant would not be tolerated. As to Counts Two and Three, the testimony is also highly relevant because General Arístides González was murdered by police officers who used firearms.

Testimony relating to the assassination of General Arístides González is not unduly prejudicial under Rule 403 because this act of violence is inextricably intertwined with the brutal drug business in which the defendant participated, including the firearms offenses at issue, and no more sensational than the other proof relating to these activities. For example, the Government expects that CW-2 will testify that the defendant solicited funds in order to purchase two rocket-propelled grenade launchers, and also shipped machineguns to drug traffickers operating on the Colombia-Venezuela border. It is simply not unfairly prejudicial to present evidence about the murder given that the defendant was ***directly*** involved in planning and paying for the murder.

### Individual-1

During the conference on December 7, the Court requested more information concerning (i) the evidence that Rosendo Najera was one of the defendant's co-conspirators; and (ii) "why it would be reasonable for the jury to conclude that the defendant wanted Individual-1 killed because he was interfering with the charged cocaine importation conspiracy." (Tr. at 35-36).

As to the first point, the Government anticipates that there will be testimony from, at a minimum, CW-1 and Rivera Maradiaga that Rosendo Najera worked for the defendant and was involved in his drug-trafficking activities. For example, Rivera Maradiaga worked with Rosendo Najera on a maritime cocaine shipment, and is expected to testify that Rosendo Najera

---

3 

The Honorable Paul G. Gardephe  Page 7
December 8, 2018

confirmed during that shipment that he worked for the defendant.  Similarly, CW-1 had a number of conversations with Rosendo Najera regarding his participation in the conspiracy.  As a result, the Government anticipates that it will be able to establish his involvement in the conspiracy.

As to the second point, while CW-1 was not explicitly told why Rosendo Najera and the defendant wanted to kill Individual-1, CW-1 understood from their conversations that Individual-1 was one of the defendant's rivals.  Regardless, in light of the guidance provided by the Court at the conference on December 7, the Government will not elicit testimony from CW-1 concerning conversations with Rosendo Najera or the defendant about Individual-1.

The Government notes, however, that it does still intend to elicit testimony from CW-1 about the fact of the meeting with the defendant at which the defendant discussed Individual-1.  The Government will not seek to admit testimony about Individual-1 from that meeting.  Instead the Government will elicit that the defendant met with CW-1 and bribed him during the meeting.  Prior to CW-1's testimony, the Government respectfully requests that it be provided an opportunity to briefly confer with CW-1 outside the presence of the jury to ensure that information about Individual-1 is not inadvertently disclosed at trial.

    Respectfully submitted,

    GEOFFREY S. BERMAN
    United States Attorney

By: /s/
    Emil J. Bove III
    Matthew J. Laroche
    Assistant United States Attorneys
    (212) 637-2420

Cc:    Victor Rocha, Esq.
        (Via ECF)