UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA                    CASE NO.:  15-CR-378

       *Plaintiff*,

vs.

FREDY RENAN NAJERA MONTOYA,

       *Defendant*.

_____/

**DEFENDANT'S MOTION TO VACATE PLEA**

Joaquin Perez, Esq.
*Counsel for Defendant*
6780 Coral Way
Miami, Florida 33155
Tel.: (305) 261-4000
Fax: (305) 662-4067
New York Bar No. 5237532

# TABLE OF CONTENTS

I.      CONCISE STATEMENT…………………………………………………….      1

II.     STATEMENT OF FACTS……………………………………………      5

    A.      Timeline of Court Dates and Summary of Attorney Rocha's Jail Visits During His Legal Representation of Mr. Najera……………………………………………      5

    B.      The Period Between March 12, 2018 and July 24, 2018……………………      6

    C.      Period between July 24, 2018 and October 31, 2018………………………..      6

    D.      Period from October 31, 2018 through December 3, 2018…………………      8

    E.      Hearing on December 7, 2018…………………………………………….      8

        (1). Denial of Motion to Continue…………………………………………….      8

        (2).The Court's Ruling on Government's Motion in *Limine*……………………      12

    F.      Hearing on December 10, 2019…………………………………….      14

        (1)      Mr. Najera's Continuous Objections to Mr. Rocha's Representation…………………………………………………..........      14

        (2)      The Court's Involvement in the Proceedings……………...................      14

        (3)      The Plea Colloquy…………………………………………...........      19

        (4)      Period from December 10, 2018 until January 20, 2019……............      21

III.    LEGAL AUTHORITY.......................................................................................      22

    A.      The guilty plea was involuntarily made, unfairly obtained, and given through fear or inadvertence and otherwise inconsistent with Due Process of Law.      24

    B.      Attorney Rocha had an actual conflict stemming from his representation of Wilter Blanco, an individual upon whom blame could be laid for one of the most serious allegations made by the government.      26

        (1).      The Trial Court's and the Government's Obligation to Inquire About a Conflict of Interest……………………………………………………..      26

        (2).      The Conflict Problems, Apart from the Duty to Inquire……………………      28

            a.      Legal Standard…………………………………………………      28

            b.      Najera Was Prejudiced As A Result of the Conflict………………      29

IV.    CONCLUSION……………………………………………………………      32

Pursuant to Rule 11(d)(2) and 32(e) of the Federal Rules of Criminal Procedure Defendant, FREDY RENAN NAJERA MONTOYA ("Najera"),  respectfully request the entry of an order setting aside the Defendant's guilty plea to Counts One and Two of the Indictment entered on December 10, 2018.  As grounds, the Defendant states as follows:

I.   CONCISE STATEMENT

It is fundamental that an accused's plea of guilty, the equivalent of a conviction after trial, with all the substantive and procedural safeguards of the federal constitution, may be accepted only if made voluntarily, understandably and knowingly.  Although the *voluntary* acceptance is a function of the defendant's state of mind, the *understanding* requirement is one in which the defense counsel plays an essential role, as the aim of the right to counsel is to make certain that the defendant is fully appraised of the evidence against him and has a full understanding of his options. The guilty plea in this case was induced by coercion, and was otherwise unfairly obtained or given through fear or inadvertence and, thereby, is involuntary and inconsistent with due process of law.  Mr. Najera's assertions and the record herein plainly chronicle his reluctance to plead guilty and the involuntary nature of the plea.

In an attempt to determine whether Mr. Najera was "satisfied with the representation of Mr. Rocha…," (Transcript of December 10, 2018 Hearing ("Trans. Dec. 10th") at 10:11-12), the Court asked a number of questions, namely, "…I need to hear from you as to whether you are contending that Mr. Rocha, for purposes of this guilty plea, has not provided you with effective assistance of counsel." Trans. Dec. 10th at 10:16-19.  The Court then assumed an active role in questioning Mr. Najera's assertions, ultimately concluding that they were meritless.  Intentionally or otherwise, no matter how well motivated or intentioned the Court may be, Mr. Najera was subjected to a powerful influence when the Court became a participant in the proceedings, bringing

1

to bear the full majesty and force of the office, particularly, when expressing reservations about Mr. Najera's honesty, "I have listened to your complaints about Mr. Rocha and I have previously ruled that they have completely no merit, and that it is my belief that the complaints were raised in an attempt to delay the trial."  Trans. Dec. 10th at 6:22-25.

One of the government's most powerful claims against Mr. Najera was that of his alleged responsibility for the death of General Aristides Gonzalez.  The government's main witness, Devis Leonel Rivera Maradiaga,[1] planned to testify that Mr. Najera persuaded the other co-conspirators "about the need to silence General Gonzalez because he planned to target other individuals." [2]  Mr. Najera's contention was that he had nothing to do with the planning or execution of the assassination.  Instead, the assassination was carried out by other traffickers, particularly Wilter Blanco.  As Attorney Rocha was laboring under an actual conflict of interest due to his representation of Wilter Blanco, he made no effort to investigate, obtain reports, or secure witnesses to challenge the government's version of the assassination.[3] Police reports, including audio recordings generated by both the Honduran Attorney General's Office and Honduran law enforcement concluded that General Gonzalez' seizure of Wilter Blanco's 143 kilos of cocaine had been the cause of the assassination.

---

[1] Mr. Devis Leonel Rivera Maradiaga as well as his brother Javier Eriberto Rivera Maradiaga were the government's key witnesses in the case against Mr. Najera.  Henceforth, they will be referred to by their names or otherwise collectively by their *nom de guerre* "Los Cachiros."

[2] *See*, D.E. 79 at 3; *see also*, Government's Motion *in Limine*, D.E. 61 at 4.

[3] A cursory review of available well publicized news media reports (including a New York Times article (*see*, *infra*, fn. 4) could have alerted Attorney Rocha as well as the government attorneys about the need to hold a potential *Curcio* hearing to advise Mr. Najera about a potential conflict of interest arising from Attorney Rocha's Representation of Wilter Blanco and his representation of Mr. Najera.  *See, United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982)

# The New York Times

## Files Suggest Honduran Police Leaders Ordered Killing of Antidrug Officials

MEXICO CITY — More than a dozen conspirators gathered at the headquarters of the Honduran National Police just after 9:30 p.m. One of them clicked open a briefcase, and bundles of American dollars were distributed among the police officers — payment for the next day's hit job.

After everyone else filed out of the room, the three highest-ranking officers stayed behind to make a call.

"Keep watch over the news tomorrow, sir," one of them said, according to case files gathered by Honduran investigators. "We'll do it all in the morning, good night, sir."

They kept their word.



