UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO. 1:15-CR-378 PGR

**UNITED STATES OF AMERICA**

 *Plaintiff*,

 -V.S.-

**FREDY RENAN NAJERA MONTOYA**

 *Defendant.*

_____/

## MOTION TO SUPPLEMENT RECORD REGARDING ATTORNEY ROCHA'S CONFLICT WITH RESPECT TO MR. MATTA WALDURRAGA

               Respectfully submitted,
               Counsel for Defendant
               /s/ *Joaquin Perez*
               JOAQUIN PEREZ, ESQ.
               NYB: 52376532
               6780 Coral Way
               Miami, Florida 33155
               Tel: (305) 261-4000
               jplaw1@bellsouth.net

## **TABLE OF CONTENTS**

I. RELEVANT BACKGROUND………………………..……………….. 1

II. NEWLY DISCOVERED EVIDENCE……………..………………….2

    A.    C.S. 1 ………………………………………………………..2
    B.    C.S. 2 ………………………………………………………..2
    C.    C.S. 3 ………………………………………………………..3
    D.    C.S. 4 ………………………………………………………..4

III. THE GOVERNMENT'S FAILURE TO DISCLOSE KNOWN
     EXCULPATORY EVIDENCE ………………………………………….4

III. ATTORNEY ROCHA'S DECEPTIVE ACTIONS…………………………….7

Defendant Fredy Renan Najera Montoya "Mr. Najera" respectfully submits this supplemental memorandum explaining how attorney Rocha's prior representation of Mr. Matta Waldurraga impacted his representation of Mr. Najera and his decision to enter a guilty plea. More specifically, it addresses the plausible strategies that attorney Rocha neglected to pursue due to his representation of Mr. Matta Waldurraga. It will also demonstrate how attorney Rocha failed to properly investigate Mr. Najera's case and prepare an appropriate defense.

## I. RELEVANT BACKGROUND

Relying upon the testimony of Devis Leonel Rivera Maradiaga, the government portrayed Mr. Najera as a violent criminal responsible for the death of General Aristides Gonzalez. According to the Government, this evidence was relevant not only to Counts Two and Three of the Indictment, but also to the drug trafficking charge, by suggesting that acts of violence were intrinsically intertwined with drug trafficking activities.[1] This web of lies also included other witnesses that the government claims supported Rivera Maradiaga's assertions.[2] Since the credibility or a lack thereof of all these witnesses impacts the integrity of the

---

See Supplemental Submission re Aristides Murder Document filed by USA. Entered: 12/08/2018(DE 79)

[1] Testimony concerning the murder is also admissible as direct proof of the defendant's involvement in the charged crimes, as Rule 404(b) evidence, and under Rule 403. As described in the Government's motions in limine, the defendant's coordination of this brazen act of violence with Mejia Duarte, the Cachiros, and members of the Sinaloa Cartel is highly probative as to each of the charges in the Indictment. Indeed, as to **Count One, the testimony is highly relevant to show the ways in which the defendant would retaliate against anyone for interfering with his drug-trafficking activities. The murder was clearly an act in furtherance of the drug trafficking conspiracy in that it allowed the defendant to continue operating in Olancho with impunity and sent a message to law enforcement that investigating the defendant would not be tolerated. As to Counts Two and Three, the testimony is also highly relevant because General Arístides González was murdered by police officers who used firearms. De 79, P.6, 4-14.**(*emphasis added*)

[2] Later, **CW-3 had a meeting with the defendant during which the murder was discussed.** At the time of this meeting, the defendant had stopped working with Mejia Duarte because the defendant was upset with his share of the profits. As a result, the defendant cut Mejia Duarte out of his trafficking activities and began working directly with the Cartel. **During the meeting with CW-3, the defendant discussed his frustration with Mejia Duarte to which CW-3 responded, in substance, at least Mejia Duarte had killed General Arístides González**. The defendant responded by acknowledging that the murder was paid for with several hundred thousand dollars. De 79 P. 5, 18-25.

1

government's case, attorney Rocha's failure to investigate and prepare an appropriate defense prevented Mr. Najera from making a knowing and intelligent decision.

## II. NEWLY DISCOVERED EVIDENCE

Several witnesses have been unearthed who place in question the government's version of the events, the credibility of their witnesses and the validity of the plea. These potential witnesses fear retribution from SDNY prosecutors, the Cachiros and their associates in Honduras. Henceforth they will be referred to as Confidential Sources (CS 1 through 4).

**A-** C.S. 1- was a high-ranking police commissioner who responded to the call of the shooting. Upon his arrival at the crime scene, he viewed the vehicle where General Gonzalez's body was slumped against the wheel. He then observed Deputy Commissioner Jose Ventura Flores Maradiaga in close proximity to the scene taking no action to investigate the occurrence. Individuals associated with the Cachiros and Wilter Blanco were present with Commissioner Flores Maradiaga.

