UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

FREDY RENAN NÁJERA MONTOYA,

Defendant.

S1 15 Cr. 378 (PGG)


## THE GOVERNMENT'S SENTENCING MEMORANDUM


AUDREY STRAUSS
Acting United States Attorney
Southern District of New York
*Attorney for the United States*
*of America*

Emil J. Bove III / Matthew Laroche
*Assistant United States Attorneys*
*Of Counsel*

# TABLE OF CONTENTS

BACKGROUND ........................................................................................................... 3

I.   The Defendant's Corrupt Conduct Helped Ravage Honduras ............................... 3

II.   The Defendant's Criminal Conduct .................................................................... 7

  A.   Drug Trafficking ............................................................................................ 7

     1. 2008 – 2011:  The Defendant's Drug-trafficking Activities with Sergio Neftali Mejía Duarte .................................................................................................................... 8

     2. 2011 – 2015:  The Defendant's Drug-trafficking Activities with the Sinaloa Cartel ... 10

       a. 2011: The Defendant Fortifies His Connections to the Cartel ................................. 10

       b. 2012: The Defendant Participated In 12 Cocaine Shipments with the Sinaloa Cartel .................................................................................................................... 12

       c. 2012 – 2015: The Defendant Facilitated Large Scale Drug-Trafficking at Puerto Cortés ................................................................................................................ 13

       d. 2013 – 2015: The Defendant Received Thousands of Kilograms of Cocaine Via Helicopters in Olancho ........................................................................................... 14

  B.   Weapons Possession, Weapons Trafficking, and Violence ........................... 14

  C.   Bribery ...................................................................................................... 15

  D.   Additional Public Corruption....................................................................... 16

PROCEDURAL HISTORY............................................................................................ 19

I.   The Indictment and the Defendant's Surrender ................................................ 19

II.   The Defendant's Bad-Faith Efforts to Delay Trial ........................................... 20

III.   The Defendant's First Guilty Plea .................................................................... 20

IV.   The Defendant's Motion to Withdraw His Guilty Plea ..................................... 21

V.   The Defendant's Second Guilty Plea ................................................................ 22

THE SENTENCING GUIDELINES ............................................................................... 23

I.   The Applicable Guidelines Range Is Life Imprisonment ................................. 23

  A.   Drug Quantity: § 2D1.1(a)(5) .................................................................... 23

  B.   Violence: § 2D1.1(b)(2).............................................................................. 24

  C.   Use of Private Aircraft: § 2D1.1(b)(3)........................................................ 24

  D.   Payment of Bribes: § 2D1.1(a)(11)............................................................ 24

  E.   Criminal Livelihood: § 2D1.1(a)(16).......................................................... 25

  F.   Use of Weapons:  Counts Two and Three ................................................... 25

  G.   Leadership Role: § 3B1.1(a)....................................................................... 26

H.   Abuse of Trust:  § 3B1.3 ................................................................................. 26

I.   Obstruction of Justice: § 3C1.1 ..................................................................... 27

II.   The Defendant's Objections To The PSR Are Meritless ................................. 27

III.   The Defendant Is Bound By the Guidelines Stipulation In The Plea Agreement ............ 31

DISCUSSION ........................................................................................................................... 35

I.   The Section 3553 Factors Support a Within-Guidelines life Sentence ............................ 35

A.   The Nature and Circumstances of the Offense ............................................. 35

B.   The History and Characteristics of the Defendant ........................................ 39

C.   The Need to Afford Adequate Deterrence ..................................................... 41

D.   A Life Sentence Would Not Result in Unwarranted Sentencing Disparities ............. 43

II.   The Court Should Impose $39 Million of Forfeiture ....................................... 49

III.   The Court Should impose a $10 Million Fine ................................................. 49

CONCLUSION ......................................................................................................................... 51

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

FREDY RENAN NÁJERA MONTOYA,

Defendant.

S1 15 Cr. 378 (PGG)

The Government respectfully submits this memorandum in advance of sentencing in this matter, currently scheduled for January 6, 2021, at 11:00 a.m., on the defendant's convictions of participating in a conspiracy to import cocaine into the United States, in violation of 21 U.S.C. § 963; using firearms in furtherance of his drug-trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(a)(i); and participating in a conspiracy to carry and use machineguns and destructive devices in furtherance of his drug-trafficking offense, in violation of 18 U.S.C. § 924(o).

The defendant was a Honduran congressman and the leader of a violent and prolific drug-trafficking organization.  Over the course of at least seven years, the defendant abused his public office and helped corrupt the democratic institutions of Honduras to enrich himself by transporting at least 20,000 kilograms of cocaine—a staggering amount of poison that he admitted in connection with his guilty plea he helped import into the United States.  To accomplish this astonishing level of drug distribution, the defendant commanded dozens of men armed with military grade weapons, including machineguns, grenade launchers, and landmines; he controlled numerous clandestine airstrips that received planes and helicopters filled with cocaine; he bribed politicians and law enforcement officials; and he directed acts of violence.  For example, the Honduran Supreme Court concluded in 2016 that evidence from a Honduran trial "unquestionably

attest[s] beyond all reasonable doubt" that the defendant "participated willfully, along with other persons" in an October 2012 murder.

The defendant made at least $39 million in blood money through this egregious course of conduct. He also abused his political position to facilitate these drug-trafficking activities in a country that has been ravaged by drug-related violence. Prior to 2012, as a politically connected Honduran citizen operating in Honduras, the defendant acted with confidence that he could not be held accountable for his crimes in the United States. The Honduran constitution forbade it. When Honduras amended its constitution to permit extraditions in 2012 based on pressure from the United States, the defendant sought to exploit his political connections to achieve additional protection. That year, he funneled a $1 million bribe from the Sinaloa Cartel to a Honduran presidential candidate. In 2014, the defendant was caught on tape meeting with other Honduran congressmen and drug traffickers to discuss his efforts to obtain additional support from the recently elected Honduran president and others.

The defendant has done nothing to mitigate his abhorrent criminal conduct since he surrendered in this case. Instead of showing remorse for his crimes, the defendant has repeatedly lied, minimized, and obstructed justice. To give a few examples, the defendant (i) lied to the Court about his prior counsel in a bad-faith effort to delay his December 2018 trial; (ii) falsely claimed to the Court that he was actually innocent of Count One of the Indictment, after pleading guilty to Counts One and Two in December 2018 and before doing so again in February 2020; and (iii) falsely claimed to the Court that a cooperating witness had threatened him in prison. The defendant's comprehensive plea agreement—pursuant to which he was permitted to withdraw his

December 10, 2018 guilty plea—accounts for the defendant's criminal conduct and obstructive behavior through a Guidelines stipulation that includes 11 enhancements and a Guidelines range of life imprisonment.  Despite that agreement, the defendant recently filed yet another submission falsely claiming that he was threatened by a cooperating witness in prison—a claim that the defendant stipulated in his plea agreement was false.

The defendant's conduct was, and continues to be, extraordinary.  The Probation Office has recommended a within-Guidelines sentence of life imprisonment, and such a sentence is appropriate based on the § 3553(a) factors.  The defendant trafficked cocaine on a monumental scale, corrupted his elected office, contributed to the already deteriorating conditions in Honduras, and repeatedly lied to the Court.  Accordingly, the Government respectfully submits that the Court should impose a sentence that includes life imprisonment, a $10 million fine, and $39 million in forfeiture.

## BACKGROUND

### I.    The Defendant's Corrupt Conduct Helped Ravage Honduras

For the past twenty years, the overwhelming majority of cocaine consumed in the United States has been produced in South America and transported through Honduras.  (July 30, 2020 Revised Final Presentence Investigation Report, Dkt. No. 146 ("PSR") ¶¶ 21-24).  The reason Honduras has developed as a key transshipment point for United States-bound cocaine is clear: Drug-trafficking organizations have gained unprecedented power in Honduras with the support and direct participation of high-ranking politicians, including the defendant.

3

Honduras borders Guatemala, El Salvador, and Nicaragua in Central America, and is comprised of 18 departments, which are similar to states in our country. For purposes of this case the most pertinent departments are (i) Olancho, a department with approximately 500,000 inhabitants that is roughly the size of the state of Vermont, where the defendant was a congressman and conducted a substantial portion of his drug-trafficking activities (PSR ¶¶ 47, 49-50, 53, 55, 58-60, 61); and (ii) Copán and Cortes, departments along the Guatemala border through which huge quantities of United States-bound cocaine were transported with the help of the defendant and his co-conspirators (PSR ¶¶ 68-71, 83).



Honduras has two principal political parties, the Liberal Party and the National Party.  The defendant is a member of the Liberal Party.  (PSR ¶ 34).  Since at least 2000, both political parties have supported and facilitated widespread drug trafficking in exchange for massive bribes to support their campaigns and to enrich themselves.  The defendant stipulated in his plea agreement that he abused his position as a Honduran congressman to facilitate drug trafficking.  The Government has established in related cases that several Honduran presidents also accepted bribes from traffickers in exchange for sensitive law enforcement and military information and for protection from arrest and extradition.[1]

While the defendant and other members of Honduras's political elite privately worked hand-in-hand with drug traffickers, they publicly pretended to support the United States' efforts to curb drug trafficking.  In that respect, prior to 2012, the Honduran constitution did not permit the extradition of Hondurans to the United States for drug-trafficking crimes.  (PSR ¶ 86).  Thus, for the first few years of the conspiracy in this case, it was not even conceivable to the defendant or his Honduran co-conspirators that they could be held responsible for their conduct in the United States.  Rampant corruption allowed drug traffickers to operate with impunity and succeed at unprecedented levels.  In 2012, based on diplomatic pressure from the U.S. State Department, Honduras amended its constitution to allow, for the first time, the extradition of Honduran nationals to the United States to face prosecution for drug-trafficking charges.  As a result, drug

---

[1] *See, e.g.*, Proposed Findings of Fact and Conclusions of Law at 5-8, *United States v. Lobo*, No. 15 Cr. 174 (LGS), Dkt. No. 146; Sentencing Submission at 3-5, *United States v. Fernandez Rosa*, No. 12 Cr. 894 (RJS), Dkt. No. 80; Motions *In Limine* at 4-7, *United States v. Hernandez Alvarado*, No. 15 Cr. 379 (PKC), Dkt. No 78.

traffickers in Honduras purportedly faced the possibility of prosecution in the United States.  In reality, drug traffickers who were aligned with corrupt politicians like the defendant faced little risk of extradition.  (*See, e.g.*, PSR ¶¶ 23, 86-94).

