UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO. 15-CR-378

**UNITED STATES OF AMERICA**,

    *Plaintiff*,

v.

**FREDY RENAN NAJERA MONTOYA**,

    *Defendant*.

_____/

**DEFENDANT FREDY NAJERA MONTOYA'S SENTENCING MEMORANDUM AND INCORPORATED OBJECTIONS AND CLARIFICATIONS TO PRESENTENCE INVESTIGATION REPORT**

    Respectfully submitted,
/s/ *Joaquin Perez*

_____
JOAQUIN PEREZ, ESQ.
Counsel for Defendant
NYB: 52376532
6780 Coral Way
Miami, Florida 33155
Tel: (305) 261-4000
Fax: (305) 662-4067
FL Bar: 335339

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| | PRELIMINARY STATEMENT……………………………..…………… | 3 |
| I. | INTRODUCTORY STATEMENT……...…………………………….... | 4 |
| II. | HONDURAS…………………………………………………………… | 5 |
| III. | VIOLENCE AND WEAPONS TRAFFICKING…….……….…………… | 6 |
| | A. Najera's Alleged Participation in the 2012 Murder of Claudio Rigoberto Mendez……………………………………….……………..… | 6 |
| | B. Najera was not involved in Arms Transactions Involving Rocket-Propelled Grenade Launchers and Machine Guns……………………………………. | 8 |
| IV. | THE GOVERNMENT'S DISPUTED INFERENCES……………………… | .9 |
| | A. Unproven Conduct that should be Disregarded Regarding Drug Trafficking………………………………………………………………… | 9 |
| | B. Unproven Allegations of Potential Corruption……………………….. | 11 |
| V. | CONCLUSION……………………………………………………….. | 13 |

## **PRELIMINARY STATEMENT**

What was Mr. Najera's motivation when he agreed to leave his family behind and self-surrender, knowing that he would be facing a significant period of incarceration in the United States? Why would he agree to meet with SDNY prosecutors and admit his drug trafficking activities in Honduras? Was he intending to manipulate the system of justice as the government now suggests? Wouldn't it have been easier to reach a cooperation agreement with the government by admitting its claims imitating the path followed by some of his accusers? Did he hhave a right to articulate complaints against an attorney who had expressed a disinterest in representing him?

Unsatisfied with Mr. Najera's admission of drug trafficking activities, the government overstates his importance wrongfully imputing violence and dishonesty. Mr. Najera could have been spared these disparaging accusations had he had followed the example set by the so called Cachiros [1] and admit the government's perception of his past wrongdoings. Guided by his own moral principles he chose a different path.

On the day he left his family behind, Mr. Najera was aware that he would be atoning for his drug trafficking activities by facing incarceration in the United States. He came to redeem for his mistakes by admitting responsibility for his drug trafficking activities. From the outset he agreed to disclose his illegal activities by proffering with the prosecutors.  Preconceived notions nurtured by informants who had reached favorable agreements sealed his fate. Leonel and Javier Rivera were the driving force of that perception. The so-called Cachiros have long had a personal grudge against Mr. Najera exemplified by their prior attempt to assassinate him.  Once in the

---

[1] US v. Rivera Maradiaga, Devis Leonel Case No. 13-cr-00413-JGK(SDNY)

United States they settled that score by creating a false narrative misrepresenting and twisting the truth.

Mr. Najera's unwillingness to adopt the Cachiro's prepared script engendered a breakdown in communication causing the government's foreclosure of a cooperation. From that point on, what was intended as a mutually convenient pact became the subject of great acrimony. The Government's attitude changed, and Najera became an outright enemy. At all times thereafter, the government has magnified the scope of Najera's wrongdoing by painting him to be a violent, greedy, and scheming politician. In essence by overplaying his responsibility relying upon the Cachiros, individuals who had a long-standing feud with Mr. Najera. From that point forward based upon questionable claims the government has accused him of engaging in outrageous acts. How a defendant who self-surrendered and admitted being a significant drug trafficker sunk so low?

What follows is not a denial of past criminal conduct but rather an attempt to place in context the nature and extent of his criminal activities and his personal characteristics, factors relevant in imposing sentence.

I. INTRODUCTORY STATEMENT

The Pre-sentence Investigation Report ("PSR") contains a lengthy description of the purported 'offense conduct.' While presented as the conclusions of the United States Probation Office, ("Probation Office") the description of the case is essentially a verbatim reiteration of the Government's version of events that appear to have been inserted in the PSR. As such, the 'offense

conduct' description should be accorded little weight - as it does not represent an objective analysis of what should be an independent arm of the court - namely the Probation Office. [2]

Nevertheless, the Probation Office inexplicably recommends life imprisonment, a penalty widely disproportionate to the actual offense conduct. Having no evidence that Mr. Najera engaged in any acts of violence in connection with the offense of conviction, a life sentence would be grossly excessive, unfair, and unjust.

