UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO. 1:15-CR-378 PGG

**UNITED STATES OF AMERICA,**
    *Plaintiff*,

**-V.S.-**

**FREDY RENAN NAJERA MONTOYA,**
    *Defendant*.
_____/

## DEFENDANT FREDY RENAN NAJERA MONTOYA'S SENTENCING MEMORANDUM

Respectfully submitted,

*/s/ Joaquin Perez*
_____
JOAQUIN PEREZ, ESQ.
Counsel for Defendant
NYB: 52376532
FL Bar: 335339
6780 Coral Way
Miami, Florida 33155
Tel: (305) 261-4000
Fax: (305) 662-4067
Jplaw1@bellsouth.net

I.     INTRODUCTION …………………………………………………..….3

II.    PERSONAL CHARACTERISTICS ……………………………………….3

    A.     ADULT LIFE AND FAMILY ………………………………………….3

    B.     CHILDHOOD AND UPBRINGING………………………………………..5

    C.     FAMILY AND COMMUNITY TIES ……………………………………...7

    D.     EXTRAORDINARY DEVOTION TO OTHERS …………………………….8

III.   UNEXPECTED CONDITIONS OF CONFINEMENT ………….………….11

    A.     Legal Framework …………………………………………………..11

    B.     Lockdown ……………………………………………………………13

    C.     COVID-19 Pandemic ………………………………………………..14

IV.    THE NEED FOR ADEQUATE DETERRENCE ………………………....16

V.     AVOIDANCE OF SENTENCE DISPARITIES ………………………..…17

VI.    CONCLUSION………………………………………………………….19

## I.     INTRODUCTION

Defendant, Fredy Najera Montoya ("Mr. Najera" or "Defendant"), files this sentencing memorandum requesting this Honorable Court to exercise its discretion and impose a sentence sufficient, but not greater that necessary, to achieve the purposes of 18 U.S.C. § 3553(a).[1]

People are complex and multidimensional. Mr. Najera deeply regrets his drug trafficking activities; however, he has redeeming qualities that should be considered when fashioning a sentence. Those personal characteristics are discussed in more detail below and are factors which are relevant to statutory concerns such as personal deterrence and the overall message to the community.

## II.     PERSONAL CHARACTERISTICS

A.  **Adult Life and Family**



Mr. Najera was born on January 11,1977 and is currently 44 years old.   He has four children: Alejandra Maria (15 years old), Luis Renan (13 years old), Laura Ramona (8 years old), and Fredy Samuel (7 years old.)

---

[1] This statute also directs the Court to consider: the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found of similar conduct; and the need to provide restitution to any victims of the offense.18 U.S.C. 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

Mr. Najera's absence has caused his family to suffer emotionally and financially as he was the primary breadwinner for his immediate and extended family.  His family is aware of his present incarceration and remains supportive of him.  His four children expressed that Mr. Najera has been an excellent, responsible, and caring father. They also described how the separation has traumatized their lives to the degree that they are receiving psychological counseling to help adjust to life and school.

His youngest daughter, Laura Ramona, writes,

> "*I miss him very much; he has been a good father to me; he called me many times to tell me that he loves me; I miss his love and embraces; we feel alone without him.*"

His son, Luis Renan, also writes,

> "*I love him very much; I don't want to grow up without him; he is very good with people and not having him with us has been very sad.*"

His eldest daughter, Alejandra Maria, adds…

> "*I admire [my father] for his big heart that God gave him; he is the best father in the world; he showed me to be a good person.*"

The youngest son, Fredy Samuel, says,

> "*I miss him very much; I want him to be happy and that he sees me happy also.*"

*Below: Mr. Najera and his sons enjoying a family meal*



Although he recognizes his own unlawful conduct brought this misery upon himself and his loved ones, the emotional punishment inflicted on his family is likely to dissuade him from engaging in future criminal activity.

B. **Childhood and Upbringing**

Mr. Najera was born in San Esteban, Honduras to Luis Najera and Ramona Montoya. He was reared in extreme poverty. The family home had a dirt floor with no electricity or running water. There was no plumbing or irrigation system, and Mr. Najera recalls walking to the river daily to bring water home to clean and cook. On the weekends, Mr. Najera and his mother would return to the river to wash clothes and the younger children would swim in the river to bathe themselves. (PSR ¶ 130). As the family grew, the children had no beds and resorted to sleeping on the floor. Additionally, Mr. Najera and his siblings lacked basic needs like food and clothing. Despite his difficult upbringing, Mr. Najera has maintained that he hails from a tightly knit family and that his family members are very supportive of him.

