

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

April 8, 2022

**Via ECF**
The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    <u>United States v. Fredy Renan Najera Montoya</u>, S1 15 Cr. 378 (PGG)

Dear Judge Gardephe:

      The Government respectfully writes to provide the Court with an overview of the evidence that it intends to submit at defendant Fredy Renan Nájera Montoya's *Fatico* hearing scheduled for April 12, 2022. The defendant was a Honduran congressman and leader of a prolific drug trafficking organization. Over the course of at least seven years, the defendant abused his public office, helped transport at least 20,000 kilograms of cocaine, commanded a private army to protect his drug trafficking, controlled airstrips that received cocaine shipments, and bribed politicians and law enforcement officials. The defendant now faces life imprisonment under the United States Sentencing Guidelines for his conduct. Following the defendant's hearing, the Court should reject the defendant's objections to the Presentence Investigation Report (the "PSR"), schedule a sentencing date, and impose a sentence of life imprisonment.

    **I.**    **Background**

      On February 19, 2020, after the defendant withdrew his initial guilty plea, the defendant entered a new guilty plea to (1) participating in a conspiracy to import cocaine into the United States, and to distribute cocaine on board U.S.-registered aircraft, in violation of 21 U.S.C. § 963 (Count One); (2) using and carrying firearms during and in relation to Count One, and possessing firearms in furtherance of Count One, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) (Count Two); and (3) participating in a conspiracy to use and carry machineguns and destructive devices during and in relation to Count One, and to possess machineguns and destructive devices in furtherance of Count One, in violation of 18 U.S.C. § 924(o) (Count Three).

Hon. Paul G. Gardephe
April 8, 2022

In anticipation of the defendant's sentencing, the parties filed several submissions and the defendant objected to certain portions of his PSR.[1] On November 8, 2021, the Court identified the following five disputed issues:

> (1) Najera's alleged involvement in the murder of Claudio Rigoberto Mendez (PSR ¶¶ 72-79);
> (2) Najera's alleged offer to "fix" his own election for $100,000 (*id.* ¶ 82);
> (3) Najera's alleged request for $1 million from the Sinaloa Cartel to be paid to Yani Rosenthal's presidential campaign (*id.* ¶ 88);
> (4) Najera's alleged participation in a January 2014 meeting regarding the election of Oscar Najera as president of the Honduran National Congress (*id.* ¶ 93); and
> (5) Najera's alleged construction of the Catacamas Airstrip in Olancho to receive drug shipments (*id.* ¶¶ 51-52).

(Dkt. 180).

## II.   Anticipated Scope of the *Fatico* Hearing

As to point (1) noted above, the Mendez murder, the Government proposed amendments to paragraphs 73 and 76-78 of the PSR in its letter dated March 23, 2022 to clarify that the defendant's initial trial relating to the Mendez murder was conducted by three members of the Honduran Supreme Court and that a three-judge panel consisting of three different members of the Honduran Supreme Court reversed the acquittal of the trial court panel. (*See* Dkts. 196, 196-1). The Government does not intend to elicit any testimony at the *Fatico* hearing about the defendant's alleged involvement in the Mendez murder or the related court proceedings in Honduras. Moreover, the Government will not argue to the Court at sentencing that it should find that the defendant committed the Mendez murder. The relevant paragraphs of the PSR accurately describe the defendant's relevant Honduran court proceedings and are appropriately contained in the PSR as part of the defendant's criminal history. The Government has no objection to moving those paragraphs to the defendant's criminal history section of the PSR.

As detailed below, as to points (2) through (5) identified above, the Government expects to demonstrate at the hearing that the defendant's objections to the PSR are unfounded.

## III.   Applicable Law

Pursuant to United States Sentencing Guidelines Section 6A1.3, "[w]hen any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court" regarding the disputed factor. A *Fatico* hearing is the appropriate procedural mechanism for resolving disputes regarding the application of the Sentencing Guidelines and facts relevant to the statutory sentencing factors at Title 18,

---

[1] *See* Def. Sentencing Submission, dated Nov. 23, 2020 (Dkt. 155); Gov't Sentencing Submission, dated Dec. 12, 2020 (Dkt. 160); Def. Supp. Sentencing Submission, dated June 1, 2021 (Dkt. 164); Def. Supp. Sentencing Submission, dated Sept. 28, 2021 (Dkts. 172-73).

