*Law Office Of*
**Joaquin Perez**
6790 Coral Way. Miami, Florida 33155
Phone (305) 261-4000 Ext. 3703.   Fax (305) 662-4067
Jplaw1@bellsouth.net
(*Also admitted in Massachusetts and Rhode Island*)

**Via ECF**

June 23, 2022

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
New York, New York 10007

    Re:    *United States v. Fredy Renan Najera Montoya*
                15-cr-378 (PGG-1)

Dear Judge Gardephe:

       This letter addresses the issues raised by the government in its previously filed sentencing submission, (Dkt. Nos.198 and 212).[1] The following summarizes the issues left in dispute subject to this Honorable Court's ruling.

**I.**    **Background**

       On November 8, 2021 a *Factic*o hearing was scheduled to discuss the following factual issues in the Pre-Sentence Investigation Report "PSR".

(1.)    The defendant's alleged involvement in the murder of Claudio Rigoberto Mendez, PSR ¶¶ 72-79.

       By letter dated April 8, 2022, the Government indicated "that it did not intend to elicit testimony of the Mendez murder or the court proceedings in Honduras Dkt. No.198 at 2 (15-17). Moreover, the Government had no objection to "moving these paragraphs from the relevant conduct to the defendant's criminal history section of the PSR (Dkt. No. 198 at 2 18-19). Defendant respectfully moves for the entry of an Order directing the Probation Department to amend the PSR as stated above.

---

[1] Defendant has previously submitted Sentencing Submissions dated Nov. 23, 2020 (Dkt. No. 155); Def. Supp. Sentencing Submission, dated June 1, 2921 (Dkt. No. 164); Def. Supp. Sentencing Submission, dated Sept. 28, 2021 (Dkt. Nos. 172-173)

(2.)   The defendant's alleged offer to "fix" his own election for $100,000.00 (*Id*.at ¶ 82).

(3.)   The defendant's alleged request for $1 million from the Sinaloa Cartel to finance Yani Rosenthal's presidential campaign.

The position advanced by the government regarding these claims in ¶ 2,3 is based upon the uncorroborated testimony of Alexander Monroy Murillo ("Monroy"). Monroy's credibility and the weight to be given to his testimony will be addressed below. By letter dated May 2, 2022, (Dkt. No. 211) defendant presented independent evidence undermining Monroy's claims. This Court should therefore reject Monroy's testimony as inconsistent of his boss Cesar Gastelum, who never affirmed that the Sinaloa Cartel made payments to either Yani Rosenthal or Mr. Najera.

(4.)   The defendants alleged participation in the January 14th meeting regarding the election of Oscar Najera as president of the Honduran National Congress (*Id*.at ¶ 93).

The government never established a testimonial factual foundation for the meeting and, instead, relied upon its subjective view of the recorded discussions. Neither drugs nor the revocation of the extradition treaty were ever discussed by the participants. The government brazenly concludes that the participants in the meeting, including the defendant, were "seeking favorable treatment and protection from the recently elected Honduran president, Juan Orlando Hernandez, coordinating those efforts with former Congressman Yani Rosenthal, and trying to install Oscar Najera as the president of the Honduran Congress" (*Id*. ¶ 93).

While the government can speculate about the participants' state of mind, it cannot easily ignore ascertainable public records, including media outlet reports, in particular, local Honduran newspapers which indicate that the President of the Honduran Congress was elected by a majority of seventy-six congressional representatives. *See*, "Nueva Directiva del CN fue electa por 76 diputados", (New Board of Directors of the CN was elected by 76 deputies) El Heraldo, April 7, 2014). The meeting's participants were forming a coalition to install Oscar Najera, a member of the opposition Liberal Party, to oppose President Elect Hernandez's handpicked candidate for the position. Notwithstanding their efforts, Mauricio Oliva (whose name was never mentioned at the meeting) was unanimously elected as the President of the Honduran Congress.

(5.) The defendant's alleged construction of an airstrip near Catacamas (the "Catacamas Airstrip") to receive drug shipments *(id*. ¶¶ 51-52).

Mr. Najera has never denied being involved in drug trafficking; however, Defendant rightfully disputed being involved in acts of violence. Thus, the government's presentation was superfluous and intended solely to distract the court from the issues in contention. Ironically, Monroy went so far as to deny knowledge of receiving benefits at sentencing even though his criminal exposure was similar or worse than Mr. Najera's. At

his sentencing, the government did not seek an aggravating role enhancement pursuant to §3B1.1; a 2-level firearm enhancement pursuant to §2B1.1; 2-level enhancement for the use of an aircraft pursuant to §2D1.1(b)(3)(A); or an enhancement for importing drugs into the United States while acting as a supervisor pursuant to §2D1.1(b)(16)(c). Worse the government allowed Monroy to qualify for the safety valve pursuant to §5C1.2. Finally, the government ignored his prior criminal conviction and did not seek an enhancement under 18 U.S.C § 851, which would have exposed him to a mandatory minimum term of imprisonment of twenty years. Despite this King's Ransom received, Monroy played oblivious by claiming to be unaware of the favorable treatment received:

> By Mr. Perez
> Q.   …Do you think you got a break when you got 135 months? It doesn't get any simpler than that.
> A:   Do I think that I got a break?
> Q:   Yes.
> A:   I don't think I got a break.

