UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | **ORDER** |
| -against- | (S1) 15 Cr. 378 (PGG) |
| FREDY RENAN NAJERA MONTOYA, | |
| Defendant. | |

PAUL G. GARDEPHE, U.S.D.J.:

On February 19, 2020, Defendant Fredy Renan Najera Montoya ("Najera") pled guilty to cocaine trafficking and related firearms offenses. (Feb. 19, 2020 Plea Tr. (Dkt. No. 138) at 27-29) Najera's guilty plea arises out of his involvement in trafficking at least 20,000 kilograms of cocaine while serving as a congressman in the National Congress of Honduras. (Id. at 22, 25-26; Plea Agmt. at 4-5) Sentencing is scheduled for July 29, 2022, at 10:00 a.m. (Dkt. No. 216)

In a June 1, 2021 sentencing submission, Najera objects to the following factual allegations in the Pre-Sentence Investigation Report ("PSR"):

(1)     that he constructed the "Catacamas Airstrip" in the Olancho department of Honduras to receive drug shipments (PSR (Dkt. No. 170) ¶ 51-52);

(2)     that he requested $100,000 to "fix" his own election (id. ¶ 82);

(3)     that he solicited $1 million from associates of the Sinaloa Cartel to be paid to Yani Rosenthal's presidential campaign (id. ¶ 88);

(4)     that Najera's purpose in participating in a January 2014 meeting regarding the election of Oscar Najera as president of the Honduran National Congress was to protect his drug-trafficking activities (id. ¶ 93); and

(5)     that he was involved in arms transactions involving rocket-propelled grenade launchers and machineguns.

(Id. ¶¶ 66-67; see June 1, 2021 Def. Sent. Br. (Dkt. No. 164) at 6, 9-13)[1]

In a November 8, 2021 order, this Court directed the Government to state "whether it intends to offer evidence of these disputed facts at a Fatico hearing." (Nov. 8, 2021 Order (Dkt. No. 180) at 1)  On November 16, 2021, the Government responded that it would "offer evidence of the issues disputed by the defendant at a Fatico hearing." (Nov. 16, 2021 Govt. Ltr. (Dkt. No. 181))  This Court conducted that hearing on April 12 and 13, 2022 (Dkt. Nos. 205, 207), and the Court's findings concerning these issues are set forth below.

---

[1]  Najera also objects to the factual portions of the PSR stating that he participated in the 2012 murder of Claudio Rigoberto Mendez. (See June 1, 2021 Def. Br. (Dkt. No. 164) at 6-8 (objecting to PSR (Dkt. No. 170) ¶¶ 72-79))  The Government has abandoned its efforts to prove Najera's involvement in this murder, however (see April 8, 2022 Govt. Ltr. (Dkt. No. 198) at 2) ("[t]he Government does not intend to elicit any testimony at the Fatico hearing about the defendant's alleged involvement in the Mendez murder or the related court proceedings in Honduras"), and has proposed that the Defendant's alleged participation in the Mendez murder be addressed in the PSR's criminal history section.  (See May 27, 2022 Govt. Br. (Dkt. No. 212) at 2)  Defense counsel agrees with this approach.  (Apr. 12, 2022 Tr. (Dkt. No. 205) at 4; June 23, 2022 Def. Ltr. (Dkt. No. 214) at 1)

According to the PSR, in August 2013, a three-judge panel in Honduras conducted a trial regarding Najera's alleged participation in the Mendez murder.  (PSR (Dkt. No. 170) ¶ 74)  On August 26, 2013, the judges issued a 2-1 decision "finding that the Honduran prosecution . . . failed to establish [Najera's] guilt beyond a reasonable doubt." (Id. ¶ 77)  On March 31, 2016, however, the Honduran Supreme Court "reversed the acquittal of the trial court," and ordered that a new trial be conducted before different judges. (Id. ¶ 79)  In ordering a new trial, the Honduran Supreme Court "held that the evidence 'unquestionably attest[s] beyond all reasonable doubt that [Najera] participated willfully, along with other persons in the events" that resulted in Mendez's murder. (Id. (quoting Mar. 31, 2016 Opinion (Dkt. No. 178-1) at 24))

The parties agree that no new trial has taken place in Honduras, and that accordingly Najera has not been convicted of the Mendez murder.  (Oct. 12, 2021 Govt. Ltr. (Dkt. No. 178) at 3; June 1, 2021 Def. Br. (Dkt. No. 164) at 7-8)  Given these circumstances, no discussion of the Mendez murder may be included in the PSR, and Paragraphs 72-79 of the PSR will be deleted.