> The man at the other end of that evening's phone call was
> Winter Blanco, the head of a drug cartel based on the
> Caribbean coast, according to the investigators' files. Five
> months earlier, the antidrug czar had foiled the trafficker's plan
> to use the police to steal 143 kilograms of cocaine from a rival.
> The assassination was payback, investigators concluded.    [4]

Attorney Rocha's comments that "**my client [Wilter Blanco]** has said he's not present, but he does not wish to testify.  He does not wish to testify.  I cannot compel him to testify.  **It would be unethical to force him or ask him even to testify,**" misses the point.  *See*, Trans. Dec. 10th at 20:2-5 (emphasis added).  The Court compounded the problem by concluding that "there's no reason to believe that any of these witnesses…[including,] Wilter Blanco will be a source of exculpatory evidence regarding General Gonzalez' assassination."  Trans. Dec. 10th at 23:10-13. The issue was not Wilter Blanco's willingness to testify, but rather, whether an investigation would have revealed evidence undermining Rivera Maradiaga's credibility by suggesting that he was fabricating or wrongfully implicating Mr. Najera.

---

[4] Malkin, E., (2016, April 15), Files Suggest Honduran Police Leaders Ordered Killing of Antidrug Officials, *New York Times*.  Retrieved from https://www.nytimes.com.

II.    STATEMENT OF FACTS

A. Timeline of Court Dates and Summary of Attorney Rocha's Jail
   Visits During His Legal Representation of Mr. Najera[5]



---

[5] For ease of reference, **Red** (Attorney Rocha's Jail Visits with Mr. Najera); **Green** (Court Dates); **Brown** (Proffer Sessions).

B. The Period Between March 12, 2018 and July 24, 2018

1.   On March 12, 2018, Mr. Najera self-surrendered in the Southern District of New York.[6]

2.   Between March 12 and July 5, 2018, the parties unsuccessfully attempted to reach a cooperation agreement.

3.   On July 6, 2012, this Court entered a protective order as a preliminary step to the government release of discovery in the case (D.E. 12).

4.   Extensive discovery (1 terabyte) was provided to Attorney Rocha on a rolling basis. [7] (DE 13).

5.   At a status hearing held on July 24, 2018, this Court scheduled the pretrial conference for Friday, December 7, 2018 and trial for Monday, December 10, 2018 (D.E. 14).

C.   Period between July 24, 2018 and October 31, 2018

6.   On August 20, 2018, Attorney Rocha filed *Motion to Take Deposition from 4 Witnesses that Reside in Honduras* (D.E. 20).  Specifically, Attorney Rocha sought testimony regarding the death of Claudio Rigoberto Mendez.  On August 27, 2018, the government filed a response, noting that the events surrounding the death of Mr. Mendez were not relevant as they were not in furtherance of the conspiracy charged in the indictment.  *See*, D.E. 23 – The Government's Opposition to the Defendant's Motion for Rule 15 Depositions, at 15.  ("[T]he Government does

---

[6] Mr. Najera had three proffer sessions with the government: March 20, 2018, May 21, 2018 and June 19, 2018.  Presumably in preparation for those proffers, Mr. Rocha visited Mr. Najera on March 19, 2018, April 17, 2018 and May 11, 2018.

[7] Attorney Rocha visited Mr. Najera on July 15th, July 17th and July 18, 2018 to discuss a potential resolution of the case by way of a plea, as the government had given a July 23, 2018 deadline for purposes of entering a guilty plea.

not believe that the murder of Mendez was conducted 'in furtherance of the conspiracies' charged in the Indictment.")

7.    On September 19, 2018, Attorney Rocha filed his first motion to withdraw as attorney of record alleging "preparation for this trial and the trial itself are a tremendous undertaking that will be burdensome upon myself and my staff." (D.E. 37). Mr. Rocha further indicated that he has not "been provided with the resources necessary for trial preparation and trial."  *Id*.[8]

8.    By letter dated September 26, 2018, the government requested that the "Court adjourn the due date for the defendant's reply *sine di*e until the withdrawal motion is decided," recognizing a defendant's  "…right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant…," *quoting Wheat v. United States*, 486 U.S. 153, 159 (1988).  (D.E. 40).

9.    On October 31, 2018, the Court denied Attorney Rocha's motion to withdraw (D.E. 44). During the forty one days (41) that elapsed between the filing of the motion to withdraw and the denial thereof, no pleadings were filed or hearings held in the case.  During that period, Mr. Rocha visited Mr. Najera on two occasions, September 27, 2018 and October 8, 2018.  By the time the case got back on track, Mr. Najera and his counsel had exactly forty days (40)  to prepare for the December 10th trial date.

---

[8] Although the Court suggested that Mr. Najera was "manipulating the system to continue the trial date," it is worth noting that Attorney Rocha's motion to withdraw was the first salvo that caused the breakdown of the attorney client relationship.

D.  Period from October 31, 2018 through December 3, 2018

10.   On November 21, 2018, Mr. Najera mailed a letter to the Court indicating that during the last three months Attorney Rocha "had only seen him twice" and only to "require more money." He added that the visits had been short and did not delve into "trial preparation" matters.  Finally, Mr. Najera indicated that if a continuance was granted, he understood that he would remain in custody for a lengthy period of time but preferred it "rather than to proceed blindly with an attorney that had demonstrated no interest in my situation."[9]

11.   On December 3, 2018, this Court held an *ex parte* status conference to address the concerns raised in his letter.[10]

E.  Hearing on December 7, 2018

(1). Denial of Motion to Continue

12.   At the hearing on December 7, 2018, the Court found the "[t]he records from the MCC show that Mr. Rocha has visited the defendant 19 times, including seven times in the past four months."  Transcript of Hearing of December 7, 2018 ("Trans. Dec. 7th") at 3:16-18.  The Court then concluded "Mr. Rocha's estimate of the number of visits he's had with the defendant in

---

[9] Mr. Najera's Letter was not assigned a Docket Entry number but nevertheless was received by the Court and the parties.

[10] There is no Docket Entry for this event, however, it appears that a sealed document addressing the contents of the hearing was entered on December 4, 2018 and assigned Docket Entry Number 77.

preparation for this case is accurate, and the defendant's claims to the contrary are false." Trans. Dec. 7th at 3:20-23.[11] [12] [13]

13.   The Court denied Mr. Najera's request for a continuance finding that "[t]he defendant's complaints provide no basis for me to delay the trial or to permit Mr. Rocha to withdraw at this late date. I can't allow a defendant to manipulate the system by making false allegations against his lawyer on the eve of trial." Trans. Dec. 7th at 5:8-12.

14.   The Court also denied Mr. Najera's request finding that "a delay in the trial date presents a risk of retaliation to any friends and family of the cooperating witnesses who remain in Honduras." Trans. Dec. 7th at 5:23-25.  The Court indicated that "[t]he government has revealed its witnesses, and both they and their families and associates in Honduras are at risk of retaliation." Trans. Dec. 7th at 5:5-17.

---

[11] Records obtained from the Metropolitan Correctional Center ("MCC") indicate that during the three months preceding Mr. Najera's Letter dated November 21, 2018, Attorney Rocha visited Mr. Najera on three occasions: September 6, 2018, September 27, 2018, and October 8, 2018.  In other words, Mr. Najera's complaints about being visited by Attorney Rocha on only two occasions during the preceding three months could not reasonably be seen as "false allegations." Trans. Dec. 7th at 3:20-23.