**B-** C.S.2- Soon after the murder of General Aristides Gonzalez, C.S.#2 accompanied Wilfredo Salazar, a high-ranking suspended police officer, to a meeting with Eliel Sierra and Wilter Blanco where approximately $400,000 U.S. Dollars were delivered. Eliel Sierra is a close associate and business partner of the Cachiros drug trafficking organization. He has not been charged with drug trafficking or money laundering in connection with this case.



| Eliel Sierra | Wilfredo Salazar |

**C- CS#3 -** Attorney Rocha affirmatively stated that he had never sought to interview Mr. Matta Waldurraga and didn't know what he was going to say. <u>This is simply not true.</u> Not only had he represented Mr. Matta Waldurraga at a prior debriefing, but in addition had extensive attorney-client meetings with him during the 2014-2015 period. C.S. #3 was one of Matta Waldurraga's closest associates. According to C.S. #3 Mr. Matta Waldurraga advised attorney Rocha that he was not living in Honduras in 2009 and never met with Rivera Maradiaga to discuss the assassination. Mr. Matta Waldurraga, moreover, stated that he did not even know who General Gonzalez was. According to CS.#3, Matta Waldurraga was incensed, as Rivera Maradiaga had implicated all his drug trafficking enemies in the murder and protected some of his confederates, including Eliel Sierra, who, after the Cachiros surrender, continued to run their criminal organization.

Mr. Rocha was also aware that C.S. #3 could explain the circumstances surrounding the meeting that the government claims was designed to "create a bipartisan block of votes in the congress that wield sufficient authority to achieve the protection the assembled drug traffickers

3

were seeking" i.e. to show the connection between politicians and drug traffickers. See Government's Opposition to Defendant's Motion to Withdraw Guilty Plea (DE 98). C.S. #3 would have explained that Mr. Najera and other politicians had no choice but to attend the meeting for otherwise the Cachiros would have killed Mr. Najera and his family. The meeting had political ramifications dealing with the election of the President of the Honduran Congress (a corrupt activity in Honduras) but its purpose was not to abolish and/or interfere with the extradition process. Attorney Rocha knew this witness was available yet took no steps to secure his attendance for trial.

**D-** C.S.4- Finally, C.S. #4 will testify that when asked by law enforcement about the homicide, Mr. Matta Waldurraga specifically stated that he was not residing in Honduras in 2009, nor did he have had any reason to kill General Gonzalez. According to Mr. Matta Waldurraga, the Cachiros needed no financial help or an incentive to murder individuals in Honduras in 2009. They ruled Honduras and had no need to pool resources to kill General Gonzalez. Mr. Matta Waldurraga was in possession of a passport which bore out his claim he was not in Honduras during the relevant time period.

Hence, attorney Rocha's failure to acknowledge his prior representation of Mr. Matta Waldurraga, and his failure to call witnesses to challenge the government's assertion impaired Mr. Najera's defense and his ability and thus his ability to make a knowing and intelligent decision when he entered a guilty plea on December 10, 2013.

### III. THE GOVERNMENT'S FAILURE TO DISCLOSE KNOWN EXCULPATORY EVIDENCE

At least since April 7, 2019, the government was placed on notice that "police reports, including audio recordings by the Honduran Attorney General's Office and Honduran law enforcement concluded that General Gonzalez's seizure of Wilter Blanco's 143 kilos of cocaine

had been the cause of the assassination." Several respected U.S. media outlets had corroborated and reported the information. Five days before his assassination, TIME Magazine conducted an in depth interview of General Gonzalez. Sitting in his office with 140 kilos of seized cocaine, he foreshadowed his untimely death. According to the Honduran authorities, General Gonzalez's seizure of this cocaine had prompted Wilter Blanco to order his assassination.



TIME

## Behind the Murder of Honduras' Drug Czar

By Ioan Grillo / Tegucigalpa Thursday, Dec. 17, 2009



Orlando Sierra / AFP / Getty

A picture stands atop General Julian Aristides Gonzalez's casket during his funeral in Tegucigalpa on Dec. 9, 2009, after hit men on a motorbike shot Gonzalez dead

The assassins came for Honduras' antidrug czar moments after he dropped his daughter off at school. His car was still in front of the schoolhouse when the two men drove up on a motorcycle and fired 11 bullets into Julian Aristides Gonzalez's body. His devastated wife rushed to the scene and kissed the corpse of the 57-year-old former general. He had been planning to retire within two months and move his family to Canada.

TIME conducted an in-depth interview with Gonzalez five days before he was murdered. Sitting in his office with 140 kilos of seized cocaine beside his desk, the square-jawed soldier explained the smuggling routes for the white powder with the aid of computer maps. Small aircraft were carrying bundles of cocaine from western Venezuela into Honduras, he said. His intelligence showed that the leftist Revolutionary Armed Forces of Colombia (FARC) were operating openly in Venezuelan territory and were behind many of the shipments. "The Venezuelan government is either incapable or complicit in this traffic," he said, speaking with a frankness uncommon among Latin American officials. His forces had found more than 50 such small planes within the past year.