The defendant's and others' use of Honduras's political institutions to facilitate drug trafficking and protect drug traffickers directly contributed to horrific conditions in the country. According to multiple organizations, including the State Department, United Nations, and Human Rights Watch, violent crime is rampant in Honduras and its murder rate is one of the highest in the world—higher than in some active war zones.[2]  For example, in 2011, Honduras's murder rate was 92 murders per 100,000 population, whereas in 2012, the murder rate in Afghanistan was 28 murders per 100,000 population.[3]  Accompanying these extreme levels of violence in Honduras are significant human rights issues, including extrajudicial killings; torture; arbitrary arrest and detention; killings of and threats to media members by criminal elements; and widespread government corruption.[4]  Honduras also is one of the poorest countries in the world, with more than half of its citizens living below the poverty line and about twenty percent of its citizens living

---

[2] *See, e.g.*, U.S. Dep't of State, Honduras 2019 Human Rights Report at Executive Summary, *available at* https://www.state.gov/wp-content/uploads/2020/02/HONDURAS-2019-HUMAN-RIGHTS-REPORT.pdf; Human Rights Watch, World Report, at 264-65 (2019), *available at* https://www.hrw.org/sites/default/files/world_report_download/hrw_world_report_2019.pdf; United Nations Office on Drugs and Crime, Organized Transnational Crime In Central America and the Caribbean, at 12 (2012).

[3] Military Times, *SOUTHCOM Chief: Central America Drug War a Dire Threat to U.S. National Security* (July 8, 2014), *available at* https://securityassistance.org/latin-america-and-caribbean/content/southcom-chief-central-america-drug-war-dire-threat-us-national-security-0.

[4] *See supra* 2019 Human Rights Report at Executive Summary.

in multidimensional poverty, meaning they have significant deprivations of health, education, and standard of living.[5]

## II.        The Defendant's Criminal Conduct

The defendant significantly contributed to declining conditions in Honduras by leading a drug-trafficking organization in his country that, by his own admission, facilitated the importation of at least approximately 20,000 kilograms of cocaine into the United States.  The defendant's prolonged course of conduct involved all of the evils associated with such a brazen crime—greed, violence, weapons possession, weapons trafficking, bribery, and political corruption.

### A.        Drug Trafficking

The defendant's drug-trafficking conduct began at least as early as 2008, two years after he became a congressman in Olancho.  (PSR ¶ 47).  Over the course of the next seven years, the defendant and his organization worked with some of the largest and most violent drug traffickers in the world, including:  (i) Sergio Neftali Mejía Duarte, a Honduran drug-trafficker who was subsequently sentenced to life imprisonment in the Southern District of Florida in 2018 (PSR ¶¶ 47-60); (ii) Devis Leonel and Javier Rivera Maradiaga, the leaders of the *Cachiros* drug-trafficking organization (PSR ¶¶ 54-60); (iii) members of the Valle Valle drug-trafficking organization, another substantial Honduras-based drug-trafficking organization that used "a combination of brutal violence and public corruption in order to keep a stronghold on their base of operations in

---

[5] *See, e.g.*, United Nations, Human Development Report (2019), *available at* http://hdr.undp.org/sites/all/themes/hdr_theme/country-notes/HND.pdf.

Copán, Honduras"[6] (PSR ¶ 83); and (iv) high-ranking members of the Sinaloa Cartel, a violent and powerful drug-trafficking organization based in Mexico, which sold the cocaine it received from the defendant in the United States (PSR ¶¶ 47-84).

> **1.    2008 – 2011:  The Defendant's Drug-trafficking Activities with Sergio Neftali Mejía Duarte**

By at least 2008, the defendant begin working with Mejía Duarte to receive cocaine-laden airplanes at airstrips in the Olancho department that the defendant controlled (and represented in the National Congress).  As part of their activities, the defendant and Mejía Duarte received cocaine at those airstrips and helped transport the cocaine through Honduras to members of the Sinaloa Cartel.  (PSR ¶ 47-48).

The defendant's relationship with the Sinaloa Cartel began at a meeting at one of his airstrips in 2008.  (PSR ¶ 49).  Several high-ranking members of the Sinaloa Cartel—including Jaime Gastelum Serrano, a/k/a "Kio," and a cooperating witness ("CW-1")—attended the meeting. Jaime Gastelum and CW-1 were in Olancho representing another high-ranking member of the Sinaloa Cartel named Cesar Gastelum Serrano.  Cesar Gastelum reported to the former leader of the Cartel, Joaquín Archivaldo Guzmán Loera, a/k/a "El Chapo," who is now serving a life sentence following a trial conviction in the Eastern District of New York.  (*Id.*).

---

[6] Press Release, *Treasury Targets Honduran Drug Trafficking Organization and Its Network*, U.S. Dep't of the Treasury (Aug. 20, 2014), *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl2611.aspx.

When the men arrived in Olancho, they met the defendant and Mejía Duarte at a ranch. (PSR ¶¶ 50-51). Between 15 to 20 of the defendant's workers were present, several of whom carried pistols and long rifles. The defendant then drove some members of the group to a nearby airstrip that the defendant said belonged to him and that he had built (the "Catacamas airstrip"). The defendant drove the men to the airstrip in a truck that contained an AK-47 in the front seat near him. (*Id.*). After inspecting the airstrip, which was guarded by men with pistols and rifles, CW-1 communicated to Cesar Gastelum that the defendant was ready to receive cocaine at the Catacamas airstrip. Following this trip, in about 2009, a plane shipment of approximately 1,000 kilograms of cocaine, was sent to the defendant at the Catacamas airstrip. (*Id.*).

Beginning in about 2009, the defendant and Mejía Duarte also started to participate in cocaine shipments with members of the *Cachiros* drug-trafficking organization. (PSR ¶ 54). The Maradiaga Rivera brothers led the *Cachiros* and maintained control over the Colón department and other parts of Honduras by, among other things, paying bribes to congressman Midence Oqueli Martinez Turcios and congressman Oscar Nájera. (*Id.*).[7] Congressman Martinez Turcios participated directly in some of the *Cachiros* drug-trafficking activities by assisting in the transportation of cocaine through Honduras. The *Cachiros* also bribed numerous other politicians in exchange for protection from law enforcement and extradition to the United States.

The arrangement between the defendant and the *Cachiros* generally worked as follows: the defendant and his organization received cocaine shipments in Olancho and transported them

---

[7] *See United States v. Midence Oqueli Martinez Turcios*, No. 18 Cr. 499 (LAK) (charging Turcios Martinez with drug-trafficking and weapons offenses).

to the *Cachiros* in the neighboring department of Colón.  (PSR ¶ 55).  The *Cachiros* then transported the drugs westward through Honduras to the Valle Valles and others.  Mejía Duarte then turned over the cocaine to the Sinaloa Cartel which would transport the drugs through Guatemala, Mexico, and eventually into the United States.  (*Id.*).

The defendant transported drugs to the *Cachiros* in Colón on approximately 15 occasions. (PSR ¶¶ 56-58).  The shipments varied in size between approximately 350 and 1,500 kilograms of cocaine.  The defendant employed heavily armed security teams to transport the cocaine to the *Cachiros*, and the defendant at times personally transported the cocaine to the *Cachiros*.  On one occasion, the defendant escorted a truck with cocaine to Colón with four security vehicles.  (PSR ¶ 57).  During this shipment, the defendant carried a pistol and wore a bullet-proof vest with the word "Policia" on the chest.  (*Id.*).  Several of the defendant's workers carried long-rifles.  On another occasion, the *Cachiros* organization assisted in the receipt of a cocaine-laden plane in Olancho by sending dozens of men armed with, among other things, machineguns and anti-personnel mines to place around the defendant's airstrip to ensure that rival drug traffickers and law enforcement could not interfere with the shipment.  (*Id.* ¶ 58).

## 2.   2011 – 2015:  The Defendant's Drug-trafficking Activities with the Sinaloa Cartel

### a.   *2011: The Defendant Fortifies His Connections to the Cartel*

In 2011, the defendant stopped working with Mejía Duarte because the defendant was upset about the size of his share of the proceeds from their drug trafficking work together.  (PSR at 14 ¶¶ 1-4).  Around this time, the defendant met on several occasions with members of the Sinaloa Cartel and offered to work with them directly, without the involvement of Mejía Duarte.  In

10

particular, in mid-2011, the defendant met with another cooperating witness ("CW-2") and a drug trafficker named Guillermo Lozano outside Lozano's home in San Pedro Sula, Honduras.  (*Id.* at 14 ¶ 2(a)).  During the meeting, which occurred inside the vehicle the defendant drove that day, the defendant stated, in substance and in part, that (i) the defendant was upset with Mejía Duarte because he believed he was not receiving a large enough share of the drug-trafficking proceeds; (ii) the defendant wanted to work directly with the Sinaloa Cartel; (iii) the defendant controlled airstrips in Olancho at which he could receive cocaine-laden planes; and (iv) the defendant could transport the cocaine received at those airstrips to members of the Cartel located in San Pedro Sula, Honduras.  (*Id.*).   The defendant had two M16s and a bulletproof vest in the back of the vehicle. (*Id.* at 14 ¶ 2(b)).

In or about early 2012, the defendant traveled by helicopter with CW-2 and Honduran congressman Carmelo Vasquez, among others, to visit a piece of land on the border of Nicaragua and Honduras.  (*Id.* at 14 ¶ 3).  During the trip, the group discussed, among other things, building an airstrip to receive drug flights.  Following this meeting, the defendant sent one of his workers and a member of the Sinaloa Cartel to build an airstrip at that location.  The construction required approximately 75 men who helped clear and flatten the land.  (*Id.*).

Around April 2012, the defendant met at one of his ranches in Olancho with several high-ranking members of the Sinaloa Cartel, including Cesar Gastelum, Jaime Gastelum, CW-1, and CW-2, among others.  (PSR at 14 ¶ 4).  During the meeting, the defendant agreed to receive cocaine-laden aircrafts at his airstrips in Olancho and to be responsible for transporting the cocaine to members of the Sinaloa Cartel in San Pedro Sula.  (*Id.* at 14 ¶ 4(a)).  The defendant explained

11

that he would ensure the safe passage of the cocaine because the defendant had control over military and law enforcement officials who provided him information and protection. (*Id.* at 14 ¶ 4(b)). Members of the Sinaloa Cartel agreed to pay the defendant approximately 10-14% of each shipment at the price per kilogram of the cocaine in Honduras, which at the time was approximately $13,500 per kilogram. (*Id.* at 14-15 ¶ 4(c)).