The government's sentencing memorandum (Dkt. 157) is divided into a lengthy dissertation of 1) Honduras' political history, 2) a section dedicated to drug trafficking activities, 3) a subsection dealing with violence where the government falsely suggests that a Honduran Supreme Court decision found Mr. Najera guilty of homicide[3], and finally, 4) a complete misstatement of the circumstances and legal basis surrounding the motion to withdraw his initial guilty plea.[4]

II.   HONDURAS

The government's claim that Honduras is a violent place ignores the country's conceptual history. Poverty, high unemployment, and violence have been an endemic problem since the

---

[2] On July 30, 2020, the Government submitted additions to the Offense Conduct section and related cases that the Probation Department had neglected to include in the draft report. Rather than affording the Defendant an opportunity to object to the factual allegations contained in the revised offense conduct and related cases, the Probation Department that same day issued the Final PSIR. See Final 2nd Addendum to the Pre-Sentence Report, PSR, P42.

[3] The Government had previously stated that the "murder of Rigoberto Mendez" was not conducted in furtherance of the conspiracy charged in the Indictment" Government's. Opposition to Defendants' Motion for Rule 15 Depositions. (Dkt No. 23, at 17). Moreover, the Government represented that it did not intend to argue at any point in these proceedings including at sentencing that Defendant was responsible for this homicide. Government's Opposition to Defendant's Motion for Rule 15 Depositions, (Dkt. No. 23 at 18, 3-5).

[4] This last issue was previously addressed in the initial objections to the Presentence Report. (Dkt No. 155) Thus the present objection addresses the statements added to the Final Pre-Trial Services Report (Dkt No. 146) without affording Defendant the opportunity to object or comment on its accuracy.

country's inception, as it relies upon a few agricultural staples such as coffee and bananas to sustain the economy. Thus poverty, unemployment, and violence are not a recent phenomenon caused by the drug trade but another manifestation of an endemic problem impacting Honduras' history. [5]

In 2009, the United States supported the coup that forced duly elected President Jose Manuel Zelaya from office and destroyed the rule of law, thereby gutting the country's stability. The coup had an enormous detrimental impact upon the Honduran people as the murder rate shot up not only as a result of drug trafficking, but also as a result of political instability.

The United States helped fuel the violence and the proliferation of firearms and weapons of mass destruction when it subsidized the so called "Contra War" in Nicaragua during the Reagan Administration. In fact, the so-called Catacamas' airstrip (known as El Aguacate) in Olancho was built by the United States to facilitate the transportation of weapons to the Contras in their fight against the communist regime in Nicaragua. (PSR ¶ 51,52.)[6] In the process, firearms and weapons of mass destruction were left behind, contributing to violence in Honduras.

### III.   VIOLENCE AND WEAPONS TRAFFICKING

A. Najera's Alleged Participation in the 2012 Murder of Claudio Rigoberto Méndez

The Government claims that "the record is manifested with respect to the violence and danger to the community posed by the defendant. (Gov't Sentencing Memo at 31). This is an unfair accusation with no evidence to lend it strength.

---

[5] There are no clear reasons why Honduras's political system is relevant Mr. Najera's sentencing. Political actors so severely criticized are the ones that different United States administrations have supported over the last twelve (12) years. Mr. Najera is not responsible for this situation nor should political considerations be considered at sentencing.

[6] The Government claims that Mr. Najera "built the Catacamas airstrip." As more fully explained below, a cursory review of U.S. media outlet reports reveals the falsity of those claims. See PSR. ¶51, 1-3.

Despite its lengthy investigation the government has failed to identify that Defendant was personally involved in acts of violence. Devis Leonel Rivera Maradiaga's, (hereafter referred to as Rivera or by his *nom de guerre* "Cachiro") has long held a personal vendetta against Mr. Najera. This is best exemplified by Mr. Rivera's attempt to have Mr. Najera killed, causing the death of four individuals in the process. See, La Tribuna, October 13, 2012. Atentan contra diputado y otros dirigentes liberales - Diario El Heraldo (translated title - Assassination Attempt is made against Honduran Congressman and other Liberal Party leaders.)



The Government's attributes Najera responsibility for the death of Claudio Rigoberto Mendez (PSR ¶72-79). Specifically, in October of 2012, Rigoberto Mendez died in a shootout in the Olancho Department of Honduras. Mr. Najera was subsequently charged with violations of Honduran law in connection with the murders. As the Government previously recognized, "following a trial in Honduras the defendant was not convicted. On appeal, however, the Supreme Court of Honduras ordered a new trial. The retrial in Honduras has not taken place, **… and the**

**charges against the Defendant remain pending**." Governments Opposition to Rule 15 Deposition. Dkt. No. 23 at 4. 11-14, and 5, 1 - 4.