Mr. Najera attended a local public school where he excelled in academics and was an honor student throughout his primary education. While in school, Mr. Najera's parents opened a grocery store business where they sold goods for the community's daily consumption. Despite their limited resources, Mr. Najera' parents sent him to the capital city of Tegucigalpa, where he enrolled and eventually graduated from high school. When his father Luis Najera Carcaramo died in 2004, Mr. Najera took over his family's farm, raising cattle and dairy farming. (PSR ¶127).

Mr. Najera's mother, Ramona Montoya Franco, passed away on February 28, 2021, while he was in custody. Prior to her death, she wrote,

> "…. Since he was a child, I saw many good values, friendly, noble, helpful, sincere, with a great heart, wishing to serve. When he was a deputy, he was dedicated to serve others; meaning the people living in poor houses; he is very noble towards his neighbor…."



*Above: Fredy Najera, his son, and mother in Honduras.*

Mr. Najera grew up in Olancho, a dangerous and politically unstable area in Honduras. His cousins and uncle were murdered, and his mother and brother were victims of an assassination attempt.  Although he grew up in these dangerous conditions, Mr. Najera has no prior criminal history in the United States or in Honduras, and while in custody, he has been an exemplary inmate with no disciplinary infractions, taking a variety of education courses to improve his reinsertion in society.[2] (PSR ¶19).

---

[2] For clarity purposes, the letters quoted above are filed as Exhibits to *Notice of Filing Letters in Aid of Sentencing* in Spanish accompanied by an English translation in PDF.  There are 55 letters which are attached as separate exhibits under the headings: Family and Friends; Education and Upbringing and Devotion to Others.

### C. Family and Community Ties

Mr. Najera's strong family ties and commitment to gainful employment make him less prone to recidivism. Family members describe Mr. Najera as a good-hearted humble man who is helpful, loving, and motivated to help his community. For these reasons Mr. Najera is missed by his family. The following are a few words extracted from letters written family and community members:

> **Osiris Duarte (Luis Renan and Fredy Samuel's mother)**
> "I have known him for 21 years; he is a human being that many are missing and waiting for him; he is characterized for helping other people; he has loved us as family."
>
> **Yesica Lopez (Laura Ramona's mother)**
> "Fredy has a good heart; I am a witness of many things that he did for other people; as a father he is the best, I did not make a mistake by giving the best father to my daughter."
>
> **Luis Yovanny (Fredy's older brother)**
> "He has been a good father, a good son and a good brother, straightforward, humble and with a good heart."
>
> **Josue Najera (Fredy's younger brother)**
> "I am a witness of how hard he worked to help us as a family. A very humble man, close to his family, loves being with his family; an exceptional son and brother, with a noble heart; caring of others, respectful."
>
> **Luis Josue (Mr. Najera's Nephew)**
> "I miss a lot my uncle Fredy I can't wait to be with him and cousins.
>
> **Luis Emanuel (nephew – Luis Yovanny's son)**
> "A person that I admire a lot, a great human being with a big heart; he showed me values such as serving the needy and giving to those that don't have much.
>
> **Ana Rosales (sister-in-law)**
> "I have known him for over 14 years as a brother- in-law; I met a caring uncle, a father dedicated to his family, his home and his town; I admire his    perseverance and his will to serve; a caring uncle.
>
> "A human being that is missed by his children and his nephews, his brothers, his brothers-in-law; that feeling is the product of having given much love throughout the years, much warmth, much caring; having given quality time, of planting the

efforts to help, in fact he was fundamentally the family's pillar. We are waiting for him with open arms because deep down inside he is good human being."

### D. Mr. Najera's Extraordinary Devotion to Others.

Throughout his life, Mr. Najera has helped those in his community. As further testament to Mr. Najera's selfless nature and commitment to service eighteen letters have been submitted in his support.



*Right: Mr. Najera addressing his community in Olancho, Honduras where he served as a Deputy and improved the town with infrastructure renovations and made medical care more accessible to the population.*

**Lisbeth Diaz**.
"[Fredy Najera] has helped my mother with her cancer treatment. Mr. Najera is a great man and leader from our department, and we need him for all he has done for us."