Hon. Paul G. Gardephe
April 8, 2022

United States Code, Section 3553(a). *See, e.g.*, *United States v. Whiteside*, No. 13 Cr. 576, 2016 WL 3866580, at *1 (S.D.N.Y. July 13, 2016); *see also* Fed. R. Crim. P. 32(i)(3)(B).

In resolving such a dispute, the Court is not bound by the rules of evidence. Fed. R. Evid. 1101(d)(3); *see United States v. Jacques*, No. 20 Cr. 3276, 2022 WL 894695, at *2 (2d Cir. Mar. 28, 2022). "For example, courts are not bound by rules governing hearsay, so long as the basis for the court's determination has indicia of reliability and is not otherwise contrary to a defendant's due process rights." *United States v. Gilleo*, No. 15 Cr. 346, 2016 WL 1090614, at *4 (S.D.N.Y. Mar. 18, 2016). Moreover, the Court's discretion is "'largely unlimited either as to the kind of information [the Court] may consider, or the source from which it may come.'" *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)). The law directs that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661 (emphasis added). "The district court need only find disputed facts relevant to sentencing determinations by a preponderance of the evidence." *United States v. Nunez*, 547 F. App'x 65, 66 (2d Cir. 2013) (summary order) (citing *United States v. Garcia*, 413 F.3d 201, 220 n.15 (2d Cir. 2005)); *accord United States v. Cordoba-Murgas*, 233 F.3d 704, 708 (2d Cir. 2000).

### IV.  Discussion

At the defendant's *Fatico* hearing the Government intends to elicit testimony from a cooperating witness ("CW-1"). CW-1 was a high-ranking member of the Sinaloa Cartel who engaged in narcotics trafficking with the defendant from approximately 2008 until 2015. During that period, the defendant worked with CW-1, and other members of the Sinaloa Cartel, to receive shipments of cocaine at airstrips and ranches in Honduras that the defendant controlled. As detailed below, CW-1 observed the defendant rely on his corrupt connections to military and law enforcement officials to ensure that those shipments were not intercepted and use a private army to protect his drug loads. During the same period, and while distributing narcotics with the Sinaloa Cartel, the defendant also trafficked weapons in coordination with CW-1, including by purchasing rocket-propelled grenade launchers and attempting to sell machineguns to a drug trafficking organization in Venezuela.

The Government expects that, at the *Fatico* hearing, in addition to eliciting background testimony about the relationship between CW-1 and the defendant, the Government will demonstrate the following regarding the disputed issues:

**1. The Defendant Owned and Controlled a Catacamas Airstrip that He Used for Drug Trafficking**

First, beginning in or about 2008, the defendant discussed with CW-1 and other Sinaloa Cartel members about using airstrips and ranches that the defendant controlled throughout Olancho, Honduras to traffic ton-quantities of cocaine. The defendant initially agreed to use an airstrip that was located on one of his ranches near Catacamas, Honduras (the "Catacamas Airstrip"). In or about 2008, the defendant brought CW-1 and another member of the Sinaloa Cartel to the Catacamas Airstrip. The defendant explained he had constructed that airstrip and that

3

Hon. Paul G. Gardephe
April 8, 2022

it could be used to receive airplanes loaded with cocaine. CW-1 and other members of the Sinaloa Cartel agreed to use the defendant's airstrip for trafficking their narcotics with the defendant.

Shortly after this meeting between CW-1 and the defendant, CW-1 learned that another drug trafficker had attracted law enforcement attention to the Catacamas Airstrip after sending a 1,000 kg cocaine shipment to that airstrip. Out of concern for the recent attention on the Catacamas Airstrip, CW-1 and the other members of the Sinaloa Cartel instead used several other airstrips controlled by the defendant to traffic drugs with the defendant (a point that the defendant does not contest). (PSR ¶¶ 51-52)