Transcript of *Fatico* Hearing of April 13, 2022, at 167:2-7. See, also, page 166:5-13.

To avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct this Court should consider Monroy's initial sentence of 135 month (independent of cooperation) and compare it to the life sentence the government and the probation department recommend for Mr. Najera. The government's endorsement of such disparate treatment makes a mockery of the sentencing process.

## II.   Monroy Murillo's Credibility

Monroy Murillo's testimony should be closely scrutinized particularly, in light of the benefits that have been conferred upon him. This Court should not afford an inordinate amount of weight to Monroy's testimony solely because the government called him as a witness.

The question for consideration is whether Monroy appeared to understand the questions clearly and answer the questions directly. It is important to note that Monroy used the following rote answer on at least eleven occasions [2], one of which was in response to the Court's inquiry as to whether he expected to receive more favorable treatment regarding his immigration status:

> THE WITNESS:   I would not know what to say to that because my attorney told me that it is not my obligation to testify; however, that it is my obligation to testify; however, that it is my obligation to tell the United States—to tell United States law enforcement about all the crimes that I was involved in during my drug-trafficking activities, with the truth, and, above all else, never lie.

---

[2] *See*, Transcript at pages 10, 84, 89, 96, 97, 98, 118, 125, 173, 174 and 176.

| | |
|---|---|
| THE COURT: | So, according to your understanding of your agreement with the United States, you don't think you have an obligation to testify? |
| THE WITNESS: | It is not my obligation? |
| THE COURT: | That's what you just said. |
| THE WITNESS: | As far as I understand, if I did not want to appear today to testify, I did not have to. But I am committed to the United States to tell them the truth about al the crimes that I committed during my drug-trafficking activities. |

Trans. 176:1-16.

This type of evasive response permeated Mr. Monroy's testimony. He manipulated the system by minimizing his criminal exposure, ultimately finding a way to remain in the United States. This Court should, therefore, consider his testimony with more caution than the testimony of other witnesses.

Another relevant factor is whether Mr. Najera had an opportunity to observe and remember matters to which he testified. For instance, during his testimony he referred several times to a Cessna 206 as the plane that had been used to ferry the drugs. Later, when confronted with photographic evidence of the aircraft, he acknowledged that he was mistaken:

> Q: Are you 100 percent sure that the Cessna 206 is a twin engine?
> A: I am 100 percent sure that we would put in the 326 engines on a Cessna 206 for it to be able to carry the load of 500 kilos.

Trans. 133:10-13. Only after a photograph of the plane was displayed did he admit that he was wrong.

> Q: Is that what you refer to as a Cessna 206?
> A: Yes, it looks like one.
> Q: Do you see an additional engine somewhere in that plane?
> A: You can't see the engine. It just looks the way that a Cessna 206 looks.
> Q: My question is, that just a little while ago you said it was a twin engine, right?
> A: Yes, but I was mistaken.

Trans. 134:15-22.

This, however, is not the only glaring inconsistency regarding his testimony. When asked about the location of Mr. Najera's purported airstrip in the City of Catamacas, he was unable identify a particular geographic location. *See*, Trans. pages 128:18-25; 129:1-3.

Moreover, regarding the location where Mr. Najera received the alleged $200,000 political contribution, Mr. Monroy said:

A: At first we gave him $200,000 to support his reelection campaign for congressman.
Q: And when did that happen?
A: Late 2013/early 2014, around those dates.
Q: And who delivered the money to him?
A: **He [Najera] picked up the money** in San Pedro de Sula.

Trans. 184:11-16 (*emphasis added*). When confronted with the fact that Mr. Najera had been in home detention during the 2013/early 2014 period, Mr. Monroy realized he had made a mistake and backpedaled:

Q: My question is: You testified that Mr. Najera traveled from Tegucigalpa, which is the capital, to San Pedro Sula sometime in 2013 to pick up the money, the $200,000, for his political campaign?
A: When we gave Mr. Fredy Najera $200,000 to finance his reelection campaign, **I don't recall** whether he came to receive it personally or sent someone else.

Trans. 185:18-24 (*emphasis added*).

### III. Conclusion

The government asks this Court to place great faith upon Mr. Monroy's testimony disregarding his motivations and refusal to answer simple questions directly. The Court, therefore, should reject his testimony regarding Mr. Najera's alleged offer to fix his own election and the claim that Mr. Najera received money from the Sinaloa Cartel to finance Yani Rosenthal's Presidential Campaign. With respect to the Catacamas airstrip, Mr. Najera has never denied being involved in drug trafficking. Like Mr. Monroy, Mr. Najera self-surrendered, met with the government and acknowledged his drug trafficking activities. Given the fact that both self-surrendered and chose the same path of cooperating with the government, it would be manifestly unfair to impose a life sentence as requested by the government.

Respectfully submitted,
/s/ *Joaquin Perez*              /
JOAQUIN PEREZ, ESQ.
NYB: 52376532
6790 Coral Way
Miami, Florida 33155
Tel. (305) 261- 4000
jplaw1@bellsouth.net

cc: Elinor Tarlow, (USANYS)
    Jacob Gutwillig (USANYS)