## BACKGROUND

### I.    GUILTY PLEA AND PLEA AGREEMENT

On February 19, 2020, Najera pled guilty to: (1) conspiring to (a) import more than five kilograms of cocaine into the United States; (b) manufacture and distribute more than five kilograms of cocaine knowing and intending that it would be imported into the United States; and (c) manufacture, distribute, and possess on board an aircraft registered in the United States more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 963, 952(a), 959(a), 959(c), 960(a)(1), 960(a)(3), and 960(b)(1)(B) ((S1) Indictment (Dkt. No. 2), Count One); (2) using and carrying firearms during and in relation to, and possessing firearms in furtherance of, the drug trafficking offense charged in Count One, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (id. (lesser included offense of Count Two)); and (3) conspiring to carry and use machineguns and destructive devices during and in relation to, and to possess machineguns and destructive devices in furtherance of, the drug trafficking offense charged in Count One, in violation of 18 U.S.C. §§ 924(o) and 924(c)(1)(B)(ii) (id., Count Three).  (See Feb. 19, 2020 Tr. (Dkt. No. 138) at 3-5, 27-29)

During the Rule 11 proceeding, Najera allocuted that between 2009 and 2014, in Honduras, he helped others "get clandestine[] air strips . . . in furtherance of drug trafficking," and that "[i]n the course of [his] relationship with those people, [he] always had a weapon with [him]."  (Id. at 22-23)  Najera went on to say that the weapon he carried was "a 223 rifle," and that the airstrips "he helped provide[] to drug traffickers" were protected by armed men carrying automatic weapons.  (Id. at 24)  Najera further stated that he carried the 223 rifle "to protect [him]self in connection with the drug trafficking [he] [was] engaged in," and that the men

guarding the airstrips "carr[ied] automatic weapons in order to protect the drugs that were at those airstrips." (Id.)

In his plea agreement, Najera stipulated that the offense charged in Count Three involved "rocket-propelled grenade launchers and rocket-propelled grenades used by the defendant's co-conspirators to provide security for cocaine shipments in which the defendant participated." (Plea Agmt. at 4) Najera also stipulated that he "used violence" in connection with the cocaine trafficking offense charged in Count One. (Id. at 3)

Najera also stipulated in his plea agreement to a two-level enhancement under U.S.S.G. § 3B1.3, because he "abused a position of public trust – to wit, his position as a diputado in the National Congress of Honduras, which is analogous to the position of a U.S. Congressman – in a manner that significantly facilitated the commission or concealment of the offenses [charged in Counts One and Three]." (Id. at 4-5)

Finally, Najera admits in his plea agreement that he "facilitated the importation into the United States of at least approximately 20,000 kilograms of cocaine in connection with the drug-trafficking offense charged in Count One of the [(S1)] Indictment."[2] (Plea Agmt. at 2)

## II.   THE DEFENDANT'S OBJECTIONS TO THE PSR

As discussed above, in a June 1, 2021 submission, Najera objects to the following factual statements in the July 30, 2020 PSR:

(1)    that he constructed the "Catacamas Airstrip" in the Olancho department of Honduras to receive drug shipments (June 1, 2021 Def. Sent. Br. (Dkt. No. 164) at 6, 9-10);

(2)    that he requested $100,000 to "fix" his own election (id. at 11);

---

[2]  Najera also allocuted to this fact at the February 19, 2020 plea hearing. (Feb. 19, 2020 Tr. (Dkt. No. 138) at 25-26)

(3)     that he requested $1 million from associates of the Sinaloa Cartel to be
         paid to Yani Rosenthal's presidential campaign (id. at 12);

(4)     that Najera's purpose in participating in a January 2014 meeting regarding
         the election of Oscar Najera as president of the Honduran National
         Congress was to protect his drug-trafficking activities (id. at 13); and

(5)     that he was involved in arms transactions involving rocket-propelled
         grenade launchers and machineguns.

(Id. at 9; see PSR (Dkt. No. 170) ¶¶ 51-52, 66-67, 82, 88, 93)[3]

        As to the airstrip, the Defendant denies that "he built and owned the [Catacamas]
airstrip to facilitate the so-called 'Cachete Shipment' alleged in the PSR." (Id. ¶¶ 51-52; June 1,
2021 Def. Br. (Dkt. No. 164) at 10)  According to Najera, the Catacamas airstrip was "built by
the United States to facilitate the transportation of weapons to the Contras in their fight against
the communist regime in Nicaragua." (Id. at 6)

        As to the PSR's assertion that the Defendant's 2013 "[re]election to the Honduran
Congress was rigged," Najera responds that there was "no need [for Najera] to 'fix' the election
as [he] received a greater number of votes than anyone in his party." (Id. at 11)

        With respect to soliciting the Sinaloa Cartel on behalf of Honduran presidential
candidate Yani Rosenthal, Najera denies that he "asked members of the Sinaloa Cartel for
approximately $1 million for Yani Rosenthal." (Id. at 12; PSR (Dkt. No. 170) ¶ 88)  Najera also
asserts that Cesar Gastelum – "the Sinaloa Cartel's representative in Honduras" – never

---

[3]  In a May 3, 2021 letter, Najera's counsel stated that he was "unaware of [certain] revised and
additional paragraphs" in the July 30, 2020 PSR at the time he submitted his November 23, 2020
sentencing brief.  (May 3, 2021 Def. Ltr. (Dkt. No. 159)  Accordingly, in a May 6, 2021 order,
this Court granted counsel's request to file a supplemental sentencing submission.  (Dkt. No.
160)  Najera filed his supplemental sentencing submission on June 1, 2021.  (Dkt. No. 164)  The
Court then directed the Probation Office to prepare a revised PSR that addressed objections
raised in the Defendant's original November 23, 2020 sentencing brief and in the Defendant's
June 1, 2021 supplemental sentencing submission.  (Dkt. No. 167)  A revised PSR was issued on
September 15, 2021.  (Dkt. No. 170)

mentioned this payment in a December 8, 2015 "debriefing" with the Government.  (June 1, 2021 Def. Br. (Dkt. No. 164) at 12)  According to Najera, Gastelum told the Government that the Sinaloa Cartel instead contributed to the campaign of Juan Orlando Hernandez, who won the 2013 Honduran presidential election.  (Id.; see PSR (Dkt. No. 170) ¶ 39)  Gastelum "ma[de] no mention of [] Najera or Yani Rosenthal in connection with the alleged political contribution." (June 1, 2021 Def. Br. (Dkt. No. 164) at 12)

As to the January 2014 meeting between Najera and others "regarding the nomination of Oscar Najera to [become] head of the Honduran congress" (id. at 13), Najera asserts that the recording of the meeting "reveals nothing worth noting," because "the conversation is of a political nature."  "[T]here is no quid pro quo discussion regarding the nomination of Oscar Najera," and no reference to "drug trafficking activities."  (Id.)