[12] From September 19, 2018 until the date of pretrial status hearing on December 7, 2018, Mr. Rocha visited Mr. Najera on three occasions:  September 27, (71 days before the hearing; October 8 (60 days before the hearing) and November 28, 2018, (9 days before the hearing).

[13] At the status hearing held on December 7, 2018, Mr. Najera announced his intention to enter a plea as to Count One, reserving his right to go to trial on Counts Two and Three of the Indictment. Trans. Dec. 7th at 6:4-7.  Mr. Najera executed an Advice of Rights form, which reflected his intention to enter a plea only as to Count One.  It is worth noting that Mr. Najera did not execute a similar waiver in conjunction with his subsequent plea to Count Two of the Indictment on December 10, 2018.

15.   The government overstated the nature of the potential harm resulting to the witnesses in its case.  Public disclosure had already been made about the Cachiros's surrender and agreement with the Southern District of New York.





Devis Leonel Rivera Maradiaga, left, and Javier Eriberto Rivera Maradiaga. The brothers led a drug trafficking organization called Los Cachiros that was said to be responsible for dozens of murders. Department of the Treasury Office of Foreign Assets Control

[14]

Moreover, the government did not disclose that their entire families had been relocated to the United States where they faced no danger.   Similarly, other potential witnesses including Guillermo Lozano, Adolfo Rodriguez Barrientos (aka "El Cuache") and Walter Montejo Merida had already testified without adverse consequences in the well-publicized trial of *United States v. Sergio Neftali Mejia Duarte*, Case No. 15-cr-20540-KAM (S.D. Fla. January 9, 2017).

---

[14] Goldstein, J. and Weiser, B., (2017, October 6), After 78 Killings, a Honduran Drug Lord Partners With the U.S., *New York Times*.  Retrieved from https://www.nytimes.com.

16.  Prior to commencing the aborted plea colloquy on December 7, 2018, the Court impressed upon Mr. Najera the consequences of being convicted at trial of the firearm charges, *i.e.*, that the firearm charges would be stacked consecutively.  However, the Court **did not mention** that Mr. Najera will face a consecutive thirty-year sentence of imprisonment **irrespective** of whether convicted at trial or entering a guilty plea:

> THE COURT: Okay. Let me say it again. Those firearms charges that you are going to proceed to trial on next week, are you aware that you can be sentenced to an additional term of imprisonment on those charges? Are you aware of that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Are you aware that any sentence I impose on those firearms charges, by law, must run consecutively to any sentence that's imposed on Count One? Are you aware of that?
>
> THE DEFENDANT**: I don't understand that exactly**.
>
> THE COURT: Okay. Let me break it down for you. I don't know what sentence you would receive on Count One, but for purposes of illustration only, let me suggest to you that I sentenced you to ten years on Count One. (Pause)
>
> THE COURT: Let me repeat the illustration I was about to give you. As I said, I  don't know what sentence you will receive on Count One, but for purposes of illustrating this point to you, let's assume that I sentence you to ten years' imprisonment on Count One. Are you with me?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Now --
>
> THE DEFENDANT: Charge one?
>
> THE COURT: Charge one, right. And then let's further assume that you are convicted by the jury on Counts Two and Three. Are you with me?
>
> THE DEFENDANT: Uh-huh.
>
> THE COURT: Okay. So if you are convicted on Counts Two and Three, I will impose a sentence on you for those convictions. Do you understand that? Yes?
>
> THE DEFENDANT: **Not completely**.
>
> THE COURT: Okay.
>
> MR. ROCHA: May I have a minute?
>
> THE COURT:   Yes.
>
> (Defendant and counsel confer)
>
> MR. ROCHA: Judge, I need to discuss, five minutes with the government. **It's taken a turn that was not expected**.

Trans. Dec. 7th at 3:3-25;11:1-17 (emphasis added).

11

(2).    The Court's Ruling on Government's *Motion in Limine*

17. After reaching this impasse, the Court addressed the government's *Motion in Limine* addressing the proposed testimony of Rivera Maradiaga with respect to Mr. Najera's role in General Gonzalez' assassination in December 2009.  The government argued that this evidence was probative of the existence of a drug trafficking conspiracy and, more specifically, of the firearms charged in Counts Two and Three of the Indictment. It was the government's position that Mr. Najera instigated the murder because General Gonzalez was interfering with Mr. Najera's airstrips and intended to seize his properties in the Olancho area.  The government's case was largely based upon testimonial evidence as drugs, money and/ or firearms were never seized to corroborate Rivera Maradiaga's allegations. Evidence about the assassination was highly inflammatory as it painted Mr. Najera as a violent individual and, thus, made the firearms charges more credible.  The Court concluded:

> Before ruling on this point, **I need to understand why it would be reasonable for the jury to conclude that defendant [Mr. Najera] wanted Individual No. 1 [General Gonzalez] killed** because he was interfering with the charged cocaine importation conspiracy. If the government can establish that point, this testimony appears relevant to me. If it's relevant, the defendant's statements would, of course, come in as admissions.

Trans. Dec. 7th at 35:18-24.

18. The Court also found that evidence of Mr. Najera's presence at a meeting attended by Rivera Maradiaga, Ramon Matta, Carlos Lobo, and Midence Oqueli Tureous was essential to show "access [to] political figures in the government concerning protection for drug traffickers and with respect to extradition of drug traffickers from Honduras to the United States." Trans. Dec. 7th at 30:21-24.  Mr. Najera unsuccessfully attempted to explain that the consequences of failing to attend a meeting when summoned by Los Cachiros went beyond the loss of financial and political

backing.  In this context, Mr. Najera mentioned that he had requested that Attorney Rocha seek

the testimony of Victor Sabillon to show that political figures' failure to attend meetings called by

the Cachiros would likely result in death.  The Court asked Attorney Rocha about the significance

of Mr. Najera's concerns.  In response, Attorney Rocha expressed the futility in calling witnesses

to challenge the government's case in light of what he considered to be overwhelming evidence

against Mr. Najera:

> THE COURT: All right.  So Mr. Rocha, Mr. Najera is saying that you should
> have made efforts to obtain testimony from Victor Sabillon?  What do you have
> to say?
> \*     \*     \*
> MR. ROCHA:…**This case does not rise and fall on that**….But no, that
> discussion happened a week or two ago, and I haven't done anything further with
> respect to that because it's not clear that's what he's saying, that's his inference;
> and B, the resources are not there to do that; and third, Judge, this case — the
> **evidence is so overwhelming that this case does not rise and fall on tha**t.  **The
> government could prove their case without introducing any of this evidence**.

Trans. Dec. 10th at 30:11-13,19; 31:5-11; 32:21-25; 33:1-3.   The subsequent assassination of

Honduran Congressman Carlos Eduardo Gauge, who refused to attend the meeting, illustrates how

critical the stakes were for those who crossed the Cachiros.[15] *See*, Dudley, S. (2016, April 9),

Honduran  Elites  and  Organized  Crime:  Los  Cachiros  (*Insight  Crime*).    Found  at

http://www.insightcrime.org.