The veracity of Rivera Maradiaga was clearly placed in question. After reviewing Honduran and U.S. based reports contradicting the government's version of events, efforts should

have been made to investigate and seek the truth. The government has thus far has not explained what steps, if any, were taken to support or discredit the validity of its assertions.

What the government failed to disclose has now become apparent by reviewing its pleading in *United States v. Juan Antonio Hernandez Alvarado,* Case *No.* 1:15-cr-00379-PKC. There, the government revealed that Wilter Blanco had been involved in the assassination of an individual referred to as Victim 2 because "this individual had access to too much information and feared would cooperate with the authorities." [3] The government, therefore, was aware of Mr. Blanco's propensity for violence and his willingness to assassinate individuals who cooperated with the government. Yet it failed to disclose this relevant information to Mr. Najera. The pleading filed in this case made it clear to the prosecutors that Wilter Blanco- who Mr. Rocha represented – was a prime suspect in General Gonzalez's assassination. This begs the oft-repeated question – when did they know about Mr. Blanco's involvement in the murder of Victim 2? Was it in 2015 when prosecutors met with Blanco and Attorney Rocha? (Government Reply D.E 98, 36 6-10). What have they done to investigate whether Wilter Blanco as opposed to Mr. Najera was responsible for the assassination of General Gonzalez? Are they avoiding a search for evidence likely to undermine their theory of the case?

As will be more fully discussed by another cover the government violated its *Brady*, *Giglio*, and *Napue* obligations prior to the trial date on December 10, 2018 and most certainly after the motion to withdraw the guilty plea was filed on April 7, 2019.

---

[3] The 2013 Murder of a Drug Trafficker in the Colón Department In approximately 2013, a worker for the defendant and CW-3 named ("Victim-2") was arrested in connection with drug-trafficking activities in the Colón Department. CW-3 told the defendant about the arrest of Victim-2, and described Victim-2's role in their ongoing crimes. The defendant responded that Victim-2 had access to too much information, and that they could not risk that he would cooperate with authorities. CW-3 agreed to talk to a co-conspirator, Wilter Neptalí Blanco Ruíz,9 about having Victim-2 murdered, which they did. After the murder, the defendant told CW-3 on the phone that he had seen the news and they should meet in person. During a subsequent meeting, the defendant expressed relief that Victim-2 was dead because Victim-2 knew too much about their drug-trafficking operations.

6

## IV. ATTORNEY ROCHA'S DECEPTIVE ACTIONS

Attorney Rocha's credibility should be taken into consideration. First, he filed a motion to withdraw claiming he had been promised One Million Dollars for facilitating Mr. Najera's surrender.[4] Thereafter, he alleged he had solely received $110,000.00 when in reality records show he had received in excess of $180,000.00 in fees and costs. When faced with the possibility of a trial, he opted to withdraw from the case as he had done in the past with Mr. Matta Waldurraga's and Mr. Hector Emilio Fernandez Rosa's cases, *US v. Hector Emilio Fernandez Rosa,* 12-CR-00894. Thereafter, he exaggerated the amount of hours he had worked in the case. (Attorney Rocha's representation terminated on April 13, 2016).[5]

Confronted with the possibility of a weeklong trial, attorney. Rocha had every incentive in persuading Mr. Najera to take a plea which provided no real incentive and condemned Mr. Najera to a life sentence. To make matters worse, during the lengthy change of plea hearing attorney Rocha sided with the government suggesting that attempting to defend the case was useless. This case rested completely upon the credibility of witnesses who had an incentive to lie to receive a benefit from the Government. Drugs, money or firearms were could not be directly attributed to Mr. Najera and therefore, contrary to the government's self-serving claim, the evidence was not overwhelming against the defendant. On the other hand, the evidence is overwhelming that Mr. Najera was not properly prepared by attorney Rocha.

WHEREFORE, Defendant prays for this Court to find that Attorney Rocha was operating under two significant conflicts of interest which impacted his representation of Mr. Najera and

---

[4] The retainer agreement was never produced.
[5] The Court has not ruled upon Defendant's motion to provide Attorney Rocha's billing and fee records (D.E. 105) and motion to compel production of DEA Report and other exculpatory evidence (D.E. 109) filed under seal.

that Attorney Rocha did not properly investigate Mr. Najera's case and prepare an appropriate defense.

Respectfully submitted,
Counsel for Defendant
/s/ *Joaquin Perez*
JOAQUIN PEREZ, ESQ.
NYB: 52376532
6780 Coral Way
Miami, Florida 33155
Tel: (305) 261-4000
jplaw1@bellsouth.net

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that this document has been filed with the Clerk of Court using the CM/ECF Filing System on this 2nd day of October, 2019.

/s/ *Joaquin Perez*
JOAQUIN PEREZ, ESQ.