> **b.     2012: The Defendant Participated In 12 Cocaine Shipments with the Sinaloa Cartel**

In 2012, the defendant received approximately 12 cocaine-filled planes at airstrips in Olancho. The planes were (i) sent by members of the Sinaloa Cartel; (ii) registered in the United States; and (iii) filled with cocaine in Colombia or Venezuela. (PSR ¶ 61). Each shipment contained between 500 and 1,500 kilograms of cocaine. When the planes arrived at the defendant's airstrips, the defendant's workers unloaded the cocaine from the airplane and loaded the cocaine onto a truck for transportation. (*Id.* ¶ 62). Once the cocaine was loaded onto the truck, the defendant's workers transported the cocaine on the truck, which was accompanied by several other vehicles for security, from the airstrips to members of the Sinaloa Cartel in San Pedro Sula. (*Id.* ¶¶ 62-63). The defendant's workers were heavily armed during this process, including with machineguns such as AK-47s and M16s, and destructive devices, such as rocket-propelled grenade launchers ("RPGs"). (*Id.* ¶ 62).

After the defendant and/or the defendant's workers arrived with the cocaine to San Pedro Sula, the defendant was paid for each shipment in U.S. dollars. In total, members of the Sinaloa Cartel paid the defendant more than $30 million U.S. dollars for the plane shipments. (PSR ¶ 64).

> c.      **2012 – 2015: The Defendant Facilitated Large Scale Drug-Trafficking at Puerto Cortés**

In 2012, members of the Sinaloa Cartel sought the defendant's assistance in securing access to Puerto Cortés, a major commercial port in Honduras's Cortés department.  In response, the defendant introduced members of the Sinaloa Cartel to Fabio Lobo—the son of then-Honduran president Porfirio Lobo Sosa–and a Honduran Politician named Miguel Pastor Mejía.[8]

During the summer of 2012, the defendant met in San Pedro Sula with Cesar Gastelum, Fabio Lobo, Pastor Mejía, CW-1, and CW-2, among others.  (PSR ¶¶ 68-71).  During the meeting, Fabio Lobo and Pastor Mejía agreed to provide the Sinaloa Cartel with unfettered access to Puerto Cortés for purposes of drug trafficking in exchange for bribes.  (*Id.* ¶ 69).  Members of the Sinaloa Cartel bribed the defendant approximately $100,000 at the meeting.  (*Id.*).  They also bribed Fabio Lobo and Pastor Mejía during the meeting with approximately $100,000 and $250,000, respectively.  During the meeting, the Sinaloa Cartel also agreed to contribute approximately $2 million to Pastor Mejía's unsuccessful campaign for president of Honduras.  (*Id.*).

Later in 2012, the defendant met in San Pedro Sula with CW-2 and a high-ranking port official, among others.  (PSR ¶ 70).  During that meeting, the defendant directed the port official to assist the Sinaloa Cartel in exchange for bribes.  (*Id.*).  Following these meetings, between approximately 2012 and 2015, the Sinaloa Cartel used the defendant's connections to send

---

[8] *See United States v. Fabio Lobo*, 15 Cr. 174 (LGS) (Fabio Lobo pleaded guilty to a drug-trafficking charge and was sentenced to 24 years' imprisonment).

13

thousands of kilograms of United States-bound cocaine from Colombia to Puerto Cortés.  (PSR ¶ 71).

> **d.     2013 – 2015: The Defendant Received Thousands of Kilograms of Cocaine Via Helicopters in Olancho**

In 2013, the Sinaloa Cartel began having difficulties transporting cocaine on planes into Honduras because of law enforcement efforts to shoot down or otherwise interdict the aircraft. (PSR ¶ 80).  As a result, members of the Sinaloa Cartel decided to change their operations by using helicopters, which were harder for law enforcement to track and intercept.  Members of the Sinaloa Cartel approached the defendant about the project.   During a 2013 meeting in Tegucigalpa involving, among others, the defendant and CW-1, the defendant agreed to receive cocaine-laden helicopters at ranches he controlled in Olancho.  (*Id.* ¶ 81).  In exchange, CW-1 agreed to pay the defendant about $900 per kilogram of cocaine received by the defendant.  (*Id.*).

Between approximately 2014 and 2015, the defendant received approximately thousands of kilograms of cocaine at his ranches that were sent by the Sinaloa Cartel via helicopters.  (PSR ¶ 83).  The defendant caused the cocaine to be delivered to members of the Sinaloa Cartel, which subsequently sold the cocaine in the United States.  (*Id.*).  In total, the Sinaloa Cartel paid the defendant over $9,000,000 for the defendant's work receiving cocaine-laden helicopters at his ranches.  (*Id.*).

### B.     Weapons Possession, Weapons Trafficking, and Violence

The defendant was a heavily armed drug trafficker, who worked with and employed other heavily armed drug traffickers, to protect his drugs.  As set forth above, the defendant personally possessed AK-47s and M16s as part of his drug-trafficking activities, he wore a bullet-proof police

14

vest on at least one occasion while receiving a cocaine shipment, and a witness observed a bullet-proof vest in his truck. (PSR ¶¶ 51, 57; *see also id.* at ¶ 14 2(b)). The defendant's co-conspirators also possessed, in addition to similar caches of firearms, larger weapons such as RPGs and anti-personnel mines. (PSR ¶¶ 51, 57, 62).

The defendant also engaged in weapons trafficking. (PSR ¶¶ 66-67). In about 2012, the defendant purchased two RPGs and four accompanying grenades at a cost of $20,000 per RPG and $30,000 per grenade; the Sinaloa Cartel paid for the weapons on behalf of the defendant. (*Id.* ¶ 66). Around this time, the defendant also attempted to sell 20 machineguns, including AK-47s and AR-15s, which he sent on a plane from his airstrip to members of another drug-trafficking organization in Venezuela. (*Id.* ¶ 67). The plane subsequently crashed in Nicaragua and the firearms were seized by law enforcement. The defendant was nevertheless paid approximately $2,000 per firearm. (*Id.*).

The defendant also participated in and directed acts of violence as part of his drug-trafficking activities. In about 2009, the defendant and one of his co-conspirators directed a member of the Honduran National Police to kill a rival, which the law enforcement officer declined to do. (PSR ¶ 60). And in 2012, in response to a drug-related incident in which Leonel Rivera tried to murder the defendant, the defendant helped orchestrate an attack in Olancho that resulted in the murder of Claudio Rigoberto Méndez. (PSR ¶¶ 72-79).

### C.    Bribery

During the course of his offenses, the defendant bribed law enforcement officials for information and protection. In addition to the conduct set forth above, between at least 2009 and

2011, the defendant bribed law enforcement officials in Olancho so that they would not interfere with cocaine shipments.  (PSR ¶ 85(a)).  Moreover, in 2012, the defendant informed members of the Sinaloa Cartel that law enforcement planned to raid a warehouse in San Pedro Sula that contained approximately 2,000 kilograms of cocaine.  (*Id.* ¶ 85(b)).  The defendant stated that he could not stop the law enforcement operation but that the traffickers should leave a small amount of cocaine so that law enforcement considered it a successful operation.  (*Id.*).  Furthermore, after a trafficker was subsequently arrested at the warehouse, the defendant secured the worker's release from custody.  (*Id.*).

### D.  Additional Public Corruption

The defendant also engaged in extensive public corruption as part of his criminal activities.

In 2012, the defendant asked members of the Sinaloa Cartel for approximately $1 million for former congressman Yani Rosenthal, which the defendant represented would be used for Yani Rosenthal's (unsuccessful) campaign to become president of Honduras.  The Sinaloa Cartel subsequently paid the defendant approximately $1 million in installment payments, and the defendant confirmed to the traffickers that it was delivered to Rosenthal.  (PSR ¶ 88).  Rosenthal later pleaded guilty to a money laundering charge in this District.[9]

Also in 2012, the defendant was running for reelection and requested from CW-1 approximately $200,000 for his campaign, which CW-1 provided.  (PSR ¶ 82).  The defendant

---

[9] In 2017, Yani Rosenthal and his cousin Yankel Rosenthal—a former presidential cabinet member—both pled guilty to money-laundering charges.  *See United States v. Rosenthal, et. al.*, No. 13 Cr. 413 (JGK).

later told CW-1 that he lost the election, but that the defendant could "fix" the election if CW-1 provided an additional $100,000. (*Id.*). CW-1 provided the defendant with the $100,000 and CW-1 later learned that the defendant was announced as winning the election. (*Id.*).

In about 2013, the defendant provided the Sinaloa Cartel with a list of individuals identified by the Government of Honduras as being subject to extradition to the United States. (PSR ¶ 89). The list contained the names of several of the defendant's co-conspirators such as members of the Valle Valles and the *Cachiros*, as well as other major Honduran drug traffickers such as Carlos Arnoldo Lobo. (*Id.*). The Sinaloa Cartel subsequently sent the list to the Valle Valles to warn them that they were identified as being subject to extradition to the United States. (*Id.*).

During a January 2014 recorded meeting between the defendant, congressman Martinez Turcios, and other drug traffickers, the group discussed seeking favorable treatment and protection from the recently elected Honduran president ("Official-1"), including through coordination with Yani Rosenthal and by trying to install *Cachiros* associate Oscar Nájera as the President of the Honduran congress. (PSR ¶ 93; *see also* Ex. A).



The defendant explained to the group that "we had come up with a strategy with Yani [Rosenthal]" involving pursuing a leadership position for Oscar Nájera, but that Official-1 had expressed concern about their proposal.  (PSR ¶ 93(c); Ex. A at 47).  The defendant assured the group that Official-1 had a close relationship with Rosenthal and that Official-1 "even still, is in alliance . . . with us.  Because he hasn't stopped helping us."  (PSR ¶ 93(c); Ex. A at 16-17).  The defendant explained that Official-1 indicated "that he's going to pay us sixty million [Honduran lempira], twenty each, because this is where the power is."  (PSR ¶ 93(d); Ex. A at 19).  The defendant said, however, that "we didn't agree on anything" and "then with Yani [Rosenthal], we just up and left" the meeting.  (PSR ¶ 93(d); Ex. A at 21).

The defendant also told the group during the January 2014 meeting that he was working to help aggregate a block of votes in the Honduran congress to achieve protection for drug traffickers.  (PSR ¶ 93(e)).  He stated that "[w]e want to form a tight-knit group of ten, eleven, but we've analyzed this in detail . . . Twelve.  But we need five or six people from the National Party in order to have a 100% guarantee."  (*Id.*; Ex. A 36).  Ultimately, Oscar Nájera did not become the President of the National Congress.  (*Id.*).  In December 2019, the Secretary of State designated Oscar Nájera pursuant to the Magnitsky Act based on a finding that he "engaged in and benefitted from public corruption related to the Honduran drug trafficking organization *Los Cachiros*."[10]

---

[10]   *See*   https://hn.usembassy.gov/statement-by-sec-by-michael-pompeo-on-public-designation-due-to-involvement-in-significant-corruption-of-honduran-congressman-oscar-ramon-najera.