The Government now back pedals its previous representation by inexplicably taking out of context and misrepresenting the Honduran Supreme Court's holding. The Court never made a finding that Mr. Najera was convicted beyond a reasonable doubt in the murder of Rigoberto Mendez. (PSR, ¶79). Instead, the Court found there were questions about whether defendant was present in the immediate area where the murder was committed and remanded the case to the lower tribunal for further proceeding. Following the Supreme Court decision, Mr. Najera was placed in home detention awaiting the commencement of a new trial. The Government's nefarious motivation is further evidenced by ignoring a prior representation to the Court that "the Government **does not intend to argue at any point in the proceedings, including at sentencing of the defendant should he be convicted,** that the defendant was present at the scene where Mendez was murdered." (Govt. Opposition to Defendant's Motion for Rule 15 Depositions. (Dkt. 23,18.3-7)

Lacking evidence that Mr. Najera was personally involved in acts of violence, the Government misrepresents the status of the homicide case. Its motivation is clear. Unlike other related SDNY Defendants such as Juan Antonio Hernández Alvarado *US v. Juan Antonio Alvarado Case No. 15-CR-379-PKC*, and Héctor Emilio Fernández-Rosa, *US v. Héctor Emilio Fernández-Rosa, 12-CR-000894-RJS,* who admitted involvement in multiple homicides, there is no reliable evidence that Mr. Najera was either violent or involved in the commission of the homicide. Mr. Najera should be sentenced for his admitted participation in drug trafficking, but not for imaginary and speculative acts of violence.

B  Najera was not involved in Arms Transactions Involving Rocket-Propelled Grenade Launchers and Machine guns.

 Mr. Najera has admitted that he possessed a firearm in connection with his drug trafficking activities.  The Government's voluminous 3500 material failed to reveal the so-called alleged arms transactions. Claims of rocket propelled grenade launches and machine guns are nothing more than a salacious effort to paint Mr. Najera as a violent individual.

IV.     THE GOVERNMENT'S DISPUTED INFERENCES

This section addresses the inferences to be drawn from undisputed, as well as disputed factual allegations the government asks this court to draw in its December 20, 2020 sentencing memorandum (Government's Memorandum or "Gov't. Memo").

    A.  Unproven Conduct that should be Disregarded Regarding Drug Trafficking

1. *Najera then drove some members of the group to a nearby airstrip that Najera stated belonged to him and that he had built (the "Catacamas Airstrip"). NÁJERA drove the men to the Catacamas Airstrip in a truck. PSR ¶ 51.*
 In the early 1980's U.S. engineers built so called Catacamas airstrip in efforts to provide supplies to the Contra rebels who were fighting the leftist Sandinista government. See  The Washington Post Nov. 25.2001 https://www/washington post.com/archive/politics/2001/11/25/entrepreneur-hopes-to attract-tourists-to-former-cia-base/39b26948-1aa6-4r0-b121-0dle30164db2/

 see Also https://apnews.com/article/88b73a8cda214bc6fa2a5bca2eba8c5c



Consistent with prior practice, the prosecutors accepted Mr. Rivera's testimony as gospel, never engaging in a cursory review of available police and media reports to ascertain their credibility. The Catacamas airstrip is state owned, guarded by the military and supervised by air control tower via airport code or location indictor MHGE. See https://en.wikipedia.org/wiki/El_Aguacate_Airport.  It is located five (5) miles from the City of San Esteban. The suggestion that Mr. Najera built and owned the airstrip to facilitate the so-called "Cachete Shipment" alleged in the PSR defies logic and is manifestly untrue. See PSR ¶ 52. Given its proximity to the densely populated city of San Esteban, as well as local and commercial aerial traffic it defies logic that this airport would be used for drug smuggling.

2- *Najera and Mejía Duarte also worked with another Honduran drug trafficker Juan Ramón Matta Waldurraga, who had connections to additional Colombian cocaine suppliers. On one occasion, in about 2008, a plane carrying a cocaine shipment arranged by Matta Waldurraga and Najera crashed at one of Najera's airstrips in Olancho.*
*PSI ¶ 53.*

Juan Ramon Matta Waldurraga pled guilty, cooperated with the authorities, and received a two-year sentence in the Eastern District of New York. (D.E. 38) (EDNY 14-cr-00442-KAM.) Like Mr. Najera, Matta Waldurraga also incurred the Cachiros' wrath. However, EDNY prosecutors and DEA Agents concluded that the Cachiro's claims were groundless and rejected them.