**Wilfredo Ruiz.**
"[Fredy Najera] helped our family very much during our health emergencies and was a constant support to our school age children by giving them uniforms, scholarships and supplies."

**Adilia Ramirez.**
"[Fredy Najera] has helped me personally during my medical treatment after being diagnosed with diabetes and high blood pressure."

**Angela Sheila Triminio.**
"[Fredy Najera] constantly supported many families and people that have needed him and as deputy he always promoted important socio-economic projects and infrastructure, such as educational centers and many more."

**Hernan Guevara.**
"[Fredy Najera] was always an exemplary child for his intelligence and above all, for his humility.  Thanks to him with his work as deputy he made   many   dreams come true that we had since we were children, by developing projects, such as electric lighting."

**Oscar Martinez.**
"I personally know Mr. Najera as a parliamentarian and in his work and personal life.  We know about his dedication to society, his gift of service and respect to freedom of thought.  With a firm character and determination, he built the best department.  He is a friendly, charismatic, and simple person, always at the service of others, a good son, excelled father and a good friend."

**Ana Maria Pacheco.**
"I have known Mr. Najera for 15 years; I can provide a summary of his actions correctly:  he is a hard-working man, respectful and with good manners, helpful and very sociable."

**Alba Montalvan.**
"He is a sincere friend, a great man, humble, helpful, God fearing, always  helping the needy when he was able to, and I am a witness to that."

**Ariel Pastora.**
"He was a great leader, friend, and a great father; he stood out for negotiating and approving many projects for our municipality."

**Gonzalo Padilla.**
"As municipal councilor, I believe Mr. Najera is a loving, charitable and helpful person."

**Alexis Padilla.**
"He is a man that I know for many years, humble, hard-working; I never saw Mr. Najera to be a violent man."

*Below: Mr. Najera and members of the Olancho community in an outdoor prayer service.*




*Above: Children in Mr. Najera's town thanking him for contributing work supplies and basic essentials to their school. Poster reads: "Welcome Fredy Najera… We care for you very much; you are our leader…. We will never forget you…. We love you."*

**María de la Cruz Cano.** "I am a Senior citizen suffering for 15 years of bone deformity. I know Mr. Najera since he was a child; since that time, he was humble, intelligent and above all, loving and caring about the needs of the people; we now have many projects in our community because of him, and as to the personal relationship, grateful because he was always caring about my medication when I needed it the most."

**Sonia Cordelia.** [I am] A teacher who taught Mr. Najera's children. He was and remains a very responsible father, I consider him a friendly person in all areas, respectful, caring of other people, and who negotiated many projects that benefit the area of education.

**Lester Armando Rivera.** I have been a pastor for 20 years; I am a witness that he has been a noble person with a good heart and helpful, and I know how he has behaved with the Christian people; I could fill many sheets of paper to tell how special Mr. Najera has been.

**Sandra Molina.** I am a pastor at El Encinal, Olancho and shared time with Mr. Najera Renan Ramona Montoya, and we know him to be a very special person, cooperative, helpful, and very useful to our community and congregation.

**Santos Padilla.** [I am] An Evangelist and preacher for more than 25 years; Mr. Najera is a very helpful, friendly, and respectful person, always loving to help the neediest.

**Mireya Romero.** I saw Mr. Najera growing up, whom I value because he is a simple person, friendly, respectful, and very useful in the community. I admire him because of the gift of service that God has given him.

**Mirian Andrade.** As Mr. Najera's neighbor during all of our lives, he is a very loving, charitable, helpful person, supportive of his family and with the needs of his neighbors. We thank God for Mr. Najera's life, and we miss him very much.

**Felix Acuña.** As a dairy delivery person, I believe Mr. Najera is friendly, respectful, a peaceful man, not violent - contrary to what the news have published.

**Alexander Santos.** I grew up with him; he is a very social person, a humanitarian, one who stands out for his good behavior.