### 2. The Defendant Requested $100,000 from CW-1 to "Fix" His Election

Second, in or about 2012, the defendant was running for reelection for Congress in Honduras and requested from CW-1 approximately $200,000 for his campaign, which CW-1 provided directly to the defendant. (PSR ¶ 82). The $200,000 provided by CW-1 were drug proceeds. Based on his discussions with the defendant, CW-1 understood that it was important for their drug trafficking relationship to keep the defendant in Congress, including so that the defendant could leverage his corrupt relationships with law enforcement and military officials to protect the transport of drug shipments for the Sinaloa Cartel. Following his receipt of the $200,000 from CW-1, the defendant later told CW-1 that he needed approximately $100,000 more in order to guarantee his election results, which CW-1 understood to mean manipulating the election. (*Id.*). CW-1 provided the defendant with the $100,000—which was also drug proceeds—and CW-1 later learned that the defendant was announced as having won the election. (*Id.*).

### 3. The Defendant Requested $1 Million from CW-1 for Yani Rosenthal's Presidental Campaign

Third, in or about 2012, the defendant asked members of the Sinaloa Cartel, including CW-1, for approximately $1 million for former congressman Yani Rosenthal, which the defendant represented would be used for Yani Rosenthal's campaign to become president of Honduras. The defendant informed CW-1 that it was important for the defendant to financially support Yani Rosenthal because, if Yani Rosenthal were elected, then the defendant would be able to access sensitive information and help protect their drug trafficking activities. The Sinaloa Cartel—through CW-1—subsequently paid the defendant approximately $1 million in installment payments, and the defendant confirmed to the traffickers that it was delivered to Rosenthal. (PSR ¶ 88). The $1 million paid by CW-1 to the defendant were drug proceeds.

### 4. The Defendant Participated in a January 2014 Meeting Regarding the Election of Oscar Nájera as President of the Honduran National Congress

Fourth, the defendant participated in a meeting with Honduran Congressman Martinez Turcios—a member of a Honduran drug trafficking organization who is charged with drug-trafficking and weapons crimes in a case in this District—and other drug traffickers. (PSR ¶ 42). During that meeting, the defendant discussed seeking favorable treatment and protection from the recently elected Honduran president ("Official-1"), coordinating those efforts with former

4

Hon. Paul G. Gardephe
April 8, 2022

Congressman Yani Rosenthal, and trying to install Oscar Nájera as the president of the Honduran Congress. (*Id.* ¶ 93). That meeting was video recorded by another cooperating witness ("CW-2").

The Government intends to offer at the *Fatico* hearing the recording of that meeting and translation of that recording. The Government does not intend to call CW-2 as a witness to testify about the recording. Instead, the Government will play relevant portions of the recording—including portions that are included in the PSR—at the hearing. The Government expects that CW-1, who was not present at the meeting, will identify a screenshot of the defendant from the video recording—confirming the defendant's participation in the meeting. Because the defendant does not dispute, in the PSR or his submissions, the date on which the recording was made or any of the participants in the recording, the Government does not intend to elicit any additional testimony or present any additional evidence on these points.

### 5. The Defendant Purchased Rocket-Propelled Grenade Launchers ("RPGs")

Finally, although not identified on the Court's list of disputed issues, the defendant filed the following comment in response to paragraph 66 of the PSR:

> In 2012, NÁJERA coordinated the purchase of approximately two rocket-propelled grenade launchers ("RPG-7") and four accompanying grenades at a cost of $20,000 per RPG-7 and $30,000 per grenade. At NÁJERA's request, the weapons were paid for by members of the Sinaloa Cartel, and NÁJERA confirmed to the Cartel that he received the weapons. Defense counsel contends "that claims of rocket propelled grenade launchers and machine guns are nothing more than a salacious effort to paint NÁJERA as a violent individual."

(PSR ¶ 66; *see also* Dkt. 164). Although defense counsel's objection in the PSR is ambiguous, the Government interprets his comment as an effort to dispute the defendant's direct involvement in the use and possession of RPGs and, therefore, the Government intends to offer limited testimony from CW-1 making clear that the defendant was directly involved in the acquisition and use of machineguns and RPGs as part of the defendant's massive drug trafficking conspiracy.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:  \_\_\_\_\_/s/_____
Jacob Gutwillig
Jason A. Richman
Elinor Tarlow
Assistant United States Attorneys

cc: Defense Counsel (Via ECF)

5