Finally, Najera contends that the Government's "claims of rocket propelled grenade launchers and machine guns are nothing more than a salacious effort to paint [him] as a violent individual."  (Id. at 9)

## III.   TESTIMONY AT THE *FATICO* HEARING

At the April 12 and 13, 2022 Fatico hearing, the Government called Alexander Monroy Murillo ("Monroy") to testify.  (Hearing Tr.[4] ("Tr.") at 4-5)  Najera did not call any witnesses.

### A.   Najera's Control of Airstrips in Olancho to Receive Cocaine Shipments

Monroy testified that he first met Najera in late 2008 at a ranch near the city of Catacamas within the Olancho department of Honduras.  (Id. at 7)  Monroy understood the ranch

---

[4] The Fatico hearing transcript is filed at Docket Numbers 205 and 207.  Citations to the hearing transcript refer to the pagination shown in the transcript.

to be owned by Najera.  (Id. at 7-8)  At the time, Monroy was affiliated with the Sinaloa Cartel, and worked for Cesar Gastelum trafficking cocaine.  (Id. at 8-9)  Gastelum sent Monroy to the ranch near Catacamas to determine if an airstrip located in or around the ranch could be used to traffic cocaine that would be transported in by plane from Apure, Venezuela.  (Id. at 13)  Monroy traveled to the ranch with three other associates of Gastelum – Kio, Cuache, and Dionisio Vera.  Upon arrival at the ranch, Monroy observed that the security consisted of six to ten men armed with automatic rifles.  A man named Neftali (a/k/a "Doctor") – another drug trafficker working with Gastelum – introduced Monroy to Najera.  Monroy understood that Najera was working in the drug trafficking business under Neftali.  (Id. at 14-16)

Najera drove Monroy and Dionisio Vera by truck to the airstrip.  Monroy observed that Najera had an AK-47 rifle on the front seat of the truck.  (Id. at 17)  During the five to ten-minute drive, Najera told Monroy that he had built the airstrip himself, and compacted the dirt in such a way as to ensure that planes loaded with cocaine could land there without problems.  (Id. at 16-17, 19)  At the entrance to the airstrip, Najera lowered the truck's window, and an armed guard said, "Welcome, Boss."  (Id. at 20)  Monroy observed two to three additional security guards at the airstrip; these men were armed with automatic weapons.  (Id. at 19)  In order to determine the airstrip's viability, Monroy and Vera measured its length, which came out to approximately 1,800 to 2,000 meters.  (Id. at 20)  Dionisio Vera told Najera that the airstrip was "well compacted" and in good condition, but that some tree branches could obstruct planes attempting to land.  Najera replied that the tree branches served to camouflage the airstrip, but that they would be cut back on the day that planes from Apure, Venezuela landed.  (Id. at 20-21)

Monroy later learned – from both Gastelum in early 2009 and Najera in 2012 – that cocaine shipments were delivered to Najera's airstrip near Catacamas.  (Id. at 23)  Najera told Monroy that in late 2008 or early 2009, a drug trafficker named Cachete – who worked for a Colombian paramilitary leader named Cuchillo – sent a Grumman plane loaded with between 1,000 and 1,500 kilograms of cocaine into the area around Catacamas.  (Id. at 24, 26-27)  En route to the airstrip, the plane flew over the town of Catacamas several times, drawing the attention of Honduran authorities.  (Id. at 24, 26)  Gastelum told Monroy that, as a result of this exposure, Najera's airstrip was not viable for future drug trafficking.  (Id. at 27-28)  Najera later told Monroy that Cachete's shipment was not worth the attention it drew from Honduran authorities, as Najera had expected Cachete to deliver 5,000 kilograms of cocaine, and not the 1,000 to 1,500 kilograms of cocaine that were actually delivered.  (Id. at 27)

Although Monroy did not personally use Najera's airstrip near Catacamas, he used other airstrips controlled by Najera to transport cocaine.  (Id. at 28)  For example, in April 2012, Monroy traveled with Gastelum by helicopter to a different ranch in the Olancho department owned by Najera.  (Id. at 29)  They met at this ranch with Najera, and the three men discussed Najera's compensation if he allowed Gastelum and Monroy to land planes loaded with cocaine at Najera's ranches in Olancho.  (Id. at 30)

In addition to the airstrips, Najera offered other services, including a private army – consisting of approximately one hundred men armed with rifles – to safeguard the cocaine upon arrival at the ranches.  (Id. at 30-31, 43)  Najera also offered to provide ground transportation for the cocaine from his ranches to Monroy and Gastelum's warehouses in the nearby city of San Pedro Sula, Honduras.  Najera also offered to provide information concerning

operations carried out by Honduran law enforcement, including those involving Drug