---

[15] "THE DEFENDANT: In that meeting the assassination of Honduras congressman was planned.
I don't have the name of that congressman. In conclusion, your Honor, what we tried to establish,
we had been invited to attend under threat of death by Rivera Maradiaga and Mr. Mata, Jr., and
that we were told Congressman Gaujel, because he didn't attend such meeting, was killed a few
months later." Trans. Dec. 10th at 32:21-25; 33:1-3.

F.   Hearing on December 10, 2019

(1) Mr. Najera's Continuous Objections to Mr. Rocha's Representation

19. On December 10, 2018, Mr. Rocha advised the Court that Mr. Najera wanted to plead guilty to Counts One and Two of the Indictment.  Trans. Dec. 10th at 2:11-23.  Mr. Najera asked the Court to be permitted to plead guilty with the assistance of another attorney:

> THE DEFENDANT…I'm asking you that my guilty plea may take place with another lawyer, either public or private, since Dr. Rocha didn't counsel me in a proper manner **and there were several discussions and controversies between him and myself that have been amply demonstrated** in this court. And I'm asking, I'm begging you, I'm asking you to give me the opportunity to plead guilty but with a different lawyer. Yours truly, Fredy Renan Najera Montoya.

Trans. Dec. 10th at 3:1-9 (emphasis added).

20.   In response to Mr. Najera's request, the Court stated:

> THE COURT:… Now Mr. Najera, with respect to your wish to plead guilty today but to do so with another lawyer, I cannot grant that request. The matter is on for trial today, as you know. The trial was scheduled in July. I have listened to your complaints about Mr. Rocha and I have previously ruled that they have **completely no merit**, and that it is my belief that the complaints were raised **in an attempt to delay the trial**.
>
> So your choice here is to proceed to trial as was scheduled back in July on the three charges against you, or to plead guilty, as I understand it, to Counts One and Two with the government's agreement that Count Three will be dismissed at the time of sentencing, and to do so with Mr. Rocha and Mr. Horowitz as your counsel. That is your choice. I see no basis for relieving Mr. Rocha, as I have said in the past, and I'm not going to relieve him or Mr. Horowitz for purposes of hearing your guilty plea. So do you want to proceed to trial as was scheduled or is it your wish to plead guilty to Counts One and Two?
> *   *   *
> THE DEFENDANT: Rather than to proceed to trial with an attorney who hates me, **I would rather plead guilty therefore**.

Trans. Dec. 10th at 6:19-25; 7:1-11; 7:15-17 (emphasis added).

(2) The Court's Involvement in the Proceedings

21. The Court then concluded:

14

> THE COURT: All right. Well, let me say, Mr. Najera, that I'm confident that Mr. Rocha does not hate you. But Mr. Rocha, let me hear from you on this issue of alleged animosity between the two of you.

Trans. Dec. 10th at 8:2-5.

22.   Mr. Rocha responded, in part, as follows:

> But I know that he certainly does not want to continue to see me, as I went to see him again last night and he said that he wants me out of his case as soon as possible.

Trans. Dec. 10th at 8:17-20

23.   Before the plea colloquy, the Court questioned whether Mr. Najera was satisfied with Mr.

Rocha.  *See, Benchbook, for U.S. District Court Judges*, Sixth Edition, Federal Judicial Center,

March 2013 Edition, Section 2.01 –Taking pleas of guilty or nolo contendere. The following

exchange then took place:

> THE COURT: All right. Now also before we proceed further let me say to you, Mr. Najera, that one of the questions that I'm required under the law to ask you in the course of taking your guilty plea is **whether you are satisfied with the representation of Mr. Rocha** and Mr. Horowitz. And you have expressed unhappiness with the representation of Mr. Rocha, and you have sought an adjournment on that basis and I have denied that application. But **before going any further with respect to a guilty plea, I need to hear from you as to whether you are contending that Mr. Rocha, for purposes of this guilty plea, has not provided you with effective assistance of counsel**. And the reason why I'm asking you this question is that if it is your intention to argue later Mr. Rocha did not provide you with effective assistance of counsel, then we should sort that issue out right now. I have told you that **I believe, based on the record, which is very substantial here, that Mr. Rocha has provided you with effective assistance of counsel**. **He has filed numerous motions on your behalf, he has spent hundreds of hours preparing for the case, he interviewed people in Honduras on your behalf**. So it's my belief that he has provided you with effective assistance of counsel. And I say that understanding the very difficult position you find yourself in and the enormous sentence that you face, **but I need to hear from you whether you are contending that Mr. Rocha did not effectively represent you such that it would be improper for me to accept your guilty plea**. So what do you say?

15

> THE DEFENDANT: Your Honor, I have expressed to you the fact that I am **very unhappy** in the way in which I have been advised by Mr. Rocha, and it's **very difficult for me to say under oath that I am satisfied** when that is not the truth. **But your Honor, if, in order to conclude all of this, it is necessary that in order to plead guilty I say that I agreed with the way in which I was represented, I agree to do that in order to finalize everything**.

Trans. Dec. 10th at 10:8-25;11:1-18 (emphasis added).

24.   In connection with the death of General Aristides Gonzalez, Mr. Najera asked Attorney Rocha to investigate two additional witnesses, Wilter Blanco and Ramon Matta-Waldurraga. Trans. Dec. 10th at 19:5-10. Attorney Rocha had failed to disclose to Mr. Najera his representation of Wilter Blanco in the Southern District of Florida.  (*See*, *United States vs. Wilter Blanco Ruiz*, Case No. 16-20602-CR-DMM (SD Florida).  As previously mentioned, Honduran authorities had identified Mr. Blanco as the mastermind behind the assassination of General Gonzalez.[16]

25.   Evidence pointing to Wilter Blanco as being the culprit would have accomplished three purposes: (a) to impeach Rivera Maradiaga's testimony about who participated in the planning and execution of the assassination; (b) to show the existence of a well-documented feud which would account for Rivera Maradiaga's motivation to implicate Mr. Najera; and (c) that among all well-known drug traffickers in Honduras, including Wilter Blanco, Mr. Najera was the least prone to violence and, thus, an easier target to implicate without fear of retaliation. No effort was made to pursue this information by way of a Fed. R. Crim P. Rule 15 deposition, as this endeavor would have revealed Attorney Rocha's actual conflict.  The attempt to shift the blame from Mr. Najera

---

[16] Ironically, Wilter Blanco, Juan Ramon Matta-Waldurraga, Jr. (*United States v. Matta-Waldurraga*, Case No. 14-cr-00442-KAM (E.D.N.Y 2014) and Sergio Neftali Mejia Blanco (*United States v. Sergio Neftali Mejia Duarte*, Case No. 15-cr-20540-KAM (S.D. Fla. January 9, 2017) were never charged with General Gonzalez's murder nor was the homicide mentioned at their respective sentencing.  Moreover, these individuals were not charged with conspiracy to possess or possession of machineguns and destructive devices.