## PROCEDURAL HISTORY

### I.    The Indictment and the Defendant's Surrender

On January 18, 2018, a grand jury in this District charged the defendant in Superseding

Indictment S1 15 Cr. 378 (PGG) (the "Indictment") with:

- Count One:  Participating in a conspiracy to import cocaine into the United States, and to distribute cocaine on board U.S.-registered aircraft, in violation of 21 U.S.C. § 963;

- Count Two:  Using and carrying machineguns and destructive devices during and in relation to Count One, and possessing machineguns and destructive devices in furtherance of Count One, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(1)(B)(ii); and

- Count Three:  Participating in a conspiracy to use and carry machineguns and destructive devices during and in relation to Count One, and to possess machineguns and destructive devices in furtherance of Count One, in violation of 18 U.S.C. § 924(o).

On March 14, 2018, the defendant surrendered voluntarily to face the charges.  Victor

Rocha represented the defendant.  The proceedings remained sealed temporarily following the

defendant's surrender, pursuant to a March 14, 2018 order of the Court, to allow time for the

defendant to participate in proffer sessions.  After two proffers conducted in March and May 2018,

the Government rejected the defendant's attempted cooperation.

On July 6, 2018, the Government extended a plea offer to the defendant that would have

required guilty pleas to Counts One and Three, and resulted in a 120-month mandatory minimum

term of imprisonment and a stipulated Guidelines range of life imprisonment.  (*See* Dec. 7, 2018

Tr. 41-12).  The defendant rejected the offer on July 19, 2018.  At a status conference on July 24,

2018, the Court unsealed the case and scheduled trial to begin on December 10, 2018.

19

## II.        The Defendant's Bad-Faith Efforts to Delay Trial

Through a series of *ex parte* submissions in November 2018, the defendant sought an adjournment of the trial date and new counsel.   Following an *ex parte* conference with the defendant and prior counsel on December 3, 2018, the Court denied the defendant's application on December 7.   The Court reasoned that the defendant had made "false" claims regarding Mr. Rocha, and that "the defendant's complaints about Mr. Rocha and his requests for a continuance to obtain new counsel were made in a bad-faith attempt to delay a trial that I scheduled in July of 2018."  (Dec. 7, 2018 Tr. 3, 5).

## III.        The Defendant's First Guilty Plea

In November 2018, Mr. Rocha informed the Government that a new attorney, Joaquin Perez, wished to speak to the Government about a potential disposition.   During a phone call on or about November 14, Mr. Perez asked the Government to consider, among other things, extending a plea offer to the defendant and giving the defendant another opportunity to attempt to cooperate.   The Government rejected Mr. Perez's requests, as explained in a December 2, 2018 letter to the Court.  (*See* Dkt. No. 98 at 13), and Mr. Perez did not file a notice of appearance until January 2019.

Following an aborted guilty plea on December 7, 2018, the defendant pleaded guilty to Counts One and Two on December 10.  With respect to Count One, the defendant admitted that, between 2009 and at least 2015, he worked with another "drug trafficker" to receive cocaine-laden planes and helicopters at airstrips he controlled in Honduras in exchange for payment, that "on one occasion" he was "personally near one of those airstrips when the cocaine arrived," and that "all

the drugs that arrived there ended up in the United States." (Dec. 7, 2018 Tr. 70-71). With respect to Count Two, the defendant admitted that he "carried weapons" and "motivated other people to carry weapons," including "those who were in charge of receiving the drug[s] in the airstrips." (*Id.* at 72). The defendant clarified that he used the term "motivated" to mean "paid with monies," and also admitted that the "people that was paid for receiving the drugs," *i.e.*, his workers, "carried a weapon that shot kind of automatically." (*Id.* at 74-75).

## IV.        The Defendant's Motion to Withdraw His Guilty Plea

On April 6, 2019, the defendant, now represented by Mr. Perez, moved to withdraw his guilty plea. (Dkt. No. 94). In support of the motion, the defendant claimed in an affidavit that (i) he was "unable to differentiate an automatic weapon from a regular weapon"; (ii) cooperating witness Devis Leonel Rivera Maradiaga "threatened me, and told me that I had to plead guilty"; (iii) Mr. Rocha instructed the defendant to "lie to plead guilty." (Dkt. No. 112-2 at 1-2).

At a conference on August 2, 2019, the Court described the procedural history of the case and observed that, if the Government "wants to litigate all these matters, then obviously that is what we will do," but "[i]t's not clear to me that that's the most efficient way to proceed." (Aug. 2, 2019 Tr. 19). The Court also noted that the defendant's actions in December 2018 were "incredibly disruptive," "[a]nd I'm sure that given the passage of time, there may be some prejudice to the government having to go forward with the trial." (*Id.* at 27). On August 26, 2019, the defendant filed a letter "assert[ing] his actual innocence to Count One." (Dkt. No. 119). On October 2, 2019, the defendant filed what his attorney described as a "duly executed affidavit" with additional claims regarding Mr. Rocha and Rivera Maradiaga. (Dkt. Nos. 124, 124-1).

On December 6, 2019, the Court conducted a hearing regarding the defendant's motion, at which Mr. Rocha and the defendant testified. During sworn testimony at the hearing, the defendant persisted in his claim that Rivera Maradiaga "threatened" him while they were incarcerated together. (Dec. 6, 2019 Tr. 143).[11] The defendant retracted the August 26 assertion of innocence on Count One. (*Id.* at 185). He also claimed on direct examination that he "had nothing to do with" Counts Two and Three. (*Id.* at 137). On cross-examination, however, the defendant admitted that he carried a "rifle," which he described as a "long arm," in connection with drug-trafficking activities and that at least some of his drug-trafficking associates were armed. (*Id.* 191-92). The defendant also said that he was unable to determine whether his workers at airstrips receiving cocaine were carrying semi-automatic versus automatic weapons, and he claimed that he lied at his December 2018 plea proceeding by saying that his workers were carrying automatic weapons because he felt "pressured" and Mr. Rocha told him to lie. (*Id.* at 200-01).

## V.        The Defendant's Second Guilty Plea

On February 19, 2020, the defendant pleaded guilty to Count One, a lesser-included version of Count Two that requires a mandatory consecutive 60-month sentence, and Count Three. In exchange for the defendant's plea, as set forth in the plea agreement, the Government consented to the defendant's withdrawal of his first guilty plea. Based on Criminal History Category I and a stipulated offense level of 54, capped pursuant to the Guidelines at level 43, the defendant's plea agreement contained a stipulated Guidelines rage of "life imprisonment, with a mandatory

---

[11] On June 5, 2020, pursuant to an unopposed request by the defendant, the Court unsealed the transcript of the December 6, 2019 hearing. (Dkt. No. 142).

minimum term of 180 months' imprisonment." (Plea Agmt. at 5). At the change-of-plea hearing, the defendant admitted that,

> in between 2009 and 2014, in Honduras I contributed and helped with several persons in activities related to drug trafficking like, for example, to help them to get clandestine[] air strips for them in furtherance of drug trafficking, and knowingly aware that it was in furtherance of drug trafficking, and that the end or goal of that drug trafficking was importation into the United States . . . . In the course of my relationship with those people, I always had a weapon with me.

(Feb. 19, 2020 Tr. 22-23). The defendant claimed that his weapon was a "223 rifle" that fired "shot by shot," but admitted that security at the airstrips possessed automatic weapons. (*Id.* at 23-24). Based on these sworn statements, it is clear that the defendant falsely testified on December 6, 2019 by claiming that he could not determine whether his workers possessed automatic weapons and that Mr. Rocha told him to lie about it.

## THE SENTENCING GUIDELINES

The Probation Office calculated the Sentencing Guidelines in a manner consistent with the defendant's Plea Agreement, including an offense level capped at 43, Criminal History Category I, and a Guidelines recommendation of life imprisonment as set forth below. (*See* PSR ¶¶ 115, 118, 122). The Government respectfully submits that the Court should adopt this Guidelines calculation and reject the defendant's objections to the PSR without a hearing.

### I.   The Applicable Guidelines Range Is Life Imprisonment

### A.   Drug Quantity: § 2D1.1(a)(5)

Pursuant to U.S.S.G. § 2D1.1(a)(5), the base offense level for Count One is 38. (PSR ¶ 106). The defendant admitted in his plea agreement that he "facilitated the importation into the

United States of at least approximately 20,000 kilograms of cocaine in connection with the drug-trafficking offense charged in Count One."  (Plea Agmt. at 2; PSR ¶ 25).

**B.      Violence: § 2D1.1(b)(2)**

Pursuant to U.S.S.G. § 2D1.1(b)(2), a two-level enhancement is appropriate because the defendant directed the use of violence in connection with Count One.  (PSR ¶ 107; *see also* Plea Agmt. at 3 ¶ 5).  In 2010, the defendant and Rosendo de Jesus Nájera Martinez, a/k/a "Chendo," instructed a member of the Honduran National Police to kill a rival in the vicinity of San Esteban, Olancho.  (PSR ¶ 60).  In 2016, the Honduran Supreme Court concluded that evidence from a Honduran trial "unquestionably attest[s] beyond all reasonable doubt" that the defendant "participated willfully, along with other persons" in the October 2012 murder of Claudio Rigoberto Méndez in Olancho.  (*Id.* ¶ 79; *see also* Dkt. No. 38-3 at 24 (translation of Honduran Supreme Court opinion)).

**C.      Use of Private Aircraft: § 2D1.1(b)(3)**

Pursuant to U.S.S.G. § 2D1.1(b)(3), a two-level enhancement is appropriate because the conspiracy involved the use of private aircraft in connection with the importation of cocaine.  (PSR ¶ 108; *see also* Plea Agmt. at 3 ¶ 6).

**D.      Payment of Bribes: § 2D1.1(a)(11)**

Pursuant to U.S.S.G. § 2D1.1(a)(11), a two-level enhancement is appropriate because the defendant paid bribes to facilitate Count One.  (PSR ¶ 109; *see also* Plea Agmt. at 3 ¶ 7).  The PSR describes, for example, payments by the defendant to Marcos Arias Rodriguez and another member of the Honduran National Police in exchange for assistance and protection from the police

in the Olancho Department.  (PSR ¶ 59; *see also id.* ¶ 85(a)).  In 2012, the defendant accepted bribes from the Sinaloa Cartel to facilitate drug trafficking at Puerto Cortes, and in a separate meeting directed a port official to assist the Cartel in exchange for bribes.  (PSR ¶¶ 69-70).

### E.      Criminal Livelihood: § 2D1.1(a)(16)

Pursuant to U.S.S.G. § 2D1.1(a)(16), an additional two levels are added because (i) an aggravating-role enhancement is appropriate, (ii) the defendant directly participated in the importation of cocaine, and (iii) the defendant "committed the offense in Count One as part of a pattern of criminal conduct engaged in as a livelihood."  (Plea Agmt. at 3 ¶ 8; *see also* PSR ¶ 110).