Mr. Rivera's attempt to selectively undermine individuals is best exemplified by the unfounded claim that Matta and Najera arranged a load of cocaine that crashed at one of Najera's airstrip. (PSR ¶53). Honduran police reports reflect that in 2003, as opposed to 2008, a plane carrying a load of cocaine crash landed in front of Matta's property in San Esteban, Olancho. No other police report or evidence supports the specious claim that a plane crashed at one of Matta or Najera's airstrips. https://www.laprensa.hn/honduras/556169-97/captura-de-diputados-muestra-infiltraciones

### B. Unproven Allegations of Potential Corruption

1. *Najera was running for reelection and requested from Monroy Murillo approximately $200,000 for his campaign, which Monroy Murillo provided. Najera later told Monroy Murillo, in substance and in part, that Najera lost the election but that if Monroy Murillo provided an additional $100,000, Najera could "fix" the election. Monroy Murillo provided NÁJERA with the $100,000 and Monroy Murillo later learned that NÁJERA was announced as winning the election.  PSR ¶82*

It is difficult to fathom the inclusiveness of this trivial allegation in the PSR.  Unsatisfied with other personal aspersions, the Government recurs to the foolish claim Mr. Najera's election to the Honduran Congress was rigged. The image below indicates that in the year in question there was no need to 'fix' the election as Mr. Najera received a greater number of votes than anyone in his party. http://www.tse.hn/web/estadisticas/procesos_electorales.html.



2. *In 2012, NÁJERA asked members of the Sinaloa Cartel for approximately $1 million for Yani Rosenthal. Najera represented that the money would be used for Yani Rosenthal's campaign to become President of Honduras. The Sinaloa Cartel subsequently paid Najera approximately $1 million in installment payments, and Najera represented that the money was paid to Yani Rosenthal.*

A perfunctory review of the Government's discovery would have revealed the mistaken nature of this claim. Cesar Gastelum, the Sinaloa Cartel's representative in Honduras specifically stated "that he made payments through Mario the person in charge of the Puerto Cortez, Honduras, and that he, Cesar Gastelum, sent $500,000.00 and then sent another $500,000.00 to the campaign of Juan Orlando Hernandez through another unidentified person. Cesar Gastelum's debriefing, December 8, 2015, Bates no. 3516-6 page 5 of 17. Mr. Gastelum makes no mention of Mr. Najera or Yani Rosenthal in connection with the alleged political contribution.

> 3. *In January 2014, a meeting was recorded between Najera, Matta Waldurraga, Congressman Martinez Turcios, Congressman Sabillon, and other drug traffickers. During the meeting, the group continued to discuss seeking favorable treatment and protection from Juan Orlando and Yani Rosenthal, including by trying to install Cachiros associate Oscar Najera as the President of the National Congress. (PSR ¶ 93).*

The government points to snippets of untested evidence without context regarding the meeting recorded in January 2014. Preliminarily, there is not a single reference at the meeting to either drug trafficking activities or extradition related matters. The conversation centers upon the nomination of the President of the Honduran Congress. There is no quid pro quo discussion regarding the nomination of Oscar Najera to head of the Honduran Congress. Stripped of unproven innuendos, the conversation is of a political nature, akin to US politicians forming a coalition to elevate a party member to a leadership position. To the extent it is possible to make sense of the transcript and the recording, it reveals that nothing worth noting. Ultimately Oscar Najera did not become the President of the Honduran Congress.

Finally, other assertions are either false or misleading. Article 102 of the Honduran Constitution prohibited the extradition of Honduran citizens to foreign countries until approximately January of 2012. Later, the Honduran Congress amended Article 102 to permit extradition of Honduran citizens in cases involving 'crimes of trafficking of narcotics' Legislators were free to vote for or against the amendment. Several members in fact opposed the change. As a congressman for the Olancho department, Mr. Najera voted in favor of the amendment. The claim made that the change was solely the result of U.S. pressure is not only misleading but offensive to Honduras as a sovereign country and to its citizens.

## **CONCLUSION**

By a different cover Mr. Najera will be submitting 18 U.S.C. § 3553 factors including Mr. Najera's history and characteristic information to aid the Court at sentencing. Mr. Najera should be sentenced for his role as a drug trafficker not because he is a violent individual. He has other redeeming qualities such as his dedication to family, the community, as well as the absence of a criminal conviction during his 45 years of existence. The sentencing imposed should be commensurate with the crime he committed and unrelated to the Government's hyperbolic claims.

Respectfully submitted,
/s/ *Joaquin Perez*

_____
JOAQUIN PEREZ, ESQ.
Counsel for Defendant
NYB: 52376532
6780 Coral Way
Miami, Florida 33155
Tel: (305) 261-4000
Fax: (305) 662-4067
FL Bar: 335339

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that a true copy of the forgoing was filed this 1st day of June 2021 via the CM/ECF system which will send to all parties of record.

/s/ *Joaquin Perez*

_____
Joaquin Perez, Esq.