**Luz Marina Flores.** A good person, helpful and with a very good heart towards children, youths, and the elderly.

### III. Unexpected Severe Conditions of Confinement increased the severity of punishment and the amount of deterrence associated with his imprisonment

#### A. Legal Framework

Under the old mandatory Guidelines framework, courts recognized that unusual conditions of confinement may be a basis for a downward departure. See *United States v. Carty,* 264 F.3d 191.196 (2d Cir. 2001) *(*"Where pre-sentence confinement conditions in foreign jail merited departure)*. In *United States v. Mateo,* No. 02 Cr. 668(VM) (S.D.N.Y.) (January 9, 2009). District Court Judge Marrero provided an analytical framework of what constitute excessive hardship:

"Insofar as the incarceration of a particular offender imposes terms and conditions that expand the reach of consequences ordinarily associated with confinement beyond the zone of what is to be reasonably foreseeable and to be expected in the typical care, the corresponding sentence is likely to work excessive hardships and exact a toll of suffering "of a kind, or to agree,", 18 U.S.C 3553 (b) that if not otherwise mitigated, would inflict upon a particular individual a magnitude of punishment effectively disproportionate to that meted out to offenders in the ordinary case. To that extent, the penalty may exceed what is necessary to serve the prescribed purpose of sentencing." *Id*. at 211.

Today, harsh conditions are more commonly considered under §3553(a).  In *United States v. Stewart*, 590 F. 3d 93,144 (2009), the court held that restrictive conditions of confinement including being kept in a cell for twenty-three (23) hours under restrictive conditions "increased the punitive aspect of the defendant's confinement and the deterrent effect" is also proportionally increased. The court concluded that it "was not unreasonable for the district court to conclude that the severity of the punishment would increase the severity of the punishment and the amount of deterrence associated with a given term of imprisonment." *Id* at 94.

This principle has been extended to incidents that, while shorter in time, have had the same traumatizing experience. In other words, where conditions expand the magnitude of punishment meted out to offenders in the ordinary case, the court is free to consider such factors in imposing sentence. In *United States v. Ozol*, No. 16 Cr. 692 (JMF) (S.D.N.Y Feb 2, 2019), the court took the conditions experienced by a defendant at MDC into consideration when that facility lost heat and power in January 2019 - acknowledging the excessive hardship and the toll of suffering caused by being confined in a facility lacking adequate heating even if for a limited period of time. Relevant to the case at bar are the brutal conditions under where Mr. Najera has been confined at the Metropolitan Correctional Center (MCC) since he self-surrendered on March 12, 2018.

### B. The Lockdown

Turning to the case at bar, two significant events increased the severity of the punishment faced. On February 27, 2020, Mr. Najera was awakened and forcibly removed from his cell as Bureau of Prisons Swat team members searched for a firearm that had been smuggled into the facility. Along with other inmates, Mr. Najera was forced out of his cell stark naked as the officers ransacked his cell, leaving urinals broken while also removing bedsheets, pillows, and personal belongings.

> **NYC Federal Jail Lockdown Focused on Possibility Guard Smuggled Gun to Inmate: Sources**
>
> The Metropolitan Correctional Center currently houses disgraced celebrity attorney Michael Avenatti and one-time informant Lawrence Ray
>
> By Jonathan Dienst • Published March 3, 2020 • • Updated on March 3, 2020 at 8:32 pm
>
> Investigators are focusing on whether a corrections officer at the Metropolitan Correctional Center helped smuggle a gun to an inmate, as a lockdown at the facility enters its sixth day, legal sources tell News 4.
>
> Defense lawyers representing MCC inmates that were questioned by authorities say the focus appears to be on that theory, and the subsequent investigation has left them unable to see their clients.
>
> These inmates – now potential witnesses in the investigation – tell their attorneys that authorities are trying to both confirm the theory and, if true, find the weapon.
>
> That hunt for the weapon has forced an extensive search of the facility, both common areas and individual cells, and has prompted federal officials to bring in out-of-town

Article: *NBC New York "NYC Federal Jail Lockdown on Possibility Guard Smuggled Gun to Inmate". Dienst, Jonathan (March 3, 2020).*

For the next eight (8) days, Mr. Najera and other inmates were kept in complete isolation - confined to their cells, unable to contact the family, and restricted to two (2) showers per week. As officials continued searching for weapons and contraband, inmates were kept in complete lockdown and fed only cold sandwiches once a day. When the firearm and offender were ultimately found, innocent inmates bore an unmeasurable suffering toll a lifelong reminder of the grim consequences of criminal behavior.

### Metropolitan Correctional Center on lockdown for sixth straight day

By Ben Feuerherd

The Lower Manhattan prison where Jeffrey Epstein killed himself last summer has been on lockdown for six straight days as authorities searched for a possible smuggled gun, officials said Tuesday.