Enforcement Administration ("DEA") Black Hawk helicopters.  (Id. at 32)

Najera told Monroy and Gastelum that he had sources in the Honduran army who

could inform him when the DEA helicopters took off, and thus alert pilots flying cocaine into

Honduras from Apure, Venezuela.  (Id. at 33)  Najera also told Monroy and Gastelum that he

could control Honduran air traffic control radar, such that he could obtain information about

when cocaine-laden planes were detected, or have the radar turned off altogether.  (Id. at 34-36)

Najera further advised that he could control Honduran armed forces pilots tasked with

intercepting drug-loaded planes, such that he could delay their takeoffs or have them detoured to

give Monroy and Gastelum's planes time to land undetected at Najera's ranches.  (Id. at 35)

After the April 2012 meeting, Monroy and Gastelum sent a worker named Pelon

to assist Najera in building other airstrips in Olancho and La Mosquitia, Honduras.  (Id. at 36-37)

That same month, Monroy and Gastelum arranged for approximately 1,000 kilograms of cocaine

to be flown in two Cessna 206 planes from Apure, Venezuela to one of Najera's ranches in

Olancho.  (Id. at 37-38)  The Cessna 206 planes – which Monroy and Gastelum outfitted with

more powerful engines – were each loaded with approximately 500 kilograms of cocaine.  (Id. at

38-39)  While Monroy did not witness the arrival of the cocaine at the airstrip in Olancho, Najera

and Pelon both informed him of its arrival.  (Id. at 39)

Najera arranged for the cocaine to be transported by truck from the airstrip to a

warehouse controlled by Monroy and Gastelum in San Pedro Sula.  Monroy and Gastelum then

traveled to the warehouse to inspect the quality of the cocaine.  (Id. at 40)  That same day,

Monroy and Gastelum met Najera at a house in San Pedro Sula called "El Billiard," which they

used as an office to meet with Najera.  At El Billiard, Monroy and Gastelum paid Najera $1 million, which represented roughly 10 percent of the cocaine's value.  (Id. at 40-41)

Monroy further testified that, between April 2012 and the end of that year, he trafficked 15 to 20 tons of cocaine through Najera's airstrips in Olancho.  (Id. at 41)  Monroy personally paid Najera in American dollars for each of the shipments in 2012.  (Id. at 45)  Pelon, who was present at the airstrips for each shipment in 2012, told Monroy that Najera had more than one hundred men – armed with automatic rifles and RPGs – to safeguard the cocaine.  (Id. at 43-44)

Monroy further testified that in late 2012, he and Gastelum began using Bell 407 helicopters to traffic cocaine, because the Venezuelan Air Force had begun shooting down planes flying into Apure.  (Id. at 61-62)  Monroy explained that helicopters do not require landing strips, and because they fly relatively low they can avoid radar detection.  (Id. at 62-63)

In late April 2013, Monroy met with Najera at a house that Najera used as an office in Tegucigalpa, Honduras.  (Id. at 67-68)  At that meeting, Monroy offered Najera $900 per kilogram of cocaine for use of Najera's ranches for the helicopter shipments.  (Id. at 69)  Najera eventually agreed to assist Monroy, and between the middle of 2014 and March 2015, Najera received between 10,000 and 15,000 kilograms of cocaine by U.S.-registered helicopters on different ranches under his control in Olancho.  (Id. at 62, 72-73)

### B.     Najera's Request for Campaign Donations

Monroy testified that he and Gastelum contributed to Najera's campaign to be reelected congressman for the Olancho department of Honduras.  (Id. at 69-71)  At some point between mid-2013 and mid-2014, Monroy and Gastelum provided Najera with $200,000 in drug proceeds for his reelection campaign.  (Id. at 70, 180, 184)  On the day of the election, Najera

asked Monroy for an additional $100,000 to secure his reelection.  (Id. at 71)  Monroy

understood that Najera needed the $100,000 to bribe Honduran election officials.  Accordingly,

Monroy gave Najera the requested $100,000.  After seeing election returns showing that Najera

was losing, Monroy and Gastelum became worried, and contacted Najera.  Najera told them not

to worry, because he would be elected the following day.  (Id.)

        In return for these campaign contributions, Monroy believed – based on past

experience – that Najera would provide him and Gastelum with confidential information

regarding Honduran police operations targeting cocaine trafficking.  (Id. at 70)  In early 2013, for

example, Najera helped end a Honduran police raid on a ranch Najera had purchased for

Gastelum and Monroy to traffic cocaine.  Although the police initially seized $2 million at the

ranch, Najera arranged for the police to withdraw, so that Monroy and Gastelum could evacuate

their workers hiding at the ranch.  (Id. at 66-67)  Between mid-2014 and March 2015 – when

Najera was working with Monroy and Gastelum to coordinate shipments of cocaine by

helicopter – none of Monroy and Gastelum's shipments was intercepted by Honduran law

enforcement.  Monroy testified that Najera's control of the Honduran armed forces secured this

result.  (Id. at 72-73)

    **C.**    **Najera Arranges for the Sinaloa Cartel to Make a $1 Million**
               **Contribution to Yani Rosenthal's Presidential Campaign**