to Mr. Blanco and exculpate Mr. Najera would have placed Mr. Rocha in a conflicted position. Attorney Rocha, however, neglected to conduct an investigation as his duty of loyalty to Wilter Blanco exceeded his obligation to Mr. Najera. Mr. Rocha described Wilter Blanco in the following way:

> "The undersigned [Attorney Rocha] traveled to Palacios, Gracias a Dios, Honduras on August 1, 2017 to meet Mr. Blanco-Ruiz' family and friends from his community. Notably, at the entry way to the property where Mr. Blanco-Ruiz' parents and siblings live in this small community which can only be reached via a four hour drive on a dirt road, there stands a Prayer Hall that his parents built in order to have religious services for the community. On August 2nd, 2017, the undersigned hosted a forum of over 50 relatives and friends of the Defendant who came to give me their testimony about the **kindness in the defendants' heart** and how he had helped his community with numerous charitable acts, including **counseling people against violence and hiring small planes to carry people in dire need of medical treatment** to the hospitals and clinics in La Ceiba, Honduras, which is a 6 hour drive away or a 45 minute to one-hour plane ride. Prior to the seizure of his legitimate seafood business by Honduran Government, Mr. Blanco-Ruiz employed nearly one hundred people from his community as fishermen, clerks, processors and packers. Those jobs are no longer available today. Two pastors from the area approached me and told me of the generous contributions made by Mr. Blanco-Ruiz which led to the construction of small "churches" and programs to advance their respective Ministries. The Mayor of the Municipality of JUAN FRANCISCO BULNES where PALACIOS is located, JOSE ANTONIO VILLALTA, marveled about all of the good things Mr. Blanco-Ruiz had done by providing employment to his constituents and making generous donations to the school system which uniforms to those children who could not afford them.
>
> The Director of the school, WALTER DAVID AVILA, confirmed the mayor's testimony and described Mr. Blanco-Ruiz as "having the heart of a child" because when he would pass through Palacios he would visit and play with the children at the school. Countless people came up to me, blessing me, crying and imploring me to do my best as his counsel to advocate and obtain the lowest possible sentence available under United States law. Even small children approached me crying and asking me to send Wilter home, as though I alone had the power to do that."

*United States v. Wilter Blanco Ruiz*, Case No. 16-20602-CR-DMM (SD Florida)—D.E. 31—Sentencing Memorandum, at 2-4 (emphasis added).



**WILTER BLANCO'S CARTEL ORDERED THE ASSASSINATION OF GENERAL JULIAN ARISTIDES GONZALEZ** (TRANSLATION OF HEADING BELOW)



26.     When the Court asked Mr. Rocha about a potential conflict, Mr. Rocha stated that "my client [Wilter Blanco] has said that he's not present, but he does not wish to testify.  He does not wish to testify.  I cannot compel him to testify.  It would be **unethical** to force him or ask him even to testify."  Trans. Dec. 10th at 20:1-5 (emphasis added).   The attorney-client conflict is further highlighted when Attorney Rocha shifted the blame from Wilter Blanco to Mr. Najera by brazenly suggesting that he believed the government's allegations to be true:

> MR ROCHA:….My client, Wilter Blanco, has denied that he ever talked to Mr. Rivera Maradiaga about that or he was present at any meetings where that subject was discussed. But whether Mr. Najera was present at any of those meetings **is irrelevant because he's present at meetings allegedly where money was on**

> **the table for Cachiro** [Rivera Maradiaga] with Mr. Najera present together with
> a co-conspirator to give to Cachiro for the murder of General Aristides Gonzalez
> subsequent to murder to pay off the assassins.

Trans. Dec. 10th at 21:9-18 (emphasis added).   By doing so, Mr. Rocha became an unsworn

witness to the statements made to him by Mr. Blanco.  *See, Ciak v. United States*, 59 F.3d 296,

304-05 (2d Cir. 1995) ("[s]tanding alone, becoming an unsworn witness is a basis for

disqualification of an attorney.") *abrogated on other grounds by Mickens v. Taylor*, 535 U.S. 162

(2002).

27.   Mr. Najera's response was unequivocal: "Mr. Rocha has continued to lie as he has done

throughout the whole process."  Trans. Dec. 10th at 17:2-4.  The Court then asked the following

question: "[a]nd what do you contend that Mr. Rocha has lied about in his summary of his

representation?  What do you say that he lied about?."  Trans. Dec. 10th at 17:5-7.

> THE DEFENDANT: Yes, your Honor. For example, I have emails where I was
> requesting for him to present witnesses and testimony, for example, to be specific
> regarding for example, the death of **General Aristides Gonzalez**, I requested
> from him the testimony and the witnesses, because Mr. Leonel Cachiro –

Trans. Dec. 10 at 18:9-13 (emphasis added).

### (3) The Plea Colloquy

29.   During factual proffer in support of the plea, the Court asked Mr. Najera "what you did

that makes you believe that you are guilty of the crime charged in Counts One and Two" and

whether Mr. Najera knew that the ultimate destination of the cocaine was the United States. Trans.

Dec. 10th at 69:21-24.   Mr. Najera responded: "I wasn't told that exactly, but yes, **my intuition**

was that it was going to the United States because all the drugs that arrived there ended up in the

United States."  Trans. Dec. 10th at 71:8-10 (emphasis added).

19

30.   Regarding Count Two, the Court asked Mr. Najera "what did you do that makes you believe that you're guilty of that offense?"  Trans. Dec. 10th at 72:15-16.   Mr. Najera responded as follows:

> THE DEFENDANT: I carried weapons, fire weapons, rifle 223, and I also motivated the other people to carry weapons, those who were in charge of receiving the drug in the airstrips.
>
> THE COURT: And those firearms that you carried and that the security people carried, were **those machine guns in the sense that you pulled the trigger once and multiple shots would come out**?
>
> THE DEFENDANT: Well, they were weapons, 223, like I said before, with charges that had 30 shots.
>
> THE COURT: When you say "charges," do you mean a magazine that had 30 shots?
>
> THE DEFENDANT: Yes, yes, inside the rifle, yes.
>
> THE COURT: I'm not familiar with 223, can somebody help me with that reference?
>
> MR. LAROCHE: Your Honor, a 223 is a reference is a bullet that can be used in weapons that are **capable** of being automatically fired. When I think he's referring to 223 rifle, he's referring to the bullet that can be in that rifle. There are various rifles that have different capabilities. Our evidence would reflect there are rifles including, for example, M-16s and AK-47s, which are **capable** of automatic fire. I think that your Honor has asked this before, **but maybe put the question to him again**, whether he understood that at least some of the weapons that he encouraged others to possess or that he himself possessed **could fire more than one shot with one pull of the trigger**.
>
> THE DEFENDANT: Yes, I understood.
>
> THE COURT: Let me repeat that question to you, Mr. Najera. The weapons that you carried or that you arranged for your security people to carry, were you aware that they would fire multiple shots with one pull of the trigger?
>
> THE DEFENDANT: Not the one that I carried, your Honor, because that was a 223, and even though it had a  magazine with 30 shots, it wouldn't have made more than one shot after pulling the trigger, it was only one by one that came out. But with respect to the other people, about the other people, **yes, there were people who carried a weapon that shot kind of automatically.**

Trans. Dec. 10th 71:15-25; 73:1-25; 74:1-25 (emphasis added).