### F.      Use of Weapons:  Counts Two and Three

In addition to the mandatory consecutive 60-month sentence on Count Two, the defendant stipulated in the plea agreement that Count Three involved "between eight and 24 firearms" and "rocket propelled grenade launchers and rocket-propelled grenades used by the defendant's co-conspirators to provide security for cocaine shipments in which the defendant participated."  (Plea Agmt. at 4 ¶¶ 14-15).  As explained in the PSR, the defendant "employed security teams who used military-grade weapons, including machineguns and rocket-propelled grenade launchers, to assist in receiving, protecting, and transporting cocaine through Honduras."  (PSR ¶ 28; *see also id.* ¶ 50 (describing armed security at an airstrip); *id.* ¶¶ 57, 62 (describing armed security for ground transportation of cocaine)).  For example, in approximately mid-2011, a witness observed the defendant transporting two M16 rifles and a bulletproof vest.  (*Id.* at 14 ¶ 2(b)).  In 2012, the defendant purchased grenades in a transaction funded by the Sinaloa Cartel, and he sold approximately 20 machineguns to drug traffickers in Venezuela.  (*Id.* ¶¶ 66-67).

### G.   Leadership Role: § 3B1.1(a)

Pursuant to U.S.S.G. § 3B1.1(a), a four-level aggravating-role adjustment is appropriate because "the defendant was an organizer or leader of criminal activity that involved five or more participants and was otherwise extensive."  (Plea Agmt. at 4 ¶ 18; *see also* PSR ¶ 113).   The defendant's "organization included dozens of workers" and a management structure in which the defendant had "top lieutenants," including Justo Rufino Rosales Maldonado, a/k/a "Ruffo," a/k/a "Ruffino," a/k/a "Cooper"; Rosendo de Jesus Nájera Martinez, a/k/a "Chendo"; and Mario Reniel Ramos Crosier, a/k/a "Ne," a/k/a "Cusuco."  (PSR ¶ 26).   In approximately early 2012, the defendant showed a Honduran congressman an area on the Honduras-Nicaragua border where the defendant constructed an airstrip "with the assistance of approximately 75 men."  (PSR at 14 ¶ 3). Later that year, the defendant told a group of Sinaloa Cartel operatives that he "had control over military and law enforcement officials who provided him information and protection," and subsequently received approximately "12 cocaine-filled planes at [defendant]-controlled airstrips in Olancho."  (*Id.* at 14 ¶ 4(b), ¶ 61).

### H.   Abuse of Trust: § 3B1.3

Pursuant to U.S.S.G. § 3B1.3, the defendant "abused a position of public trust" as a Honduran congressman "in a manner that significantly facilitated the commission or concealment of the offenses."  (Plea Agmt. at 4-5 ¶¶ 18-19; *see also* PSR ¶ 112; *id.* ¶¶ 85-93).  For example, the defendant "coordinated with his co-conspirators to obtain support and protection from additional Honduran politicians in the hopes of avoiding being targeted by law enforcement and extradited to the United States."  (PSR ¶ 87).  The January 2014 recorded meeting also reflected

26

efforts by the defendant to use his position in the Honduran congress to negotiate protections for himself and fellow drug traffickers with other congressmen and Official-1.

## I.     Obstruction of Justice: § 3C1.1

Pursuant to U.S.S.G. § 3C1.1, the defendant obstructed these proceedings by making "false assertions regarding Devis Leonel Rivera Maradiaga in a letter to the Court dated October 2, 2019, Dkt. No. 124-1, and a 'sworn Statement' filed with the Court on July 28, 2019, Dkt. No. 112-2" and "caus[ed] defense counsel to file an August 26, 2019 letter, Dkt. No. 119, asserting on behalf of the defendant "actual innocence" with respect to Count One."  (Plea Agmt. at 5 ¶ 20; *see also* PSR ¶¶ 100, 114).

## II.    The Defendant's Objections To The PSR Are Meritless

The defendant filed objections to the PSR on November 23, 2020.  (Dkt. No. 155).  Citing to a prior draft of the July 30, 2020 PSR, the defendant objects "to the government's suggestion that its concession to allow him to withdraw his plea was based upon the loss of a critical witness." (*Id.* (citing Jul 20, 2020 PSR ¶ 23 (Dkt. No. 145)); *see also* July 30, 2020 PSR ¶ 29).  The defendant also challenges the conclusions in the PSR that he raised false complaints about Mr. Rocha and lied about threats from Rivera Maradiaga, and he makes a series of arguments regarding the 2009 assassination of General Julian Arístides González.  (*See* Dkt. No. 155 at 3, 12-13; *see also* PSR ¶ 29).  All of these objections are meritless.

With respect to prejudice resulting from delays in this case, defense counsel is in no position to assess the Government's motivations for consenting to the withdrawal of the defendant's guilt plea.  In August 2019, the Court observed that the defendant's actions on the eve

27

of trial were "incredibly disruptive," and that, "given the passage of time, there may be some prejudice to the government having to go forward with the trial." (Aug. 2, 2019 Tr. 27). Setting aside the defendant's conflict-of-interest claims,[12] the Court also correctly concluded in December 2018 that the defendant had raised "false" complaints about Mr. Rocha's diligence and trial preparation, and that the defendant did so "in a bad-faith attempt to delay a trial that I scheduled in July of 2018." (Dec. 7, 2018 Tr. 3, 5). The defendant started to present these false arguments regarding Mr. Rocha less than a month after Mr. Perez emerged in the case behind the scenes, *i.e.*, without entering a notice of appearance. (*See* Dkt. No. 98 at 13).

Irrespective of the intent of Mr. Perez or the defendant, the fact of the matter is that the Government was prepared to try the case on December 10, 2018.[13] The Government cannot keep cooperating witnesses detained indefinitely while delaying their sentencings and/or seeking to prevent their otherwise-lawful removal from the United States. Even if, as defense counsel

---

[12] The Government does not concede that any of the defendant's claims regarding Mr. Rocha have merit, or that the defendant added force to those claims at the December 6, 2019 hearing. The Government consented to the defendant's withdrawal of his first guilty plea as an express condition of the operative plea agreement, and the Government reserves the right to pursue appropriate remedies—including reinstatement of the prior plea and resumed litigation over the defendant's motion to withdraw it—to the extent the defendant persists in factual and legal arguments that breach the agreement. *See, e.g.*, *United States v. Merritt*, 988 F.2d 1298, 1313 (2d Cir. 1993) ("[A] defendant who materially breaches a plea agreement may not claim its benefits.").

[13] It is therefore not true that the defendant "saved the Court and the government substantial resources" by pleading guilty. (Dkt. No. 155 at 3). He pleaded guilty for the first time on the day jury selection was to commence, after the parties and the Court devoted a substantial amount of time to pretrial and *in limine* litigation and the Government had prepared its witnesses. Subsequent to that plea, the defendant submitted false information to the Court, which he acknowledged in his plea agreement and required additional extensive litigation to address.

suggests, there may be procedural mechanisms for doing so, as a practical matter such delays weaken incentives for cooperation and thus harm the pursuit of valid law enforcement objectives. Moreover, as the Court indicated in August 2019—and as defense counsel surely appreciates—the passage of time leaves witnesses vulnerable to cross-examination regarding the erosion of their memories, which diluted the strength of the Government's case as it existed on December 10, 2018.   For all of these reasons, the manner in which the defendant pursued an adjournment of the trial, including by making false claims regarding Mr. Rocha's diligence and trial preparation, prejudiced the Government.   Such prejudice was a relevant and permissible consideration in the Government's decision to extend the plea offer that the defendant accepted in February 2020.

The defendant also objects to language in the PSR describing his false claims regarding threats from Rivera Maradiaga.  (Dkt. No. 155 at 8-11; *see also* PSR ¶¶ 29, 97).   In the same submission, the defendant argues that he "did not obstruct justice" and "should receive recognition for his acceptance of responsibility."  (Dkt. No. 155 at 10-11).   The defendant's plea agreement states otherwise.   In stipulating that an enhancement is appropriate "[p]ursuant to U.S.S.G. § 3C1.1," the defendant admitted that he "*willfully* attempted to obstruct and impede the administration of justice with respect to the prosecution of the instant offenses of conviction" by, *inter alia*, "making false assertions regarding Devis Leonel Rivera Maradiaga in a letter to the Court dated October 2, 2019, Dkt. No. 124-1, and a 'Sworn Statement' filed with the Court on July 28, 2019, Dkt. No. 112-2."  (Plea Agmt. at 5 ¶ 20 (emphasis added)).[14]   There is no dispute that

---

[14] The same provision of the defendant's plea agreement forecloses any challenge to the fact that he "presented blatant lies regarding his purported innocence."  (Dkt. No. 155 at 3; *see also* Plea

the Court has discretion to consider any acceptance of responsibility under 18 U.S.C. § 3553(a).

But the defendant's references to U.S.S.G. § 3E1.1 are inapposite. (*E.g.*, Dkt. No. 155 at 1 & n.1).

The Guidelines stipulation in the plea agreement, as well as the Guidelines calculation in the PSR,

appropriately afford the defendant no credit under U.S.S.G. § 3E1.1 in light of the nature and

extent of his obstruction, and the Court should reject the defendant's efforts to relitigate issues he

conceded in the plea agreement.

Finally, the defendant's sentencing arguments regarding the assassination of General

Arístides González are not mitigating. The Government has not "conceded" that the defendant

"was not implicated in the assassination." (Dkt. No. 155 at 12). Rather, for the sake of efficiency

and in light of the evidence of the defendant's other criminal activities, the Government elected

not to present evidence at sentencing relating to the defendant's role in the murder. The evidence

of the defendant's other conduct is so powerful and troubling that the Probation Office

recommended a life sentence without regard to General Arístides González.

Nor is the Government seeking to "paint" the defendant as a "dangerous and violent drug

trafficker." (Dkt. No. 155 at 7). Rather, the record establishes that his conduct had those features.

The defendant told the Court at his second guilty plea that he "always had a weapon with me."

(Feb. 19, 2020 Tr. 23; *see also* Dec. 6, 2019 Tr. 192 ("I always carry a rifle on me.")). He stipulated

in the plea agreement that he "used violence," and that Count Three "involved between eight and

---

Agmt. at 5 ¶ 20 (stipulating that the defendant "caus[ed] defense counsel to file an August 26, 2019 letter, Dkt. No. 119, asserting on behalf of the defendant 'actual innocence' with respect to Count One")).

24 firearms" as well as "rocket-propelled grenade launchers and rocket-propelled grenades." (Plea Agmt. at 3-4 ¶¶ 5, 14-15). The Honduran Supreme Court has also concluded "beyond all reasonable doubt" that the defendant "participated willfully" in a 2012 murder. (PSR ¶ 79; *see also* Dkt. No. 38-3 at 24). Thus, the record is manifest with respect to the violence and danger to the community posed by the defendant. These aspects of his crimes are part of the reason that a Guidelines sentence is warranted. And the Government's decision not to litigate at sentencing the defendant's role in the murder of General Arístides González is not a mitigating consideration or a basis for leniency. Accordingly, the Court should overrule the defendant's objections to the PSR.