Inmates at the Metropolitan Correctional Center have told their attorneys they've been forced to stay in their cells for 24 hours a day and have gone days without showers, said David Patton, the executive director of the New York Federal Defenders.

Other inmates reported being served no hot food since the lockdown began last Thursday afternoon, being offered only peanut butter and jelly sandwiches to eat.

The federal lockup has a "long, long history of miserable medical care and hygiene," Patton said. "God knows what sorts of conditions are harming people in very real ways."

On Tuesday, the Federal Defenders filed a letter about the lockdown in their ongoing case against the Bureau of Prisons related to the conditions at a federal prison in Brooklyn.

### MCC Returns to Normal Operations After Smuggled Gun Triggers Lockdown

The loaded gun was found in an inmate's cell after eight days of the lockdown; modified operations continued for a few more days after that

By Jonathan Dienst • Published March 11, 2020 • • Updated on March 11, 2020 at 11:15 am

Lawyers familiar with the Manhattan's Metropolitan Correctional Center say the facility is returning to normal operations Wednesday -- about two weeks after suspicions about a smuggled handgun triggered a lockdown at the federal jail.

The lawyers familiar with the investigation say the focus is now in part on a prison officer and whether that officer smuggled the gun, which was loaded, into the jail and gave it to an inmate. The weapon was found in a cell Thursday night, authorities said.

An MCC spokesman declined comment, as did a spokesman for the U.S. attorney's office.

Mr. Najera described the situation as being worse than solitary confinement. And while inmates are expected to endure certain indignities, humiliation, and harsh conditions when in custody the treatment endured by inmates at the MCC exceeded the proscribed purposes of punishment.

### C. COVID -19 PANDEMIC

Following such a harrowing experience, Mr. Najera expected to sail into calm waters waiting for his sentencing date. Instead, he and other inmates began to face one of the greatest calamities in modern world history as the COVID -19 virus began to spread through the population. During these unprecedented times, legal and family visits were suspended, and the facility placed inmates on lockdown twenty-three (23) hours a day.

Since the COVID-19 pandemic, judges within this district have considered the impact of the virus as a §3553(a) factor and granted downward variances based on the conditions endured

by inmates at BOP facilities. See, e.g., *United States v. Morgan*, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), (Dkt. No. 90). (cutting the sentence to less than half of the low end of the guidelines based in part on conditions at MDC during the pandemic and condemning the conditions at MCC and MDC prior to the current crisis); *United States v. Casillas*, 19 Cr. 863 (VSB) (S.D.N.Y. May 4, 2020), (Dkt. No. 27) (reducing the length of the sentence in part based on conditions at MCC during the COVID-19 crisis); *United States v. Pierson*, 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020), (Dkt. No. 73) (same for defendant detained at MDC). Case 1:19-cr-00373-PGG (Dkt. No. 317) (June 9, 2021). In the recent sentencing of *Tiffany Days*, 19 Cr. 619 (CM), held on April 29, 2021, former Chief Judge McMahon made the following comments about the MCC: "It is the finding of this Court that the conditions to which she was subjected are as disgusting, inhumane as anything I've heard about in any Colombian prison, but more so because we are supposed to be better than that." (Dkt. No. 35, at P. 19) Similarly, Judge Engelmayer's thoughtful comments during the imposition of sentence in *United States v. Aracena De Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020), Dkt. No. 27, speak volumes about the harsh conditions of detention and its impact on inmates. The court in *United States v. Aracena De Jesus* stated…

> "I am mindful . . . that you have served most of your time in prison so far during the worst pandemic in this country during the past 100 years. I'm mindful that you may have contracted COVID19 while in prison. I'm mindful that your experience in prison as a result of the pandemic, the preceding lockdown, the ensuing lockdown, and your own illness was frightful. Prison is supposed to be punishment, but it is not supposed to be trauma of that nature or close. My colleagues and I commonly informally credit prisoners who have served time awaiting extradition in dreadful prisons overseas with more time served than measured by the calendar. The same logic applies here, and then some …. Bottom line, your time in the MCC was way harder than anyone intended when you were detained following your arrest. Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you experienced since your arrest in December." Tr. 7/1/20, at p. 36-37 (transcript attached hereto as Exhibit 3); see also *United States v. Jervis Cerino*, 19 Cr. 323 (S.D.N.Y. July 21, 2020) (Judge Rakoff) (district court granted a variance from a guideline range of 57-71 months for a Hobbs Act robbery and imposed a sentence of 10 months, noting: "[I]t is fair to say that conditions in the prison system now result in a harshness that is not the

norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons."