        Monroy testified that in or about 2012, Najera asked Monroy and Gastelum to

support Yani Rosenthal's candidacy in the Liberal Party primary for the Honduran presidential

election.  (Id. at 58-59)  Najera recommended that Monroy and Gastelum contribute $1 million

to Rosenthal's campaign, because if Rosenthal were elected, Najera, Monroy, and Gastelum

would receive confidential information regarding anti-drug trafficking operations by Honduran

law enforcement.  (Id. at 59-60)  Najera explained that this confidential information would allow

Monroy and Gastelum to guarantee that their cocaine shipments between South America and Honduras would arrive safely.  (Id. at 60)

Accordingly, in San Pedro Sula, Monroy gave Najera $1 million – in drug proceeds – as a contribution to Rosenthal's campaign.  Monroy testified that he paid Najera in two installments and in bundles of $100,000.  (Id.)  Najera later confirmed to Monroy that the $1 million had been delivered to Rosenthal.  (Id. at 61)

D.   **Najera's Arms Transactions**

Najera also engaged in arms transactions with Monroy.

For example, in 2012, Monroy asked Najera if he could obtain automatic rifles – either AK-47s or AR-15s – for drug traffickers in Apure, Venezuela who sent cocaine to Najera's ranches in Honduras.  (Id. at 45-46)  Najera obtained ten to twenty automatic rifles and sent the guns to the traffickers in Apure by way of a plane that had delivered cocaine in Olancho.[5]  Monroy paid Najera $1,500 to $2,000 for each rifle.  (Id. at 46-47)

Monroy also testified about Najera's acquisition of an RPG.  Najera sent Monroy a text message that contained images of an RPG with two grenades.  The RPG was being offered for sale in San Pedro Sula at a price of about $60,000.  (Id. at 50, 53-54)  The RPG offered for sale was an RPG-7 – or a "Chinese Cane."  This type of RPG has a tube between the detonator and tip that resembles a cane.  (Id. at 51-52)  Although Monroy was not interested in the RPG-7, he offered to provide Najera with the $60,000 necessary to purchase it.  (Id. at 55)  Najera accepted the offer, and Najera bought the RPG-7 and two grenades in San Pedro Sula.  (Id. at 56-

---

[5]  The rifles never arrived in Venezuela because the plane crashed near the Nicaraguan-Honduran border.  (Id. at 47)

57)  Monroy testified that Najera bought the RPG to safeguard cocaine shipments arriving in

Olancho at Najera's airstrips.  (Id. at 56)

### E.    The January 18, 2014 Meeting

At the Fatico hearing, the Government introduced a video recording and transcript

of a January 18, 2014 meeting regarding the election of Oscar Najera as president of the

Honduran National Congress.  (Id. at 147-48; GX 302-S, 302-T; Dec. 23, 2020 Govt. Sent. Br.,

Ex. A (Dkt. No. 156-1))  Monroy identified Najera in a screenshot of the video (Tr. at 74-75),

but did not further testify about this meeting.

## DISCUSSION

## I.    LEGAL STANDARD

At sentencing, disputed factual issues are resolved subject to the preponderance of

the evidence standard.  United States v. Ruggiero, 100 F.3d 284, 290 (2d Cir. 1996) (noting that

the Government has the burden to prove disputed facts at sentencing by a preponderance of the

evidence).

> [F]ederal sentencing statutes provide that the sentencing court, "in determining the
> particular sentence to be imposed, shall consider," inter alia, "the nature and
> circumstances of the offense and the history and characteristics of the defendant," 18
> U.S.C. § 3553(a)(1), and that "[n]o limitation shall be placed on the information
> concerning the background, character, and conduct of a person convicted of an offense
> which a court of the United States may receive and consider for the purpose of imposing
> an appropriate sentence," id. § 3661. "'[H]ighly relevant – if not essential – to [the]
> selection of an appropriate sentence is the possession of the fullest information possible
> concerning the defendant's life and characteristics.'  Allowing consideration of such a
> breadth of information ensures that the punishment will suit not merely the offense but
> the individual defendant."

United States v. Delacruz, 862 F.3d 163, 175 (2d Cir. 2017) (alteration in Delacruz) (quoting

Wasman v. United States, 468 U.S. 559, 564 (1984)).  Accordingly, in sentencing a defendant, a

district court may consider conduct to which a defendant did not plead guilty, as long as doing so

"does not increase either the statutory minimum or maximum available punishment."  United

States v. Ulbricht, 858 F.3d 71, 128 (2d Cir. 2017) (citing United States v. Stevenson, 834 F.3d

80, 85 (2d Cir. 2016); United States v. Ryan, 806 F.3d 691, 693-94 (2d Cir. 2015)).

II.    **ANALYSIS**

    A.    **Najera's Construction of the "Catacamas Airstrip"**
           **in Olancho to Receive Drug Shipments**

           In his June 1, 2021 sentencing submission, Najera objects to the PSR's assertion

that he built and controlled an airstrip near Catacamas to traffic cocaine. (June 1, 2021 Def. Br.

(Dkt. No. 164) at 9-10) Najera does not repeat this argument in his post-hearing submissions,

however (see May 2, 2022 Def. Br. (Dkt. No. 211); June 23, 2022 Def. Ltr. (Dkt. No. 214) at 2),

and he has offered no reason for this Court to reject Monroy's testimony on this point. Indeed,

the evidence offered at the Fatico hearing demonstrates that Najera built and controlled an

airstrip near Catacamas, and that he used that airstrip to traffic cocaine.