31.     As shown by the photograph below, there is no visual difference between semi-automatic and fully automatic firearm.  An individual looking at a weapon from a distance would not be able to discern the capability of the weapon without either seeing it fired or looking at the firearm's internal components.   What makes a weapon fully automatic are trigger mechanism located *within* the firearm's housing:





This is the hidden component that converts the same weapon from a semi-automatic to an automatic firearm.

(4) Period from December 10, 2018 until January 20, 2019

32.    On December 10, 2018, Attorney Rocha filed his second motion to withdraw as counsel for Mr. Najera.  Trans. Dec. 10th at 77:22-25.  On December 26, 2018, Attorney Rocha filed his

third motion to withdraw as attorney of record [D.E. 83].  Mr. Najera then asked for an additional amount of time to either retain or be appointed a lawyer.  Trans Dec. 10th  at 78:3-9

33.    The undersigned entered his appearance on January 4, 2019 (DE 88).  The motion for substitution was not granted until Friday, January 7, 2019 (D.E. 90).  Over the course of the following three weeks, Attorney Rocha provided undersigned with approximately one terabyte of discovery.  The undersigned has reviewed the evidence, consulted with Mr. Najera, and is filing the instant motion as soon as feasible to avoid unnecessary delay.

### III.    LEGAL AUTHORITY

Rule 32(e) of the Federal Rules of Criminal Procedure provides that the court may grant a motion for leave to withdraw a guilty plea upon a showing of a "fair and just reason" for doing so. Although this standard implies that motions to withdraw *prior to sentence* should be liberally granted, *see, United States v. Russell*, 686 F.2d 35, 38 (D.C.Cir.1982) and *United States v. Torres*, 129 F.3d 710, 715 (2d Cir. 1997), a defendant who seeks to withdraw his plea "bears 'the burden of satisfying the trial judge that there are valid grounds for withdrawal, taking into account any prejudice to the government.'" *United States v. Quinones*, 906 F.2d 924, 928 (2d Cir.1990) (quoting *United States v. Michaelson*, 552 F.2d 472, 475 (2d Cir.1977)), cert. denied, --- U.S. ---, 111 S.Ct. 789, 112 L.Ed.2d 851 (1991).

In determining whether a "fair and just reason" exists to grant a motion to withdraw a guilty plea, the court may consider various factors, including: the amount of time that has elapsed between the plea and the motion; whether the defendant is asserting his innocence; the likely voluntariness of the plea; and any prejudice to the Government. *Torres,* 129 F.3d at 715; *United States v. Doyle,* 981 F.2d 591, 594 (1st Cir.1992). "One especially important consideration is the defendant's answers to the questions posed at his Rule 11 hearing," *United States v. Trussel,* 961

F.2d 685, 689 (7th Cir.1992), which "carry a strong presumption of veracity ..." *Torres,* 129 F.3d at 715 (citing *Blackledge v. Allison,* 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977)). Because "answers contained in [the plea proceeding] are binding," a court "cannot allow [a defendant] to disavow the answers he gave as easily as he wishes." *United States v. Winston,* 34 F.3d 574, 578 (7th Cir.1994).

Rule 11 of the Federal Rules of Criminal Procedure prohibits judicial participation in plea discussions or other discussions with criminal defendants. *See*, Fed.R.Crim.P. 11(c)(1). Courts have viewed the Rule 11(c)(1) prohibition as serving several purposes. Judicial participation and involvement in discussions prior to entry of a plea, as in this case, the judge formulating opinions as to Mr. Najera's argument, while agreeing with the government on every other issue created a "risk of coercion, compromising a judge's impartiality and giving a misleading impression as to the judge's role" in the proceedings. *United States v. Baker*, 587 F.3d 1122, 1127 (D.C. Cir. 2009).

With respect to the amount of time that has elapsed between the plea and instant motion, the undersigned counsel obtained possession of all the pertinent documents on or after January 20, 2019. The present motion, therefore, is being filed within seventy (70) days from the time that undersigned undertook the case and began to discuss and review Mr. Najera's alternatives. The recent case of *United States v. Anthony Cignac*, Case No. 17-20891-CR-Altonaga (S.D.Fla.), D.E. 61 at 2, addresses a similar issue. In *Cignac*, the court granted the motion to vacate the plea finding that the defendant did not have full opportunity to review the discovery, to discuss potential defenses to the crime charged, and to be accurately advised on how the advisory sentencing guidelines might play a role in his sentencing." *Id*. Most relevant, however, was the court's finding regarding prejudice to the government and court's resources. There, the court specifically stated that "the Court's resources will not be conserved by forging ahead with sentencing; certainly

23

the case would be revisited on a post-conviction motion under 28 U.S.. section 2255 requiring the Court's attention and time were the present Motion denied." *Id.; see also United States v. Artabane,* 868 F.Supp. 76 (M.D. Pa. 1994) ("If we are to lend any credence to Defendant's assertions, and we should for the record plainly chronicle[] Defendant's reluctance to plea guilty, then we must recognize that the voluntary nature of Defendant's plea is questionable at best.  If Defendant truly believed that he had but one option to being found guilty and that was to plead guilty, despite his continual assertion of innocence, then we must construe a 'fair and just' reason from his assertions and actions.").  It is important to note that most reported appellate decisions address the denial of a motion to vacate a plea, as opposed to orders granting the order to vacate the plea.  This is understandable in that if the motion to vacate is granted, the case proceeds to trial and the government has no recourse by way of interlocutory appeal.  This accounts for the dearth of cases where the Court of Appeals reverses the lower courts' decisions refusing to vacate a plea.

      A.    The guilty plea was involuntarily made, unfairly obtained, and given through <u>fear or inadvertence and otherwise inconsistent with Due Process of Law</u>.

Whether a plea is voluntary must be decided in the light of the events at the time of its entry.  The issue does not lend itself to precise mathematical determination.  Instead, its resolution is one of fact that involves the evaluation of psychological factors and elements that may be reasonably calculated to influence the human mind. Here, the plea was defective for a number of reasons, including the Court's involvement in judging Mr. Rocha's performance.  The Court's obligation was to ascertain that the plea was not induced by coercion, ignorance, fear or inadvertence as opposed to justify Mr. Rocha's performance.  The concerns that these fears may

be translated into an involuntary plea had been admirably stated in the often quoted statement by

Judge Weinfeld,[17]

> "the unequal position of the judge and the accused, one with the power to commit to prison and the other deeply concerned to avoid prison, raises a question of fundamental fairness. When a judge becomes a participant in plea bargaining he brings to bear the full force and majesty of his office. His awesome power to impose a substantially longer or even maximum sentence in excess of that proposed is present whether referred to or not. A defendant needs no reminder that if he rejects the proposal, stands upon his right to trial and is convicted, he faces significantly longer sentence. " See *United States ex rel. Elksnis v. Gilligan*, 256 F.Supp. 244, 254 (S.D.N.Y. 1966). See also *United States v. Figueroa*, 535 F.2d 198 (1976).