## III.      The Defendant Is Bound By the Guidelines Stipulation In The Plea Agreement

In a separate November 23, 2020 submission, the defendant argues that he was "compelled" to file objections to the PSR, which arguably breach the plea agreement, in light of "misrepresentations" by the Government. (Dkt. No. 154 at 1-2). The defendant also requested a hearing "as to both the Brady violation" and "issues raised in the objections to the Pre-Sentence Investigation Report." (*Id.* at 2). The Court should reject these arguments.

"No rule of law requires a hearing in this sort of case where the relevant facts can be ascertained from the record." *United States v. Pavloyianis*, 996 F.2d 1467, 1475 (2d Cir. 1993). In addition to a detailed Guidelines stipulation, the defendant's January 28, 2020 plea agreement contains a waiver of "any and all right to withdraw his plea or to attack his conviction" based on the argument that the Government withheld *Brady* information "that has not already been produced as of the date of the signing of this Agreement." (Plea Agmt. at 7). At the defendant's guilty plea, Mr. Perez confirmed his understanding that the Government extended the plea offer—which

31

included significant benefits to the defendant, such as accepting a plea to a lesser-included § 924(c) violation—"in exchange for the defendant agreeing to a series of stipulations, including guidelines stipulations that are set forth in the plea agreement that's dated January 28, 2020." (Feb. 19, 2020 Tr. 3). The defendant confirmed that he signed the agreement, that the agreement was read to him in Spanish before he executed it, and that he discussed the agreement and the Guidelines with Mr. Perez prior to doing so. (*Id.* at 6, 18, 20). The Court also explained to the defendant that the plea agreement reflected the parties' "understanding of how the sentencing guidelines apply to your case." (*Id.* at 21). The defendant proceeded to enter a guilty plea pursuant to that agreement. Based on the express terms of the document and the Court's careful Rule 11 proceeding, there is no basis for the defendant to escape his Guidelines stipulation and other obligations under the plea agreement.

The defendant has not presented any credible evidence in support of what he describes as "misrepresentations" and "the Brady violation" regarding the murder of General Arístides González. (Dkt. No. 154 at 2). The Government is, and has always been, in compliance with its discovery obligations relating to the assassination, which the Government has not put at issue for purposes of the defendant's sentencing. (*See* Dkt. Nos. 151, 153). The defendant's claims are based on information that was public and/or in the possession a foreign government long before the defendant's scheduled trial date and two subsequent guilty pleas. Approximately a week after the April 15, 2016 *New York Times* article emphasized by the defendant (*see* Ex. B), the *New York Times* published an article in which a former chief of the Honduran National Police asserted that the Honduran government had "mounted a 'crude setup' by fabricating and leaking documents"

32

and that "the plot . . . is even larger than the papers suggest" (Ex. C).  The *New York Times* articles were based largely on a "report" purportedly prepared by Honduran authorities.  (*See* Dkt. No. 111).  The document implicates Wilter Neptalí Blanco Ruíz, among others, in the murder, but to the Government's knowledge Honduran authorities did not arrest him—or anyone else—in connection with those findings.  Most importantly, neither the articles nor the report exclude the defendant as a participant in the killing.

In any event, the defendant acknowledged at the December 6, 2019 hearing that the report regarding the murder of General Arístides González was "public information" at the Ministry of Security in Honduras, and that he was personally aware of the report prior to the date his trial was scheduled to commence in December 2018.  (Dec. 6, 2019 Tr. 141, 164).  The defendant filed the report with the Court in July 2019, long before his second guilty plea.  (Dkt. No. 111).  The report was therefore available to the defendant at least as much as, if not more than, the Government, which lacks authority to compel Honduran authorities to turn over evidence in connection with an investigation targeting corruption at the highest levels of the Honduran government that has been anything but "joint."  *See, e.g.*, *United States v. Yousef*, 327 F.3d 56, 129 (2d Cir. 2003) ("The Government is not under an obligation to produce prior statements of foreign law enforcement officials that it does not possess."); *see also United States v. Connolly*, No. 16 Cr. 370 (CM), 2017 WL 945934, at *9 (S.D.N.Y. Mar. 2, 2017).

Defense counsel also argues that it was incumbent on the Government to question Blanco Ruíz regarding the murder of General Arístides González during a May 2015 proffer.  (Dkt. No. 155 at 7).  The Government stands by its decision not to question Blanco Ruíz regarding violence

33

at an initial proffer, without security, conducted in a hotel conference room in Guatemala City. *United States v. Saldarriaga*, 204 F.3d 50, 53 (2d Cir. 2000) ("[T]he government has no duty to employ in the course of a single investigation all of the many weapons at its disposal, and . . . the failure to utilize some particular technique or techniques does not tend to show that a defendant is not guilty of the crime with which he has been charged." (citing cases)).  Moreover, at the time of the May 2015 proffer, the Government was not aware of the purported report by Honduran authorities that the *New York Times* described in articles published in 2016, and the Rivera Maradiaga brothers had not yet admitted to participating in—and described the roles of others in—the assassination of General Arístides González.  Following the proffer with Blanco Ruíz, the Government determined that he was not credible and did not meet with him again.  Accordingly, the defendant has not credibly alleged a *Brady* violation with respect to the murder of General Arístides González.

The second alleged "misrepresentation" asserted by the defendant relates to whether Jencks Act and *Giglio* material that the Government disclosed to him in 2018 included information regarding other violence by Blanco Ruíz.  (Dkt. No. 154 at 1-2).  It is far from clear how such disclosures would have, as counsel argues, "produced a different outcome" in any of the parties' plea negotiations between 2018 and 2020.  Nevertheless, enclosed are examples of the Government's 2018 disclosures regarding violence by Blanco Ruíz (referred to as "Wilter Blanco" or "WB"), including disclosures regarding Blanco's role in the murder of "El Chino" and other murders.  (Ex. D (discussing Blanco's role in the murders of (i) several members of the Los Grillos gang at page 2; (ii) El Chino at page 7; and (iii) Mario Munoz at page 8); Ex. E (discussing Blanco's

34

role in the murders of (i) El Chino at page 5, and (ii) Munoz at page 6)).[15]  Blanco's role in the "El Chino" murder in particular was discussed during testimony in open court at the October 2019 trial of Juan Antonio Hernández Alvarado—the brother of Official-1—and in the defendant's objections to the PSR.  (Dkt. No. 155 at 7 & n.9).  Therefore, the Government has not made misrepresentations, the defendant is not entitled to a hearing, and there is no basis for the defendant to pursue arguments that breach his plea agreement.

## DISCUSSION

**I.     The Section 3553 Factors Support a Within-Guidelines life Sentence**

The balancing of the Section 3553(a) factors strongly supports the imposition of a life sentence in this case, as recommended by the Probation Office.

### A.     The Nature and Circumstances of the Offense

The defendant's crime was extraordinarily serious, long-running, and devastating to his country.  For at least seven years, the defendant—an elected congressman who was supposed to be helping his fellow countrymen—led a prolific and violent drug-trafficking organization that was responsible for importing at least 20,000 kilograms of cocaine into the United States.  The defendant used violence and commanded a small army of men armed with military-grade weapons to protect millions of dollars' worth of cocaine.  He stipulated in his plea agreement that the offense involved between eight and 24 firearms as well as RPGs used by co-conspirators to provide security for cocaine shipments, and the PSR establishes a great deal more than that.  (*E.g.*, PSR

---

[15] Because Exhibits D and E are proffer notes that discuss targets who remain under investigation, the Government respectfully requests permission to file those documents under seal.

¶ 58 (anti-personnel mines at an airstrip), *id.* ¶¶ 66-67 (weapons sales)).

The defendant also stipulated in his plea agreement that he bribed law enforcement and used his political position in a manner that significantly facilitated the commission of his crimes. Between at least 2008 and 2012, the defendant engaged in severe violations of U.S. law while his extradition was barred by the Honduran constitution.  When a 2012 constitutional amendment placed the defendant at risk of facing justice here, he used his power and his connections to seek political protection, as exemplified by (i) his delivery of a million-dollar bribe from the Sinaloa Cartel to Yani Rosenthal (PSR ¶ 88); and (ii) the 2014 recorded meeting with other Honduran congressmen in which the defendant described negotiations involving Rosenthal and Official-1 (*id.* ¶ 94).  Consistent with his established track record of lies, the defendant told the Probation Office that his efforts to ratify the amendment gave rise to safety risks.  (*Id.* ¶ 137).  To the contrary, the defendant's conduct is tantamount to treason as a betrayal of Honduran citizens, and the case serves, unfortunately, as but one example of the depths of corruption that have plagued Honduran political institutions.

Setting aside for the moment the defendant's stipulated violence, weapons, corruption, and bribery, the scale of his drug trafficking was so massive that it is difficult to fathom the full extent of the individual, personal consequences of his crime.  Drug trafficking on this level is by no means victimless.  When sentencing a former member of the Honduran National Police on a drug-trafficking charge that involved far less cocaine than the quantity as issue here, Judge Schofield aptly summarized the harm to Honduras and the United States arising from large-scale drug trafficking:

36

> It is sometimes difficult in drug cases to realize how serious the crime is and its impact on people, but I am sure just from looking at the society in Honduras and how it has been ravaged by drug dealers, that you have seen how serious and how negative drugs can be on the population in many ways, and so it is not just the people in Honduras that have been affected, it is also the people in the United States who were the ultimate consumers and buyers of these drugs.

*United States v. Valladares Garcia*, No. 15 Cr. 174 (LGS) (Dkt. No. 357, Tr. 20). During the defendant's reign, poverty spread and the murder rate in Honduras became one of the highest in the world.

The defendant has admitted that he helped import at least approximately 20,000 kilograms of cocaine into the United States. Twenty tons of cocaine—not an inchoate agreement with that object, a mountain of actual drugs that the defendant helped send to this country. "The harm that is done by a ton of cocaine is almost incalculable. The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering." *United States v. Palagio Suarez*, No. 16 Cr. 453 (RJS) (Dkt. No. 160, Tr. 27). "[T]he drugs at issue here cripple individuals and destroy[] families and whole communities." *United States v. Santibanez*, No. 13 Cr. 912 (RJS), 2020 WL 3642166, at *3 (S.D.N.Y. July 6, 2020) (quotations omitted). The defendant sent millions of individual-use cocaine doses to the United States, without regard to the victims here, in order to enrich himself. While doing so, he "participated in an important way in the distribution of a substance, which creates misery in the lives of the people who use it," and he "was indifferent to the poison that was being distributed and ruining people's lives." *United States v. Aguirre Cuero*, No. 15 Cr. 125 (PKC) (Dkt. No. 36, Tr. 22, 24). And the extensive harm caused by the defendant was not limited to the United States and Honduras. This sort of cocaine trafficking harms every country the drugs transit:

> It is clear that this type of activity has an impact on Colombia, on Mexico, and other countries, the safety of people in those countries, in the strength of their institutions, including their judicial institutions, including their police and prosecutorial forces. This drug activity contributes to all of that. It is organized crime. When people decide to assist organized crime enterprises, they have to understand the consequences that are caused by that in multiple countries. It is a serious crime.