This Court has recently recognized that the brutal conditions in which defendant Michael Avenatti was kept for several months at Manhattan's Correctional Center warranted a reduction from the otherwise applicable Federal Sentencing Guidelines" See *United States v. Michael Avenatti,* No.19 Cr. 373 (S.D.N.Y. July 8, 2021) (Dkt. No. 339). In granting a variance, this Court stated,

"A variance is also necessary because Mr. Avenatti was held in horrific conditions at the MCC for more than three months, in solitary confinement for much of the time and in lockdown for nearly all of it; first, because a loaded handgun had been smuggled by someone into the facility and later because of the Covid-19 pandemic. Conditions were terrible. It's hard to believe they could occur in the United States of America. Mr. Avenatti himself was at risk from the Covid-19 virus as the result of a preexisting medical condition." See *United States v. Michael Avenatti,* No.19 Cr. 373 (S.D.N.Y. July 8, 2021) (Dkt. No. 339) (P. 43, L 2-10).

Here, Mr. Najera has experienced the same brutal conditions of confinement Mr. Avenatti suffered in light of the COVID-19 lockdown and the subsequent lockdown as a result of the security breach where a loaded handgun was found at the MCC.

### IV. <u>THE NEED TO AFFORD ADEQUATE DETERRENCE.</u>

With respect to specific deterrence, Mr. Najera has no prior criminal history. The government makes claims that Mr. Najera was convicted for the murder of Claudio Rigoberto Mendez. *See Govt. Sent. Memorandum (*Dkt Nos. 156, 44). This is an unfair attempt to paint Mr. Najera as a violent individual, impugn his character, and prejudice the Court's decision. As previously discussed in *Najera's Sentencing Submission* (Dkt. No. 164, 6-8), Mr. Najera's case was remanded to the lower court for a new trial. As such, Mr. Najera has not been convicted and retains the presumption of innocence.

Stripped of the government's baseless claim, Mr. Najera should be sentenced for his admitted participation in drug trafficking. Mr. Najera came to the United States to accept responsibility and

is unlikely to reengage in criminal conduct upon his return to Honduras. By admitting his wrongdoing and pleading guilty to the charges, he will forever be disgraced in the public's eye. Thus, specific deterrence should not be an important feature of his sentence.

Finally, by the time Mr. Najera is released from prison he would be close to sixty (60) years old. The U.S. Sentencing Commission has previously found age to be an important factor in influencing recidivism. Any sentence imposed by the Court which exceeds fifteen (15) years would place him in the age group of 51-60 where the likelihood of recidivism is reduced to 15.5%.

With respect to general deterrence, the imposition of a draconian sentence upon an individual who voluntarily self-surrendered, admitted his culpability, and made an effort to cooperate will send the wrong message to other individuals similarly situated. Rather than following Mr. Najera's example, they will likely attempt to abscond and hide in Honduras, making their arrest and extradition more difficult and costly to the Government.[3]

### V. AVOIDANCE OF SENTENCE DISPARITIES AMONG SIMILARLY SITUATED DEFENDANTS.

A lengthy sentence would not be just considering the sentence imposed on an individual charged or alleged to have co-conspirators in this case. During the course of this litigation, the Court had heard about two individuals previously represented by Attorney Victor Rocha. They were major drug traffickers involved in acts of violence including assassinations.

Wilter Neftali Blanco Ruiz, who spearheaded General Aristides Gonzales's assassination, and was also responsible for the assassination of another individual referred to as 'El Chino.' The following is the government's account of his involvement:

"In approximately 2013, a worker for the defendant and CW-3 named ("Victim-2") was arrested in connection with drug-trafficking activities in the Colón Department. CW-3 told the defendant about the arrest of Victim-2 and described Victim-2's role in their ongoing crimes.

---

[3] This is in stark contrast to other defendants mentioned by the Government who did not self-surrender and were convicted at trial. (Dkt. No. 46).