           Monroy testified that he visited an airstrip near one of the Defendant's ranches in

2008. (Tr. at 7-8) While driving to the airstrip, Najera told Monroy that he built the airstrip

himself, and that he compacted the dirt in such a fashion as to ensure that planes loaded with

cocaine could safely land on it. (Id. at 16-17) Monroy further testified that when he and Najera

arrived at the gate to the airstrip, a security guard said to Najera, "Welcome, Boss." (Id. at 20)

Najera also told Monroy about a shipment of approximately 1,000 to 1,500 kilograms of cocaine

he received at this airstrip from another drug trafficker named Cachete. (Id. at 24-25)

           Monroy's testimony concerning the Catacamas airstrip is corroborated by

Najera's plea allocution, in which Najera stated that – between 2009 and 2014 – he helped others

in Honduras "get clandestine[] air strips . . . in furtherance of drug trafficking." (Feb. 19, 2020

Plea Tr. (Dkt. No. 138) at 22-23) Moreover, Najera has not disputed portions of the PSR stating

that, in 2012, he "received 12 cocaine-filled planes at Najera-controlled airstrips in Olancho."

The PSR asserts that the planes were "sent by members of the Sinaloa Cartel," and that each plane "contained between 500 and 1,500 kilograms of cocaine."  (PSR (Dkt. No. 170) ¶ 61)

This Court finds by a preponderance of the evidence that Najera constructed and controlled an airstrip near Catacamas, Honduras, and that he used this airstrip to facilitate cocaine trafficking.  Accordingly, Najera's objection to Paragraphs 51 and 52 of the PSR is overruled.[6]

**B.      Najera's Request for $100,000 to "Fix" his Election**

In his June 1, 2021 sentencing submission, Najera objects to the PSR's assertion that he requested $100,000 from Monroy and Gastelum to bribe Honduran election officials and thus "fix" his election.  (June 1, 2021 Def. Br. (Dkt. No. 164) at 11-12)

Paragraph 82 of the PSR states:

> Around [2013], Najera was running for reelection and requested from Monroy Murillo approximately $200,000 for his campaign, which Monroy Murillo provided.  Najera later told Monroy Murillo, in substance and in part, that Najera lost the election but that if Monroy Murillo provided an additional $100,000, Najera could "fix" the election.  Monroy Murillo provided Najera with the $100,000 and Monroy Murillo later learned that Najera was announced as winning the election.

(PSR (Dkt. No. 170) ¶ 82)

Monroy testified that in mid-2013, Monroy and Gastelum provided Najera with $200,000 in drug proceeds for his campaign to be reelected as congressman for the Department of Olancho in Honduras.  On the day of the election, Najera requested an additional $100,000 from Monroy "to guarantee his reelection."  (Tr. at 69-71)  Monroy testified that he understood that Najera needed the $100,000 to bribe Honduran election officials to ensure he would win

---

[6]  Although Najera contends that the "so called Catacamas airstrip" is state-owned, located near the city of San Esteban, and was built by U.S. engineers (see June 1, 2021 Def. Br. (Dkt. No. 164) at 6, 9-10), there is no evidence supporting these allegations.

reelection.  (Id. at 71)  Monroy gave Najera the $100,000 he requested.  After news outlets reported that Najera was losing the election, Monroy and Gastelum became concerned and contacted Najera.  Najera told them not to worry, and that his election would be announced the following day.  (Id.)  Najera was in fact reelected.  (Id. at 71-72)

Najera contends that this Court should disregard Monroy's testimony on this point, because Monroy was inconsistent "regarding the location where . . . Najera received the alleged $200,000 political contribution."  (June 23, 2022 Def. Ltr. (Dkt. No. 214) at 5 (citing Tr. at 184))  On direct, Monroy testified that in "[m]id-2013" he and Gastelum "gave . . . Najera around $200,000 for his reelection," and did not specify a location for the pay-off.  (Tr. at 70)  On cross-examination, Monroy testified that the payment was made in "[l]ate 2013/early 2014, around those dates," and that Najera "picked up the money in San Pedro Sula."  (Id. at 184)  Monroy later testified that he did not "recall whether [Najera] came to receive [the $200,000] personally or sent someone else."  (Id. at 185)

Given that Monroy was testifying about an incident that took place eight or nine years ago, some uncertainty or inconsistency as to dates is not surprising.  As to Monroy's testimony regarding the location of the bribe, Monroy did not testify that he personally "delivered the money to [Najera]."  (Id. at 184)  Accordingly, he may not have been present for the payment to Najera.

Najera also argues that "there was no need to 'fix' the [2013] election [because] [he] received a greater number of votes than anyone in his party."  (June 1, 2021 Def. Br. (Dkt. No. 164) at 11)

But it matters not whether Najera in fact needed the money to bribe Honduran election officials.  The gist of Paragraph 82 of the PSR is that Najera extracted another $100,000 in drug proceeds from Monroy and Gastelum, telling them he would otherwise lose the election. The Court concludes that this fact has been proven by a preponderance of the evidence.