From the outset, Mr. Najera expressed doubts about pleading guilty given his disagreement

with Mr. Rocha, whom he claimed "hated him." Mr. Najera had not only adhered to his not guilty

plea, but steadfastly had asserted his intention to resist the charges of possession and use of a

machine gun and destructive devices incorporated in Counts Two and Three of the Indictment. In

addition, Mr. Najera was credibly asserting his innocence and lack of understanding as to the

firearm charge he was pleading to. *United States v. Craig*, 985 F.2d 175, 178 (4th Cir. 1993)

(whether the movant credibly asserts his innocence is a factor that may be considered in

determining whether a fair and just reason exists for granting a motion under Rule 32(e) and noting

that defendant "has never asserted, credibly or not, his innocence ..."); *see also United States v.*

*Medlock*, 12 F.3d 185, 187 (11th Cir.) (noting that defendant "does not even deny guilt"), *cert.*

*denied*, 513 U.S. 864, 115 S.Ct. 180, 130 L.Ed.2d 115 (1994); *United States v. Doyle*, 981 F.2d

591, 596 (1st Cir. 1992) ("the absence of a claim of innocence weighs in favor of allowing a guilty

---

[17] Judge Weinfeld was nominated by President Harry Truman on July 10, 1950, to the United States District Court for the Southern District of New York. He received his commission on August 5, 1950 and served until his death on January 17, 1988.

plea to stand"); *United States v. Artabane*, 868 F.Supp. 76, 78 (M.D.Pa.1994) ("[w]hether the movant has asserted his legal innocence is an important factor to be weighed").

Nor should the Court have placed itself in a position of expressing opinions about the wisdom of Mr. Najera's request for additional investigation.   When Mr. Najera expressed dissatisfaction with Mr. Rocha's performance, the Court assumed an active role questioning Mr. Najera's assertions, thereafter, concluding that Mr. Najera's concerns were meritless.  Even if the Court's conclusions were accurate (a matter that Mr. Najera disputes), this process created a coercive atmosphere impacting his subsequent decision to enter a plea to what amounted to a life sentence.  Intentionally or otherwise, the accused is subjected to a powerful influence when the court becomes a participant in the proceedings.  The record is replete with Mr. Najera's statements about his dissatisfaction with Mr. Rocha. These factors deprived Mr. Najera of a conscious choice and independent will, causing him to enter  a plea that  provided no concrete benefit.  This is not a case where the defendant was facing death, leaving a life sentence as a viable alternative.  The imposition of a 40 year sentence of imprisonment to a person who is 42 years old would have the practical effect of a life sentence.

   B.   Attorney Rocha had an actual conflict stemming from his representation of
        Wilter Blanco, an individual upon whom blame could be laid for one of
        the most serious allegations made by the government.

        (1)  The Trial Court's and the Government's Obligation to Inquire About a Conflict
             of Interest

The resolution of this question requires an analysis as to when the prosecutors and the Court became aware of the existence of a potential conflict of interest due to Mr. Rocha's concurrent representation of Mr. Najera and Mr. Blanco.  The trial court has an obligation to inquire into the facts and circumstances of an attorney's interests either in response to a timely conflict of interest objection, *United States v. Stantini*, 85 F.3d 9, 13 (2d Cir. 1996), *citing*

*Holloway v. Arkansas*, 435 U.S. 475, 488, 98 S.Ct. 1173, 1180-81, 55 L.Ed.2d 426 (1978), or "when it knows or reasonably should know of the possibility of a conflict of interest." *Strouse v. Leonardo*, 928 F.2d 548, 555 (2d Cir.1991); *see also Levy*, 25 F.3d at 153. An inquiry allows the trial judge to determine the precise nature of the conflict and how to proceed, *i.e.*, whether to disqualify counsel, obtain a waiver from the defendant pursuant to *Curcio*, or take no action. *See United States v. Malpiedi*, 62 F.3d 465, 468 n. 2 (2d. Cir. 1995).

A cursory review of available court records[18] and media reports would have alerted all the parties of the  need for a *Curcio* hearing to advise Mr. Najera about a conflict of interest arising from attorney Rocha's representation of Wilter Blanco..  See *United States v. Curcio*, 680 F. 2d 881 (2d Cir. 1982). Here, the Court had actual notice of the potential conflict and chose to overlook it. Attorney Rocha admitted that he represented Wilter Blanco.  See, supra, Trans. Dec. 10th at 19:24-25; 20:1-5.   But attorney Rocha did more than that—he became an unsworn witness by claiming "that my client [Wilter Blanco] has said he was not present," (Trans. Dec. 10th at 20:2-3) referring to a meeting at which the assassination of General Aristides was planned.  Although abrogated on other grounds, in *Ciak vs. United States*, 59 F.3d 296, 305 (1995), the Second Circuit Court of Appeals noted that under similar circumstances, attorney Rocha's statements could "be viewed as a statement of a witness as well as an advocate…thereby creating a conflict severe enough to require…disqualification."  *Id*.

---

[18] Q. Who are some of the other drug traffickers that you spoke to about General Aristides?
   A. Fredy Najera, Neftali Duarte Mejia, Elier Sierra, Moncho Matta, Luis Valle, Arnulfo Valle, Wilter Blanco, Ton Montes, Tito Motes, and Juan Carlos Montes. See *United States v. Fabio Porfirio Lobo* SDNY 1:15 CR 00175-LGS, D.E. 167 - Trans. March 6, 2018 18:12-16

(2) The Conflict Problems, Apart from the Duty to Inquire

a. Legal Standard.