*United States v. Cabezas Garcia*, No. 17 Cr. 23 (RJS) (Dkt. No. 71, at 21).

The defendant's conduct was abhorrent, not only because of its nearly unprecedented scope, but because of his privileged position as a Honduran congressman. The defendant abused his elected office in numerous ways including by (i) bribing law enforcement officials for information and protection; (ii) attempting to use the power of the Honduran government to protect drug traffickers and pursue trafficker-friendly policies through multiple meetings with Honduran politicians (PSR ¶¶ 23, 54); and (iii) providing members of the Sinaloa Cartel with a list of individuals identified by the Government of Honduras as being subject to extradition to the United States, which the Cartel used to warn its co-conspirators (*id.* ¶ 89). The defendant's egregious conduct compromised Honduran political institutions that are supposed to support law-abiding citizens and corrupted law enforcement bodies intended to protect the public.

At bottom, the defendant was a corrupt and violent congressman driven by power and greed who spent his time in office leading a large-scale drug-trafficking organization—all to line his own pockets with drug money. His conduct caused harm to people in every country the drugs passed through from South America to the United States. The nature and circumstances of this offense warrant the most severe punishment available.

## B.     The History and Characteristics of the Defendant

The history and characteristics of the defendant also merit a Guidelines sentence.  The defendant has shown no remorse and has sought to obstruct these proceedings.  His bad-faith conduct includes: (i) lying to the Government by minimizing the extent of his drug-trafficking activities during two proffers in 2018; (ii) making false statements to the Court in 2018 in a bad-faith attempt to delay trial (Dec. 7, 2018 Tr. 3, 5); (iii) falsely claiming in a filing that he was actually innocent of Count One, which he recanted at the December 2019 hearing and during his February 2020 guilty plea (Dec. 6, 2019 Tr. 184; Feb. 19, 2020 Tr. 22-23); (iv) falsely testifying in December 2019 that he could not determine whether his workers carried automatic weapons (Dec. 6, 2019 Tr. 200), in contrast to his sworn admission in December 2018 and February 2020 that his security carried automatic weapons (Dc. 10, 2018 Tr. 73-74; Feb. 19, 2020 Tr. 24); and (v) making multiple false statements to the Court about his interactions with a cooperating witness in prison.

The defendant also committed his crimes as a politically and socially powerful member of Honduras's elite.  While the defendant suggested to the Probation Office that he grew up poor and always lived in Olancho, the defendant attended and graduated from high school in Tegucigalpa, Honduras's capital (which is hundreds of miles from Olancho), and attended *Universidad Nacional Autónoma de Honduras*, Honduras's largest and highest ranked university.  (PSR ¶ 141).  The duration of the defendant's crimes also speaks for itself.  His crimes were not a one-time event arising, for example, from a split-second decision made under financial distress.  Rather, the defendant's crime was the product of a series of decisions made over a course of years, and it was

within his power to stop his crime at any point in time.  From 2006 until his arrest, the defendant was one of three congressmen in Olancho, where he made approximately $3,000 per month.  (PSR ¶ 143).  The defendant also has "specialized skills in cattle raising" and purportedly began raising cattle in 1996.  (PSR ¶ 144).

Thus, the defendant did not initiate his criminal scheme because of an inability to make money legally.  Unlike many defendants who appear before the Court, he was fully capable of making a comfortable living lawfully.  He had every opportunity to succeed in life through legitimate work given his education, farming skills, and elected office.  In fact, his $3,000 per month salary as a congressman was approximately 12 times the minimum wage in Honduras.  The defendant chose to abandon honest work to lead a large-scale drug-trafficking organization.  Although the defendant could have ended his crimes at any time, even after making millions of dollars, he chose not to do so.  Instead, it was only after he was publicly charged in this District that it became clear to the defendant that it was no longer possible to brazenly lead a powerful drug-trafficking organization as a public official.  By then, he had already been importing massive amounts of cocaine for years, which no doubt contributed to Honduras becoming one of the most violent places in the world.

Finally, despite his privileged political and social status, the defendant violated the trust placed in him as a public figure and elected official by individuals who trusted him to represent their interests.  In so doing, the defendant demonstrated his lack of respect for the law and basic ethical norms.  Therefore, the defendant's personal characteristics do not warrant leniency and, instead, support the imposition of the life sentence recommended by the Probation Office.

C.      The Need to Afford Adequate Deterrence

A life sentence is also necessary to serve the purpose of affording adequate specific and general deterrence to criminal conduct.  The audacity of the defendant's crime has understandably captured the attention of the public in Honduras and elsewhere in South and Central America.  Thus, the deterrent message and effect of the sentence imposed by the Court in this case will likely resonate significantly with any powerful official tempted to engage in conduct similar to the defendant's.

With respect to specific deterrence, although this is the defendant's first conviction, he stipulated for purposes of the Guidelines that drug trafficking was his criminal livelihood.  (Plea Agmt. at 3 ¶ 8).  His crimes spanned at least seven years.  An October 2012 gunshot wound to the knee, which the defendant attributes to traffickers, did not persuade him to leave the drug trade.  (PSR ¶ 137).  Being arrested for the October 2012 murder of Claudio Rigoberto Méndez—which the Government submits was plainly related to the defendant's knee injury—at most slowed, temporarily, the defendant's drug trafficking.  (*See id.* ¶¶ 72-79).  The Honduran Supreme Court concluded in 2016 that evidence from the defendant's 2013 trial "unquestionably attest[s] beyond all reasonable doubt" that the defendant "participated willfully, along with other persons" in the murder of Rigoberto Méndez.[16]  (PSR ¶ 79).  The defendant also spent approximately three more

---

[16] The Court can and should rely on the findings of the Honduran Supreme Court, which it made "beyond all reasonable doubt" in connection with proceedings in which the defendant was represented by counsel, to conclude by a preponderance of the evidence at this sentencing that the defendant participated in the murder.  *See United States v. Concepcion*, 983 F.2d 369, 387-88 (2d Cir. 1992) ("[I]nformation from other proceedings may be relied upon at sentencing so long as the defendant ha[s] an opportunity to respond in order that the court not rely on misinformation."

41

years after that murder, including two years while the appeal was pending, working with the Sinaloa Cartel to import cocaine. (*Id.* ¶ 93). In 2014, at a meeting involving another Honduran congressman, he discussed negotiations with Yani Rosenthal and the newly elected president, Official-1, for protection of drug traffickers. Particularly in light of the defendant's political connections and local control in Olancho, which suggest that the defendant would return to a cloak of impunity in Honduras upon completing his sentence, specific deterrence is an important feature of this sentencing.

So, too, is general deterrence. This case illustrates why arresting drug traffickers alone, without prosecuting the politicians who protect them, will not suffice to stem the tide of cocaine coming into this country. Drug traffickers will be replaced and the defendant's co-conspirators likely already have been. What must be targeted is the political and structural support provided to drug traffickers in countries like Honduras that allows drug traffickers to flourish at monumental levels. At the sentencing of Fabio Lobo—the son of former Honduran president Porfirio Lobo Sosa, who participated in the importation of 1.4 tons of cocaine (as opposed to 20) and did not plead guilty to weapons charges—Judge Schofield reasoned as follows with respect to general deterrence:

> The most damning fact in your background and in your participation in this is that you are
> not like the police officers who have made plea agreements with the government for a much

---

(internal quotation marks omitted)); *see also United States v. Cruz*, 586 F. App'x 36, 38 (2d Cir. 2014) ("[A] district court may rely on any source, including reliable hearsay evidence and out-of-court declarations, so long as it has 'sufficient indicia of reliability to support its probable accuracy.'" (quoting U.S.S.G. § 6A1.3 & cmt.)).

less amount of time in prison.  You were the son of the sitting president of Honduras, and you used your connections, your reputation in your political network to try to further corrupt connections between drug traffickers and Honduran government officials. And these included not only lowly officials, like customs people and military and law enforcement personnel, but also extremely high level officials.  In short, what distinguishes your case from so many is that you facilitated strong government support for a large drug trafficking organization for multiple elements of the Honduran government, and you enriched yourself in the process.

*United States v. Romero*, 904 F.3d 238, 241-42 (2d Cir. 2018) (quoting sentencing transcript).

Reviewing that language, the Second Circuit found that, "[c]onsidering the breadth of Lobo's corruption and the extent of his criminal activity, the district court acted well within its discretion when it imposed a sentence reflecting the need to deter government officials from using their positions of power to facilitate drug trafficking."  749 F. App'x 31, 34-35 (2d Cir. 2018).  Similar reasoning applies in this case, but with even greater force because the defendant himself long held an elected positon in Honduras.  A Guidelines sentence would appropriately send a clear message to the political and social elite in Honduras that supporting drug traffickers will result in severe consequences in the United States.

### D.    A Life Sentence Would Not Result in Unwarranted Sentencing Disparities

A life sentence would not result in unwarranted sentencing disparities.  *See* 18 U.S.C. § 3553(a)(6).  Very few drug-trafficking cases involve the mix of aggravating factors that this case presents.   In fiscal year 2019, only 6.6% of 19,421 cases involving the application of U.S.S.G. § 2D1.1 included, as this case does, a base offense level of 38.[17]   Even within that 6.6%, the

---

[17] The statistics set forth in this section are taken from reports prepared by the Sentencing Commission, which are available at:

defendant's drug quantity is extraordinary:  his 20,000 kilograms of cocaine is more than 40 times the 450-kilogram threshold for application of Guidelines base offense level 38.  The defendant's other Guidelines offense characteristics are similarly hard to come by.  Only 1.4% of the 19,421 cases involved an enhancement pursuant to U.S.S.G. § 2D1.1(b)(2), which applies here, based on the defendant's use of violence.  Only 17 of the 19,421 cases involved the bribery enhancement to which the defendant stipulated pursuant to U.S.S.G. § 2D1.1(b)(11).  And just 63 cases—0.3%— involved the enhancement set forth in the defendant's plea agreement relating to his criminal livelihood pursuant to U.S.S.G. § 2D1.1(b)(16)(E).  Drug-trafficking cases such as this one involving enhancements for aggravating role and obstruction are also rare.  Only 2.1% of cases applying U.S.S.G. § 2D1.1 also involved an obstruction enhancement pursuant to U.S.S.G. § 3C1.1.  Courts applied aggravating role adjustments pursuant to U.S.S.G. § 3B1.1 in 1,419 drug-trafficking cases in fiscal year 2019, and the defendant is noteworthy among that 7.3% of defendants because the highest-available, four-level enhancement applies.  These statistics further support the conclusion of the Probation Office based on the PSR's factual description of the defendant's offense conduct: a within-Guidelines sentence of life imprisonment will not result in unwarranted disparities because there are few, if any, similarly situated defendants.