The defendant responded that Victim-2 had access to too much information, and that they could not risk that he would cooperate with authorities. CW-3 agreed to talk to a co-conspirator, Wilter Neftali Blanco Ruíz, about having Victim-2 murdered, which they did." See Case No. 15-cr-379 (PKC) (S.D.N.Y.) (Dkt. No.78).

Despite such outrageous violent behavior, Wilter Blanco received a 240-month sentence of imprisonment. See Case No. 16 Cr. 20602 (DMM) SDFL (Dkt. No. 39). Similarly, Juan Ramon Matta Walderruga, who is alleged to have been involved in the assassination of General Gonzales and Ex-Security Minister Alfredo Landaverde [4] received a sentence of twenty-five months of imprisonment.  Case No. 14 Cr. 442 (KAM) (E.D.N.Y.)  (Dkt. Nos. 32, 33). [5]

The Government also overlooks that Yani Benjamin Rosenthal Hidalgo and Yankel Rosenthal Coello, who allegedly laundered money for Los Cachiros, were sentenced to 36-months and 29-months respectively. (PSR ¶ 10).  Worth noting is the Government's allegation they received $1 million dollars in contributions from the Sinaloa Cartel, which was channeled through Mr. Najera. When challenged by the Rosenthals' attorneys to support such claim, the Government relented and acknowledged that it had **no evidence** of such payment and "that there was no explicit quid pro quo in connection with the campaign contributions that the Rosenthals' received."  Case No. 13 Cr. 413 (JGK) (S.D.N.Y.)[6]

The Government's reliance for comparison, upon Hector Emilio Fernandez Rosas' (No. 12 Cr. 894 (RJS) (S.D.N.Y.) and Antonio Hernandez's (No. 15 Cr. 379 (DKC) (S.D.N.Y.)) sentences is misplaced. These individuals were convicted at trial or acknowledged to have been involved in several homicides.  Mr. Najera was not involved in any assassinations or convicted of similar

---

[4] https://insightcrime.org/news/brief/ex-security..

[5] First, as to the "bribes," the government now admits – after alleging again and again that Mr. Rosenthal "accept[ed] bribes from members of the Cachiros and other drug traffickers that were styled as purported campaign contributions," (see Plea Hr'g Tr. at 29:14-16; see also 7/26/2017 DOJ Press Release), that it "has no evidence of an explicit quid pro quo" in connection with the campaign contributions Mr. Rosenthal received in 2012.  *(United States v. Yani Benjamin Rosenthal Hidalgo*, No. 13 Cr.413 (JGK), (S.D.N.Y. December 13, 2017), (Dkt. No. 263).

[6] Mr. Najera believes the Cachiros' lied about Mr. Matta Waldarruga's involvement in both homicides.

violent crimes. Finally, Fernandez Rosas and Antonio Hernandez were arrested, extradited, and made no effort to cooperate - making their circumstances distinguishable from the case at bar.

As this Court recently recognized, a variance may be necessary where there is a significant sentence disparity between similarly situated defendants. Here, the government is asking for a life sentence completely overlooking that Wilter Neftali Blanco Ruiz, a drug trafficker who admitted being involved in several homicides, solely received a sentence of 240 months of imprisonment. To paraphrase the Court while sentencing Defendant Avenatti, "it would not be just, it would not be justice for Mr. Avenatti to be sentenced to a nine to eleven -year term of imprisonment when Mr. Geragos was not even charged." See *United States v. Michael Avenatti*, Case No. 19 Cr. 373 (PGG) (SDNY) (July 8, 2021) (Dkt. No. 341) (P. 44, L 20-23).  Here, it would not be just - and it would not be justice for Mr. Najera to be sentenced to life imprisonment when Wilter Blanco was only sentenced to 240 months.

## VI. CONCLUSION

For all the above reasons, Mr. Najera submits that that the Court should impose a sentence of no greater than 180 months of imprisonment.

                          Respectfully Submitted,

                          /s/ *Joaquin Perez*
                          Joaquin Perez, Esq.
                          Counsel for Defendant
                          6780 Coral Way Miami,
                          Florida 33155
                          Tel.: (305) 261-4000
                          Fax: (305) 662-4067
                          New York Bar No. 5237532

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that this document has been filed with the Clerk of Court using the CM/ECF Filing System on this 28th day of September 2021.

/s/ *Joaquin Perez*
JOAQUIN PEREZ, ESQ.