### C.      Najera's Request for $1 Million from the Sinaloa Cartel for Yani Rosenthal's Presidential Campaign

Najera asks this Court to reject Monroy's testimony that "Najera facilitated a $1 million payment between the Sinaloa Cartel and then Honduran presidential candidate Yani Rosenthal in 2012."  (May 2, 2022 Def. Br. (Dkt. No. 211) at 1; see June 23, 2022 Def. Ltr. (Dkt. No. 214) at 2)

Najera asserts that Monroy did not mention this payment to the Government in his initial debriefing on May 27, 2015, noting that this allegation is not reflected in the "typed DEA-6 memorializing th[e] meeting."  (May 2, 2022 Def. Br. (Dkt. No. 211) at 1)  Najera further complains that "the rough notes used by case agent SA Fraga to prepare the DEA-6" "do not bear the author's identity nor the date or time when the notes were prepared," and therefore the notes should not be considered by this Court.  (Id.)

Najera similarly complains that the payment for Rosenthal's campaign is not mentioned in the notes of Gastelum's December 8, 2015 proffer session with the Government. (Id. at 2; see May 27, 2022 Govt. Br., Ex. A (Dkt. No. 212))[7]  Given that "Monroy received and implemented instructions from Gastelum regarding . . . financial contributions," Najera contends that this Court should find that "Monroy manipulated his testimony" regarding the payment for Rosenthal's campaign.  (May 2, 2022 Def. Br. (Dkt. No. 211) at 1-2)

---

[7]  This exhibit was filed under seal.

The Government counters that although the DEA-6 report of the May 27, 2015 Monroy proffer session does not mention the payment to Rosenthal's campaign, the case agent's handwritten notes "file[d] as an attachment" to the report indicate that Monroy discussed this payment at that meeting. (April 19, 2022 Govt. Ltr., Ex. A (3505-33) (Dkt. No. 209) at 5 (agent notes reporting that Monroy "gave money for politics" and that "Cesar and Cuache gave money to Fredy Najera to Yani Rosenthal for . . . primary elections"))[8] While the agent's handwritten notes do not reflect the name of the author or the date the notes were prepared, the Government points out that "the substance of the handwritten notes and the DEA-6 report are generally consistent." The Government also represents that "the DEA [has] confirmed that th[e] handwritten notes are saved in the DEA's electronic files as an attachment to the typed DEA-6 memorializing the May 27, 2015 proffer." (May 27, 2022 Govt. Br. (Dkt. No. 212) at 8; see Tr. at 143-44) Finally, the Government has submitted reports indicating that Monroy discussed the $1 million payment to Rosenthal's campaign in other proffer sessions with the Government on November 30, 2018, January 13, 2022, April 4, 2022, and April 11, 2022. (April 19, 2022 Govt. Ltr. (Dkt. No. 209) at 1; see id., Exs. B-E)[9]

As for Gastelum's failure to mention a payment for Rosenthal's campaign at his December 8, 2015 proffer session, the Government responds that "Gastelum is not a witness . . . in this case and the notes of a single proffer session cannot fairly be compared to questioning under oath about a specific topic." (May 27, 2022 Govt. Br. (Dkt. No. 212) at 9) The Government further contends that "there is nothing about the [December 8, 2015] proffer notes that is directly inconsistent with [Monroy's] testimony." (Id.) Indeed, the DEA-6 report of

---

[8] This exhibit was filed under seal.
[9] These exhibits were filed under seal.

the December 8, 2015 proffer session says that Gastelum stated generally that he made "payments through intermediaries to various presidents during their candidacy for office" (May 27, 2022 Govt. Br., Ex. A (Dkt. No. 212) at 4), and "there is no statement in the DEA-6 . . . that Gastelum denied engaging in th[e] [Rosenthal] transaction." (May 27, 2022 Govt. Br. (Dkt. No. 212) at 9)

Najera's arguments concerning the DEA-6 report of Monroy's May 27, 2015 proffer session provide no basis for rejecting Monroy's account. There is no requirement that an agent's report be a verbatim account of notes taken at a proffer session. The agent's notes indicate that Monroy did in fact discuss the payment for Rosenthal's campaign at the May 27, 2015 proffer session, and Najera has not rebutted Monroy's testimony that he discussed the payment "not . . . only once, but on many occasions when [he] was interviewed by DEA agents and prosecutors." (Tr. at 118) The Court also accepts the Government's proffer that the "DEA confirmed that th[e] handwritten notes are saved in the DEA's electronic files as an attachment to the typed DEA-6 memorializing the May 27, 2015 proffer." (May 27, 2022 Govt. Br. (Dkt. No. 212) at 8; see Tr. at 143-44)

As to Gastelum's December 8, 2015 proffer session, the Court acknowledges that the DEA report regarding that proffer session makes no specific mention of a $1 million payment for Rosenthal's campaign. However, Gastelum stated generally at this proffer session that he made "payments through intermediaries to various presidents during their candidacy for office." (May 27, 2022 Govt. Br., Ex. A (Dkt. No. 212) at 4) Accordingly, Gastelum's account is

consistent with Monroy's account to the extent that Gastelum acknowledged making payments through intermediaries for presidential candidates. [10]

        In sum, the Court credits Monroy's testimony on this subject and finds by a preponderance of the evidence that Najera requested and facilitated a $1 million payment from the Sinaloa Cartel to Yani Rosenthal's campaign to become the Liberal Party nominee for president of Honduras.  Accordingly, Najera's objection to Paragraph 88 of the PSR is overruled.