A claim that counsel is conflicted is in essence a claim of ineffective assistance of counsel. *Glasser v. United States,* 315 U.S. 60, 70, 62 S.Ct. 457, 464–65, 86 L.Ed. 680 (1942). Generally, a defendant who claims ineffective assistance must show prejudice to prevail. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). However, when counsel is burdened with an actual, as opposed to a potential, conflict of interest, a "fairly rigid" presumption of prejudice applies. *Id.* at 692, 104 S.Ct. at 2067. Nevertheless, "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " *Id.* "In the multiple representation context, an attorney has an actual, as opposed to a potential, conflict of interest when 'during the course of the representation, the defendants' interests ... diverge with respect to a material factual or legal issue or to a course of action.'" *United States v. Fulton,* 5 F.3d 605, 609 (2d Cir.1993). Once a defendant has established that there is an actual conflict, he must show that " a lapse of representation' ... resulted from the conflict." *United States v. Iorizzo,* 786 F.2d 52, 58 (2d Cir. 1986). To prove a lapse of representation, a defendant must "demonstrate that some plausible alternative defense strategy or tactic might have been pursued" but was not and that "the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Winkler v. Keane,* 7 F.3d 304, 309 (2d Cir.1993) (quoting and adopting the test of *United States v. Gambino,* 864 F.2d 1064, 1071 (3d Cir.1988), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 566 (1989)), *cert. denied,* 511 U.S. 1022, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994).

b.   Najera Was Prejudiced As A Result of the Conflict

Although the voluntary aspect is a function of the defendant's state of mind, the understanding aspect is one in which the defense counsel plays an essential role as the aim of the right to counsel is to make certain that the defendant is fully appraised of the evidence against him and has a full understanding of his options.  Hence, counsel's advice and advocacy is intrinsically interconnected with the voluntariness of the plea.  Besides acting as an advocate, the attorney provides the accused with the information needed to make a knowing and intelligent decision. This means that the plea reflects the considered choice of the accused—free from any inducement which unfairly influenced or overcome his will.  The record is clear that Mr. Rocha did not want to continue representing Mr. Najera, and that Mr. Najera was equally dissatisfied with Mr. Rocha. On October 30, 2018, in *lieu* of permitting Mr. Rocha's withdrawal from the case and allowing Mr. Najera to obtain another attorney or appoint a public defender, the Court insisted on the December 10th trial date, 40 days later. On November 21, 2018, this antagonism became more apparent in a letter to the Court indicating that Mr. Rocha had not conducted an investigation and was not otherwise prepared for trial.  A perfect storm was created by the Court's insistence in keeping Attorney Rocha in the case against his will, refusing to grant a continuance to allow Mr. Najera to get another attorney, and, finally, by the Court's finding that Mr. Najera was being dishonest and attempting to manipulate the system.  By December 10, 2018, tensions between Attorney Rocha and Mr. Najera had increased, placing the Court in the difficult position of expressing opinions that impacted Mr. Najera's ultimate decision to plead guilty.

The circumstances described above impaired Mr. Najera's ability to make a knowingly and intelligent decision regarding the entry of a plea.  Mr. Najera was aware that Mr. Rocha had not taken the necessary steps to prepare for trial.  This was compounded by the fact that Mr. Rocha

was laboring under an actual conflict of interest that was preventing him from pointing to his prior client, Wilter Blanco as being the individual responsible for the death of General Gonzalez.

To understand how Attorney Rocha's conflict prejudiced Mr. Najera, the Court must consider that Rivera Maradiaga's testimony was the cornerstone of the government's case. As the government recognizes, the only violent act that could be attributed to Mr. Najera is the assassination of General Gonzalez. Trans. Dec. 7th at 39:1-12. Rivera Maradiaga's credibility, therefore, was significant and the need to impeach his testimony essential. Rivera Maradiaga admitted attempting to kill Mr. Najera on at least three or four occasions. (D.E. 23 – The Government's Opposition to Defendant's Motion for Rule 15 Depositions, at 5). They had a long-standing feud that permeated their relationship for many years. The most effective way to impeach Rivera Maradiaga's testimony was by suggesting that he singled out Mr. Najera as a soft target with whom he had a score to settle. Evidence tending to suggest that Rivera Maradiaga falsely accused Mr. Najera (as opposed to Wilter Blanco) for the assassination would have had a devastating impact upon his credibility.

The Honduran investigation into General Gonzalez' assassination would have been relevant to undermine Rivera Maradiaga's credibility. No effort was made to obtain testimony from witnesses in Honduras, which would have implicated Wilter Blanco and exonerated Mr. Najera in the assassination. This information about the Honduran investigation was readily available to anyone, including the government. Even a cursory review of well recognized media outlets (such as the New York Times) would have placed Attorney Rocha on notice that there were avenues available to undermine the government's contentions raised in the government's pleadings. As Attorney Rocha was laboring under an actual conflict of interest, unearthing information tending to show that his former client, Wilter Blanco, was lying placed Attorney

Rocha in the midst of an ethical dilemma, *i.e*, to exonerate Mr. Najera, Attorney Rocha had to obtain evidence to establish that Wilter Blanco was the person responsible for the death of General Gonzalez.  As recognized by the Court in *Ciak*, an actual conflict of interest existed where the defense theory involves accusations against defense attorney's former client.  *Ciak*, at 305, *citing with approval, Fitzpatrick v. McCormick*, 869 F.2d 1247, 1252 (9th Cir.), *cert. denied*, 493 U.S. 872 (1989).

The foregoing explains the reasons why Attorney Rocha's actual conflicts impaired his ability to conduct a thorough investigation, call witnesses, and obtain information to place in doubt the government's most damming accusations against Mr. Najera. Attorney Rocha never explained to Mr. Najera that in order to properly defend him, he had to lay the blame on Wilter Blanco.  The situation was worsened when Mr. Najera innocently raised concerns about Attorney Rocha's failure to call Mr. Wilter Blanco as a witness.   Attorney Rocha's response was that he had concluded that his client Blanco "had nothing to do with the assassination" and that he could not ethically do anything about the situation.  As a lay witness, Mr. Najera was unable to explain why blame should be laid at Wilter Blanco's feet since he was the person responsible for the assassination.   The Court compounded the problem by stating:

> THE COURT: All right. Well, let me say that from what I have heard there's no reason to believe that any of these witnesses, Leonel Maradiaga, also known as Cachiro, Ramon Mata, Jr. or Wilter Blanco would be a source of exculpatory evidence regarding the General Gonzalez assassination.
>
> Mr. Najera, what other **complaints** do you have with respect to Mr. Rocha that you want to tell me about?

Trans. Dec. 10th at 23:9-15 (emphasis added).

IV.    CONCLUSION

Having attempted to bring to the Court's attentions his concerns, and being rejected

along this path by both the Court, Attorney Rocha and the prosecutor, Mr. Najera felt that

he had but one option—to plead guilty to the charges that realistically condemned him to

a life sentence.   All of these factors—the short time given to prepare for the case, his

feelings that Mr. Rocha was not properly representing him, the lengthy hearing that

preceded the plea colloquy—undermined Mr. Najera's will resulting in the entry of a plea

which he now seeks to vacate.   The foregoing provides valid grounds for the Court to find

a "fair and just reason" to vacate the plea.

WHEREFORE, Defendant, FREDY RENAN NAJERA MONTOYA, respectfully request

the entry of an order vacating the plea of guilty and scheduling the instant cause for trial.

                              Respectfully Submitted,

                              /s/ Joaquin Perez                    /
                              Joaquin Perez, Esq.
                              *Counsel for Defendant*
                              6780 Coral Way
                              Miami, Florida 33155
                              Tel.: (305) 261-4000
                              Fax: (305) 662-4067
                              New York Bar No. 5237532


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this document has been filed with the Clerk of Court using the

CM/ECF Filing System on this 6th day of April, 2019.

                              /s/ Joaquin Perez      /
                              JOAQUIN PEREZ, ESQ.