As suggested above, the *Lobo* case is an appropriate starting point for determining a just sentence in this case.  Lobo pleaded guilty to participating in a conspiracy to import cocaine, and

_____

(i)      https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2019/Use_of_SOC_Guideline_Based.pdf; and
(ii)     https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2019/Ch3_Guideline_Based.pdf.

Judge Schofield sentenced him principally to 24 years' imprisonment.  The defendant deserves a much greater sentence.  In contrast to the 20 tons of cocaine at issue in this case, Lobo helped transport a relatively modest 1.4 tons as an associate of the *Cachiros*—one of the defendant's partner drug-trafficking organizations.  Lobo also agreed to participate in a three-ton shipment that was proposed by confidential informants in connection with a DEA sting investigation, but the shipment did not happen.  Unlike the defendant, Lobo was not convicted of weapons offenses. Judge Schofield applied a three-level role enhancement, as opposed to the four levels to which the defendant stipulated here.  Judge Schofield also did not apply the enhancements for criminal livelihood, violence, bribes, or obstruction that are set forth in the defendant's plea agreement. Lobo's father was the president, but, unlike the defendant, Lobo himself was not an elected official. At sentencing, Judge Schofield emphasized general deterrence of politically connected drug trafficking using the above-quoted language that applies to an even greater degree to the defendant. *See Romero*, 904 F.3d at 241-42.  And, as noted above, the Court of Appeals affirmed the emphasis on deterrence in *Lobo*.  *See Romero*, 749 F. App'x at 34-35.  As in *Lobo*, the sentence imposed must communicate to the public that these types of crimes will not be tolerated and will be punished to the fullest extent of the law.  Because the defendant's conduct is much more serious in nearly every respect than Lobo's—including but not limited to the fact that the defendant helped import more than 14 times as much cocaine—a substantially more serious sentence than Lobo's 24 years is appropriate.

The Southern District of Florida prosecution of Mejía Duarte, which resulted in a trial conviction for cocaine-importation conspiracy and a life sentence, also supports a Guidelines

sentence in this case.  *See* 15 Cr. 20540 (S.D.F.L.); *see also United States v. Mejía Duarte*, 780 F. App'x 730 (11th Cr. 2019).  The trial evidence established that Mejía Duarte, like the defendant, was responsible for transporting approximately 20,000 kilograms of United States-bound cocaine. Mejía Duarte and his workers possessed firearms, including automatic rifles, in furtherance of their drug-trafficking activities.  Mejía Duarte's organization engaged in acts of violence against its rivals, including murders.  Mejía Duarte also engaged in obstruction by threatening a cooperating witness while they were incarcerated together.  Thus, the defendant and Mejía Duarte are roughly similar in terms of drug quantity, weapons possession, and acts of violence, and obstruction enhancements are appropriate at both sentencings.  However, the defendant is substantially more culpable in terms of bribery and political corruption.  Mejía Duarte was not an elected official, whereas the defendant abused his political position for years to foster the structural environment in Honduras that allowed drug-traffickers such as Mejía Duarte to thrive on a monumental scale. Accordingly, Mejía Duarte's case supports the imposition of a life sentence.[18]

In 2019, Judge Sullivan sentenced a Honduran drug trafficker named Hector Emilio Fernandez Rosa to a life sentence.  *See* 12 Cr. 894 (RJS) (S.D.N.Y.).  Fernandez Rosa pleaded

---

[18] In 2017, one of Mejía Duarte's associates, Juan Carlos Arvizu Hernandez, was sentenced principally to 30 years' imprisonment following a trial conviction for cocaine-importation conspiracy.  *See* 17 Cr. 20130 (RNS) (S.D.F.L.).  Arvizu Hernandez was not a political official, he was not convicted of § 924(c) violations, and he was responsible for the importation of 5,000 kilograms of cocaine, rather than 20,000 kilograms like the defendant here.  The defendant is also more culpable than Arvizu Hernandez in terms of weapons possession, bribery, political corruption, and obstruction.

guilty to cocaine-distribution conspiracy, was responsible for the importation of 155 tons of cocaine and methamphetamine, and ordered or participated in 19 murders.  Fernandez Rosa's case supports a Guidelines sentence in this one as well.  While Fernandez Rosa was responsible for importing more drugs, the quantity of drugs in both cases is astronomical and indisputably caused unfathomable harm.  Similarly, while Fernandez Rosa caused more murders, as Judge Sullivan recognized, "[e]ach [murder] alone would merit a life sentence."  (Sent. Tr. 111).  Moreover, the defendant is more culpable in some respects in that Fernandez Rosa was not a privileged political official who used his position to facilitate drug trafficking.  Judge Sullivan concluded that Fernandez Rosa deserved "many life sentences."  (*Id.* at 111-12).  The defendant's pernicious, long-running, and corrupt criminal conduct, which is at least on par with Fernandez Rosa's, certainly justifies at least one such sentence.

In 2018, a Guatemalan drug trafficker named Waldemar Lorenzana Cordon was sentenced in the District of Columbia principally to life imprisonment following a trial conviction for cocaine-importation conspiracy.  *See* 03 Cr. 331 (CKK) (D.D.C.).  The Government attributed an unspecified "thousands" of kilograms of cocaine to Lorenzana Cordon's offense, and the court applied enhancements for leadership and use of weapons.  Lorenzana Cordon was not a congressman.  And in contrast to the defendant's plea agreement, the court did not apply enhancements for violence, bribery, abuse of trust, criminal livelihood, or obstruction.  Accordingly, a Guidelines sentence in this case would be consistent with Lorenzana Cordon.

Finally, another case that supports a life sentence is *United States v. Suarez*, No. 11 Cr. 836 (KBF), 2014 WL 1998234 (S.D.N.Y. May 15, 2014).  In *Suarez*, Judge Forrest sentenced a

Colombia-based drug trafficker who pleaded guilty to cocaine-importation conspiracy to 648 months' imprisonment, which the court intended to be "effectively a life sentence." 791 F.3d 363, 365 (2d Cir. 2015). Judge Forrest found that the offense involved "thousands of kilograms of cocaine" and weapons possession. The Court also applied enhancements for leadership and criminal livelihood—but not obstruction—and concluded that Suarez "caused men armed with weapons to murder two men." 2014 WL 1998234, at *3. The defendant has stipulated that his crimes also involved the use of violence, he distributed more cocaine than Suarez, he paid more bribes, and he was an elected official. Thus, *Suarez* also supports imposing a life sentence here.

\* \* \*

In sum, all of the above considerations support the imposition of Guidelines sentence recommended by the Probation Office. The defendant was a Honduran congressman with vast political, social, and economic power who acted with impunity to enrich himself and to lead a violent drug-trafficking organization, all to the detriment of his fellow citizens and other victims throughout South America, Central America, and the United States. Since coming to the United States, the defendant has done nothing to mitigate his culpability, and has instead engaged in bad-faith conduct intended to delay his case and obstruct justice. Based on his offense and his personal characteristics, a Guidelines sentence is necessary to provide just punishment, to promote respect for the law, and to afford adequate deterrence—particularly general deterrence with respect to powerful and politically connected individuals like the defendant who seek to use their power to facilitate the activities of drug-trafficking organizations in their countries.

48

## II.        The Court Should Impose $39 Million of Forfeiture

Pursuant to Title 21, United States Code, Section 853, "a defendant convicted of a drug crime 'shall forfeit . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of' the crime of conviction." *United States v. Roberts*, 660 F.3d 149, 165 (2d Cir. 2011) (quoting 21 U.S.C. § 853(a)(1)). "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to define the scope of what was to be forfeited." *United States v. Monsanto*, 491 U.S. 600, 607 (1989). The purpose of forfeiture is "punitive rather than restitutive," *Roberts*, 660 F.3d at 166, and the defendant's ability to pay is irrelevant, *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010); *see also United States v. Khan*, 761 F. App'x 43, 47 (2d Cir. 2019) (holding that "the forfeiture statute for drug crimes is not limited to *profits* from those crimes; rather, it extends to "any property constituting, or derived from, any *proceeds* the person obtained, directly or indirectly, as the result of" the crime of conviction." (quoting 21 U.S.C. § 853(a)(1); citing *Honeycutt v. United States*, 137 S. Ct. 1626, 1632-33 (2017); and emphasis in original)).

The defendant admitted to the forfeiture allegation in the Indictment, and he made conservatively at least $39 million based on his drug-trafficking crime. (PSR ¶¶ 60, 64, 84). Therefore, the Court should order the defendant to forfeit that amount.

## III.       The Court Should impose a $10 Million Fine

The Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). "The burden of establishing inability to pay rests on defendant." *United*

*States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001) (citing *United States v. Thompson*, 227 F.3d 43, 45 (2d Cir. 2000)).  Where a defendant fails to demonstrate an inability to pay a fine, the Court must craft one based in part on consideration of the § 3553(a) factors.  *See* 18 U.S.C. § 3572(a).

The Probation Office determined that the defendant "appears to have the ability to remit a fine."  (PSR ¶ 146).  The defendant cannot meet his burden of establishing inability to pay based on a conclusory claim that he has $7,000 in personal savings and $257,000 in land in Honduras.  (PSR ¶ 145).  Those claims are belied by the fact that the defendant made at least approximately $39 million in drug-trafficking proceeds over the course of his crimes, and has retained two private attorneys to represent him for years in this case.  For the reasons set forth above, the § 3553(a) factors support the imposition of the maximum available penalties.  Therefore, the Government respectfully submits that the Court should order the defendant to pay a fine of $10 million.  (*See* PSR ¶ 158 (noting Guidelines fine range of $25,000 and $10 million)).

50

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court should sentence the defendant to life imprisonment, require forfeiture in the amount of $39 million, and order the defendant to pay the statutory maximum fine of $10 million.

Dated: New York, New York
       December 23, 2020

                                         Respectfully Submitted,

                                         AUDREY STRAUSS
                                         Acting United States Attorney
                                         Southern District of New York


                              By:      /s/
                                       Emil J. Bove III
                                       Matthew Laroche
                                       Assistant United States Attorneys
                                       Tel.: (212) 637-2444/2420

51