### D.    Najera's Participation in a January 18, 2014 Meeting Regarding the Election of Oscar Najera as President of the Honduran National Congress

        The PSR asserts that Najera attended a January 18, 2014 meeting regarding the election of Oscar Najera as president of the Honduran National Congress, and that his purpose in attending this meeting was to protect his drug trafficking activities.  (PSR (Dkt. No. 170) ¶ 93) While the parties agree that the meeting's attendees discussed "the creation of a coalition to support Oscar Najera's . . . candidacy to become head [of the] Honduran Congress" (May 2, 2022 Def. Br. (Dkt. No. 211) at 3; May 27, 2022 Govt. Br. (Dkt. No. 212) at 9), Najera contends that "drug trafficking or repealing extradition laws [was] never a subject of discussion during the meeting."  (May 2, 2022 Def. Br. (Dkt. No. 211) at 2-3)  Najera further contends that "the government's claim that the participants [of the meeting] were discussing favorable treatment and protection from the recently elected President of Honduras, Juan Orlando Hernandez, is erroneous."  (Id. at 3)

---

[10] Najera also argues that "the government's decision to abstain from using Monroy's statements in its prosecution of Yani Rosenthal" "belie[s] the claim that Najera funneled drug proceeds for . . . Rosenthal's campaign."  (May 2, 2022 Def. Br. (Dkt. No. 211) at 2)  Rosenthal was sentenced in this District on December 15, 2017, however, and "the U.S. Attorney's Office in this District did not begin proffering [Monroy] until . . November 2018."  (May 27, 2022 Govt. Br. (Dkt. No. 212) at 9 (citing United States v. Yani Benjamin Rosenthal Hidalgo, Case No. 13 Cr. 413 (JGK) (Dkt. No. 265) (Dec. 20, 2017 Judgment))

In sentencing Najera, this Court will disregard the PSR's discussion of this January 18, 2014 meeting.  No witness testified as to the substance of the discussions at this meeting or the context in which the meeting took place.  Moreover, the transcript of the meeting makes no reference to drug trafficking activity.  (See GX 302-T)

Accordingly, Najera's objection to Paragraph 93 of the PSR is sustained.

**E.    Najera's Involvement in Arms Transactions**

In his June 1, 2021 sentencing submission, Najera asserts that he "was not involved in arms transactions involving [RPGs] and machine guns."  (June 1, 2021 Def. Br. (Dkt. No. 164) at 9)

Paragraph 66 of the PSR states that "[i]n 2012, Najera coordinated the purchase of approximately two rocket-propelled grenade launchers ("RPG-7") and four accompanying grenades at a cost of $20,000 per RPG-7 and $30,000 per grenade."  (PSR (Dkt. No. 170) ¶ 66) Paragraph 67 of the PSR states that "[i]n 2012, Najera sent approximately 20 machineguns, including AK-47s and AR-15s, on a plane from his airstrip to members of another drug-trafficking organization in Venezuela."  (Id. ¶ 67)

Monroy testified that in 2012, Najera obtained ten to twenty automatic rifles for Monroy, and that Najera put the guns on a plane that was returning to Apure, Venezuela after having delivered cocaine in Olancho.  (Tr. at 45-47)  Monroy paid Najera $1,500 to $2,000 for each rifle.  (Id. at 47)

As discussed above, Monroy also testified that Najera sent Monroy a text message that contained images of an RPG with two grenades.  The RPG was being offered for sale in San Pedro Sula at a price of about $60,000.  (Id. at 50, 53-54)  Although Monroy was not interested in buying the RPG-7, he offered to provide Najera with the $60,000 necessary to purchase it. (Id. at 55)  Najera accepted the offer, and Najera bought the RPG-7 and two grenades in San

Pedro Sula.  (Id. at 56-57)  Monroy testified that Najera bought the RPG to safeguard cocaine

shipments arriving in Olancho at Najera's airstrips.  (Id. at 56)[11]

          Accordingly, the Court finds by a preponderance of the evidence that Najera

purchased ten to twenty automatic rifles and an RPG to assist in his drug trafficking activities.

(See PSR (Dkt. No. 170) ¶¶ 66-67)  Paragraph 66 of the PSR will be amended to reflect Najera's

purchase of "one RPG-7 and two grenades, for a total price of $60,000."  (See Tr. at 53-57)

Paragraph 67 will be revised to reflect that Najera purchased "ten to twenty automatic rifles" for

drug traffickers in Apure, Venezuela, and that he "was paid approximately $1,500 to $2,000 per

firearm."  (See id. at 46-47)  Najera's objections to Paragraphs 66 and 67 of the PSR are

otherwise overruled.

## **CONCLUSION**

          Najera's objections to the PSR are sustained or overruled as set forth above.

Following sentencing, this Court will direct the Probation Office to make the necessary changes

to the PSR.

Dated:  New York, New York
       July 15, 2022

                          SO ORDERED.

                          _____
                          Paul G. Gardephe
                          United States District Judge

---

[11] Monroy's testimony regarding Najera's purchase of the RPG and the use of the RPG to
protect Najera's drug-trafficking activities is supported by the Defendant's admission in his plea
agreement that "rocket-propelled grenade launchers and rocket-propelled grenades [were] used
by [Najera's] co-conspirators to provide security for cocaine shipments in which [Najera]
participated."  (Plea Agmt. at 4)